ALLAN E. ANDERSON (SBN 133672)
allan.anderson@afslaw.com
ADAM D. BOWSER (*pro hac vice pending*)
adam.bowser@afslaw.com
ANDREA M. GUMUSHIAN (SBN 342528)
andrea.gumushian@afslaw.com
**ARENTFOX SCHIFF LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: 213.629.7400
Facsimile: 213.629.7401

Attorneys for Plaintiff
L'OCCITANE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L'OCCITANE, INC., | Case No. 2:24-cv-1103 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| v. | |
| Zimmerman Reed LLP; and 3,144 Of Its Purported Clients, | |
| Defendant(s). | |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff L'Occitane, Inc. ("L'Occitane"), for its Complaint seeking a Declaratory Judgment and Injunctive Relief against Defendant Zimmerman Reed LLP ("Zimmerman Reed") and its putative clients (collectively, the "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory and injunctive relief to stop the Defendants from manufacturing arbitration claims *en masse* by simply visiting L'Occitane's website (if at all), and then claiming their "privacy" was violated under the California Invasion of Privacy Act ("CIPA") – a Cold-War Era wiretapping law that is nearly identical to one recently invalidated by the Ninth Circuit on constitutional grounds. *See Project Veritas v. Schmidt*, 72 F.4th 1043 (9th Cir. 2023). More specifically, L'Occitane's claims arise under the First, Fifth, and Fourteenth Amendments to the Constitution of the United States, the Communications Decency Act, 47 U.S.C. § 230, and the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030.

2.     In addition, the Defendants' latest escalation in the weaponization of CIPA has crossed the line from pursuing the digital equivalent of setup slip-and-fall claims, to being an unlawful conspiracy to continue manufacturing frivolous arbitration claims after the Defendants have been unequivocally informed to cease and desist from their conduct.  L'Occitane respectfully asks for the Court's assistance to preliminarily enjoin the Defendants' actions, and put an end to these shakedown suits under this facially unconstitutional state penal law once and for all.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the First, Fifth, and Fourteenth Amendments to the Constitution of the United States, the Communications Decency Act (47 U.S.C. § 230), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030). This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

4.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)-(2) because

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 2 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

a substantial part of the events or omissions giving rise to the claims occurred in this district, the coordinated activity of the Defendants is centered in this district, and on information belief, Defendants overwhelmingly reside in the State of California, and for those that do not, they are asserting or threatening arbitration claims under California law for purported "violations" that allegedly "took place within one year … in California."

## **PARTIES**

5.     Plaintiff L'Occitane, Inc. is a New York corporation with its principal place of business in New York.

6.     Defendant Zimmerman Reed LLP is a law firm with an office in Los Angeles, California and clients that reside in this district and in other districts in the State of California.

7.     The remaining Defendants, who Zimmerman Reed purports are its individual clients, and who L'Occitane asserts are Zimmerman Reed's co-conspirators in these manufactured mass arbitration claims, are listed in Exhibit 1.

## **FACTUAL BACKGROUND**

**L'Occitane's Business and Website**

8.     Plaintiff L'Occitane is the U.S. operating company of its parent company, L'Occitane International S.A., incorporated under the laws of Luxembourg, and which specializes in sustainable beauty and personal care products, fragrances, and home products. The company celebrates and preserves the traditions of Provence, France in the products and services it offers.

9.     L'Occitane operates a website providing information and serving customers in the United States, which can be found at https://www.loccitane.com/en-us/ (the "Website").

10.     As a "Certified B Corporation," L'Occitane has a mission of helping to create a more equitable, inclusive, and regenerative economy. Thus, aside from its various products offered on the Website, L'Occitane also promotes actions and

policies through the Website to that end. For example, L'Occitane's "Reduce, Recycle, React" program minimizes waste through waste-reduction measures implemented in its factories and actions its customers can take. L'Occitane is also committed to ending animal testing for beauty products globally.

11. L'Occitane engages certain service providers to support the operation of its Website that are well known and widely utilized across the Internet, including Contentsquare, Google Analytics, and Forter – the three service providers that are at the center of the Defendants' arbitration demands.

12. L'Occitane engages the service provider Contentsquare to anonymously analyze a user's interaction with the Website. Anonymous data is collected, aggregated and analyzed by L'Occitane through the Contentsquare service, which provides L'Occitane with insight to inform potential changes to its Website for a variety of purposes.

13. Google Analytics is an extremely common analytics tool utilized by L'Occitane for statistical analysis to help L'Occitane understand the source of Website traffic, gauge the success of marketing campaigns, and discover patterns and trends in user engagement with the Website, including measuring potential fraud. Google Analytics is so common that Defendant Zimmerman Reed also has Google Analytics deployed on its own website, https://www.zimmreed.com/.

14. L'Occitane engages Forter solely to provide fraud prevention services. As an e-commerce platform, the Website is not immune from fraudulent, abusive, or otherwise illegal activity around transactions. Forter does not "track" Website user activity on the Website; the service identifies and blocks known and potentially new fraudsters with similar patterns of behavior.

15. Website visitors in California and other jurisdictions are immediately informed of L'Occitane's use of these cookies and other website technologies

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 4 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

through a pop-up window when they come to the Website for the first time (at least).[1]

16.    Website visitors are also provided the ability to control non-essential cookies through the "Manage Cookies Preferences" option that can be easily accessed via the "Cookie Settings" button conspicuously disclosed in this pop-up window, which further informs Website visitors in relevant part "[u]se of our website and any of our services represents your consent to the use of cookies and acceptance of our **Privacy Policy**.":



---

[1]    Website visitors that use Incognito Mode, or similar "do-not-track" settings, are provided this notice each time they visit the Website.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19       17.    Further, there are very limited areas on the Website where a visitor could

20   potentially "communicate" anything to L'Occitane; that is, forms where visitors can

21   submit their email address – immediately adjacent to a disclosure of L'Occitane's

22   Privacy Policy:

23
24
25
26
27
28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 6 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

18.    Notably, the services provided by Contentsquare, Google Analytics, and Forter do not even have access to, or "touch," the content of anything submitted through these forms. That is, L'Occitane employees can use Google Analytics or Contentsquare to track how many website visitors, on an *anonymized* and aggregate basis, used the form, but these services do not collect or otherwise have access to the email addresses that a Website visitor can submit through the form. *That* information – any actual email address submitted via the Website – is provided directly to L'Occitane.

19.    These common website tools noted above that L'Occitane uses gather information – on an *anonymous* basis – related to Website visitors' general interactions on L'Occitane's Website, such as pages viewed, scrolls, areas on the Website clicked, duration of visits, and other metadata associated with the general use of L'Occitane's Website.

20.    These website tools like Google Analytics are so common that ***Zimmerman Reed* itself uses the *same* third-party technologies on its website:**[2]

///
///
///
///
///

---

[2]    The screenshot below depicts the cookies and other tracking technologies deployed on Zimmerman Reed's website, www.zimmreed.com, as soon as one reaches its website, as of January 2024.  In other words, Google Analytics, represented by the "_ga" cookie, is deployed on a visitor's browser and begins collecting data immediately on the Zimmerman Reed website, and thus without regard to a website visitor's prior consent. In addition, the "Connect" tab on Zimmerman Reed's own website opens a new page with a "Contact Us" webform that requires name, email, and phone number and invites users to provide "comments." It is unclear how Zimmerman Reed can take the position that L'Occitane is somehow "aiding and abetting" the interception of "communications" without implicating itself for being engaged in the same "criminal" conduct.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 7 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF



21.    Unlike Zimmerman Reed, L'Occitane provides California residents with immediate notice of its cookie practices *and* the ability to easily reject non-essential cookies.

**L'Occitane's Terms and Conditions and Arbitration Provision**

22.    L'Occitane's Website Terms & Conditions ("Terms") expressly provide that the Terms "apply when **you purchase products** on our Websites and in Stores, including gift cards and e-gift cards ("Merchandise"), from L'Occitane. … **By placing an order** for Merchandise through loccitane.com/en-us or any L'Occitane-owned or affiliated Internet sites or Stores, … you accept these Terms of Use and agree to be bound by them."[3]

23.    Similarly, the Dispute Resolution provision applies "[i]n the event of any controversy, claim, action or dispute **arising out of or related to any transaction conducted on the Websites**, or the breach, enforcement, interpretation, or validity of this Agreement or any part of it ("Dispute")."[4]

24.    Further, for (legitimate) Disputes subject to the Terms, and assuming the other elements of contract formation are met, it is expressly a "condition

---

[3]    *See* https://www.loccitane.com/en-us/pages?fdid=terms-conditions#1 (emphasis added).
[4]    *Id.* (emphasis added).

precedent" to arbitration that "**the party** asserting the Dispute shall first try in good faith to settle such Dispute by providing written notice to the other party (by first class or registered mail) **describing the facts and circumstances (including any relevant documentation)** of the Dispute and allowing the receiving party 30 days in which to respond to or settle the Dispute."

**Zimmerman Reed's Mass Arbitration Threat**

25.     The dispute arose when Zimmerman Reed sent L'Occitane a letter dated September 6, 2023: a "Pre-Filing Notice of Dispute/ Confidential Settlement Communication." Zimmerman Reed stated, "We write at this time to inform you of the potential legal claims that approximately 2,250 of our clients. . . may present against you and to request the opportunity to discuss informal resolution prior to the formal filing of any claims." A copy of the September 6, 2023 letter is attached as Exhibit 2.

26.     In this form letter,[5] Mr. Christopher Nagakawa of Zimmerman Reed cited L'Occitane's Terms providing for "dispute resolution by arbitration," even though he did not identify a *single* party he claimed to represent, but rather referred generally to "approximately 2,250 of our clients" that "interacted on L'Occitane's

---

[5]     As Judge Bernal aptly observed in *Byars v. Hot Topic, Inc.*, No. EDCV221652JGBKKX, 2023 WL 2026994, at *5 (C.D. Cal. Feb. 14, 2023), another CIPA shakedown suit: "Initiating legitimate litigation generally requires a considerable expenditure of time: in order to establish jurisdiction and state a claim for relief, a plaintiff must plead specific facts arising out of a specific encounter with a specific defendant. As the saying goes, time is also money. So when the goal is to file as many lawsuits as possible in the least amount of time, it is far easier and cheaper to copy and paste a complaint over and over again, and to write the original template in such a way that hardly anything needs to be swapped out. … And surely, whatever one's views on the propriety of copying and pasting from boilerplate pleadings, there is a point at which all reasonable people should agree the practice has gone too far." Here too, Zimmerman Reed simply defined L'Occitane as "Respondent" at the beginning of its September 6 letter, and thereafter provided no tailored information in "Summary of the Claims." On information and belief, Zimmerman Reed has sent substantively identical letters to numerous other companies for the purpose of extracting settlements – based on conduct that Zimmerman Reed itself engages in.

website." Nor did he describe the facts and circumstances, including any relevant documentation, to substantiate any of the threatened CIPA claims under Sections 631 and 632.7, including when, what, and how each individual Claimant supposedly "communicated" with L'Occitane.

27.     On October 6, 2023, L'Occitane, through undersigned counsel, responded by letter to Zimmerman Reed's September 6 form letter. A copy of the October 6, 2023 letter is attached as Exhibit 3, and expressly incorporated by reference. Without limiting the foregoing, L'Occitane described how L'Occitane provided clear notice of its use of cookies and its Privacy Policy generally on the Website, as well as the merits (or lack thereof) of the threatened CIPA claims.

28.     L'Occitane also detailed the irreconcilable contradiction of the Defendants' position here, i.e., that the individual Defendants never agreed to the Terms, or L'Occitane's Privacy Policy, but they can still enforce the Terms against L'Occitane – while skipping the Informal Dispute Resolution obligation. On this latter issue, L'Occitane noted that "[t]his Informal Dispute Resolution provision is, by itself, a condition precedent to invoking the Arbitration Agreement. And here, you have not even identified *the party* – each individual person you claim to represent – let alone the actual *facts and circumstances* for *each* such individual *and* the supporting documentation showing *each* individual's supposed 'interaction' with the Website. Again, you cannot have it both ways: you cannot threaten to invoke the Dispute Resolution provision, and then ignore the first half of it. … To be clear, the Informal Dispute Resolution provision must be followed, on an individualized basis, so that L'Occitane can potentially resolve any issue *informally*, but also assess whether the complaint raised by each individual falls within the scope of a Dispute. And the 'information' provided in your demand letter makes it impossible to make this determination *in the aggregate*, let alone on the required individualized basis."

29.     In the October 6 letter, L'Occitane also instructed Zimmerman Reed and its clients (among others) that they were no longer authorized to access L'Occitane's

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 10 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

Website.

30.    On information and belief, the Defendants are continuing to access the Website, and Zimmerman Reed is knowingly encouraging its co-conspirator "clients" and co-defendants to do so without authorization for the express purpose of manufacturing the threatened CIPA claims in order to extract settlement payments from L'Occitane.

31.    On October 20, 2023, Mr. Nagakawa sent the letter attached as Exhibit 4 to counsel for L'Occitane that attached a list of 3,144 individuals Zimmerman Reed purported to represent, with no other information responsive to their threatened claims. Instead, Mr. Nagakawa simply wrote "[w]e understand from your letter of October 6, 2023 that … L'Occitane disputes all claims presented in our September 6 letter on the merits and has no further interest in discussing resolution of any Claimant's claims."

32.    By letter dated November 13, 2023, and sent to an address not associated with L'Occitane nor in compliance with the notice provision of L'Occitane's Dispute Resolution Provision, Zimmerman Reed purportedly notified L'Occitane that it had begun to commence mass arbitration with the AAA. A copy of this letter is attached as Exhibit 5.

33.    Zimmerman Reed initially filed 103[6] arbitrations of the approximately 3,144 threatened proceedings, in two separate "batches."

34.    Based on personal information provided by Zimmerman Reed in connection with the initial 103 claims filed with AAA, L'Occitane has no record of **over 90%** of these individuals ever purchasing anything from L'Occitane (or any other records). And of the 10 individuals L'Occitane could locate through their email addresses provided to AAA, 3 had engaged in transactions *after* L'Occitane sent the

---

[6]    Zimmerman Reed's 103 demands for arbitration appear to include two duplicate filings on behalf of the same two individuals, such that there are 101 unique individuals on whose behalf Zimmerman Reed filed otherwise identical arbitration demands.

1 October 6 cease-and-desist notice under the Computer Fraud and Abuse Act. For

2 example, one claimant made a purchase on December 28, 2023.

3      35.    On information and belief, L'Occitane reasonably suspects that

4 Zimmerman Reed and its "clients," both known and unknown, will continue to

5 manufacture purported CIPA claims and obtain information from the Website by

6 continuing to access the Website, despite being unequivocally informed that they no

7 longer are authorized to access the Website.

8      36.    On information and belief, Zimmerman Reed is knowingly directing and

9 conspiring with its purported clients to intentionally "record" information on or from

10 L'Occitane's Website, and their interactions on the same.

11      37.    By letter dated January 30, 2024, Defendant Zimmerman Reed

12 demanded that L'Occitane reimburse it $12,625 for the arbitration filing fees it

13 purports to have paid to AAA. Zimmerman Reed concluded this letter by demanding

14 L'Occitane pay this amount within 14 days, or by February 13, 2024. A copy of this

15 letter is attached as Exhibit 6.

16      38.    By letter dated February 2, 2024, AAA accepted the claims filed by

17 Defendant Zimmerman Reed and issued an invoice to L'Occitane in the amount of

18 $32,825.00 as the Initiation Fee for 101 individual proceedings to be paid by March

19 4, 2024. A copy of this letter is attached as Exhibit 7.

20      39.    Finally, by letter dated February 5, 2024, AAA notified counsel for

21 L'Occitane that AAA received an additional 1,980 individual consumer demands for

22 arbitration filed by Zimmerman Reed on January 31, 2024. A copy of this letter is

23 attached as Exhibit 8. Notably, over 150 of the individual Defendants included in

24 this round of mass arbitration filings are listed as residing in states other than

25 California, and it is unclear how such individuals could potentially avail themselves

26 of a *California penal* law that has no application to activity, if any, occurring entirely

27 outside the boundaries of California.

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 12 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

**STATUTORY FRAMEWORK**

40.     California has a first-in-the-nation, comprehensive privacy law that gives consumers rights and control over the personal information businesses collect about them – the California Consumer Privacy Act, as amended by the California Privacy Rights Act (herein referred to as the "CCPA").

41.     The CCPA purposely addresses how businesses can use consumers' information obtained online, what disclosures are required, and *when and how* such disclosures need to be made.

42.     And as to when and how, the CCPA requires businesses to provide notice to consumers that their personal information may be collected, *at or before* the point of that collection. *See* Cal. Civ. Code § 1798.100(a). In the section titled "Required Disclosures to Consumers" the CCPA regulations state, "[t]he privacy policy shall be posted online and accessible through a conspicuous link. . . using the word 'privacy' on the business's website homepage(s)." Cal. Code Regs. tit. 11, § 7011(d). Further, the regulations explain that the "Notice at Collection shall be made readily available where consumers will encounter it." Cal. Code Regs. tit. 11, § 7012(c). As the above screenshots of the Website make clear, this is precisely how L'Occitane complies with any potential obligation under the CCPA: "[w]hen a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all webpages where personal information is collected." Cal. Code Regs. tit. 11, § 7012(c)(1). With respect to the businesses' use of tracking technologies on websites, businesses typically effectuate the notice and opt-out requirement through the use of a pop-up consent banner displayed upon the first visit to the business's website.

43.     There is no contention here – nor could there be – that L'Occitane is not in compliance with any applicable requirements under the CCPA, the law that was enacted to specifically address online privacy issues and the larger Internet

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 13 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

ecosystem.

44.  Instead, L'Occitane is being threatened with mass arbitration by Defendants under a Cold-War-era penal law, the California Invasion of Privacy Act, which was enacted for the purpose of preventing "eavesdropping upon private communications" and "the invasion of privacy resulting from the continual and increasing use" of "modern listening devices." Cal. Penal Code § 630.

**CIPA SECTION 631**

45.  Here, Defendants are asserting in their mass arbitration claims that L'Occitane's use of the services provided by Contentsquare, Google Analytics, and Forter violates CIPA Section 631, which provides in relevant part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170.... Cal. Penal Code § 631(a).

> Notably, expressly exempted from this statute are:

> (1) Any public utility, or telephone company, engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility or telephone company.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 14 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

(2) The use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility. Cal. Penal Code § 631(b).

46.     The California Supreme Court has more concisely held that Section 631 protects against three types of harms: "[1] intentional wiretapping, [2] willfully attempting to learn the contents or meaning of a **communication in transit** over a wire, and [3] attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Tavernetti v. Superior Court*, 22 Cal.3d 187, 192 (1978) (emphasis added).

47.     For ease of reference, the following chart contains Section 631(a)'s statutory text next to the California Supreme Court's interpretation of the corresponding provision:

| Section 631 Statutory Text[7] | Cal. Supreme Court Interpretation[8] |
|---|---|
| Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, | (1) intentional wiretapping, |

---

[7]     Cal. Penal Code 631(a).
[8]     *Tavernetti v. Superior Court*, 22 Cal.3d 187, 192 (1978).

| **Section 631 Statutory Text**[7] | **Cal. Supreme Court Interpretation**[8] |
|---|---|
| or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; | (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, |
| or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to *unlawfully* do, or permit, or cause to be done any of the acts or things mentioned above in this section. | (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities. |

48.     Given CIPA's express purpose of preventing eavesdropping, Section 631 consistently "has been held to apply only to eavesdropping by a third party and not to recording by a participant to a conversation." *Warden v. Kahn*, 99 Cal. App. 3d 805, 811 (Ct. App. 1979); *see also Powell v. Union Pac. R. Co*., 864 F. Supp. 2d 949, 954 (E.D. Cal. 2012) (ruling that Section 631 applies **only** to "third party actions and therefore, as a party to the call, he **cannot be liable as a matter of law**"; further ruling by extension that a party to conversation **cannot "be liable** for aiding or

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 16 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

conspiring with a third party to enable that party to listen in on the call.") (emphasis added).

49.    Although it should be logically and legally impossible for a party to any communication to violate Section 631 under the precedent above, hundreds of coordinated complaints under CIPA have recently been filed against website operators in both federal and state California courts.  *See, e.g., Licea v. Caraway Home Inc.*, 655 F. Supp. 3d 954, 964 (C.D. Cal. 2023) ("The Ninth Circuit's unpublished decision in *Javier v. Assurance IQ*, 2022 WL 1744107 (9th Cir. May 31, 2022) appears to have **opened the floodgates for these cases**, an unfortunate unintended consequence of a brief, narrow ruling limited to the issue of prior consent.") (emphasis added).

50.    These coordinated Section 631 claims are predicated on the theories that website operators are either "wiretapping" their own websites, or "aiding and abetting" their technology and/or communications service vendors. For example, Defendants likewise assert that L'Occitane "violated the [non-existent] fourth prong of § 631(a) by employing and / or agreeing with the third-parties providing the tracking software to aid and assist in that process."

51.    Under this view, because website operators like L'Occitane did not build their own Internet or develop other features used on modern websites, their hiring of third parties to provide these services gives rise to CIPA liability.

52.    To prevent the criminalization of modern forms of web-based communications services and/or information services provided by third parties *because* they are "third parties," many courts read into Section 631 an "extension" exception.  That is, a "set of cases, led by Judge Beeler in *Graham v. Noom*, holds that software vendors … are 'extension[s]' of the websites that employ them, and thus not third parties within the meaning of the statute." *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 899 (N.D. Cal. 2023) (citing *Graham v. Noom*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021)) ("*Javier Remand Order*").

53.     In contrast, some courts, like Judge Breyer in the *Javier Remand Order*, interpret Section 631(a) as not being susceptible to a vendor "extension" exception. *Javier Remand Order*, 649 F. Supp. 3d at 899 ("reading a use requirement into the second prong would add requirements that are not present (and swallow the third prong in the process)."). On information and belief, *this* interpretation is one advanced by Defendants against L'Occitane – because in their view it is immaterial that L'Occitane's technology vendors and service providers are providing services on L'Occitane's behalf.

54.     With respect, however, these courts are effectively arguing over the *symptoms caused* by CIPA *only* favoring public utility communications, rather than the disease itself. That is, the fact that CIPA discriminates – unreasonably and unconstitutionally in L'Occitane's view – in favor of communications occurring over public utility networks, but does not afford the same exemption to modern information services providers.[9]

55.     Put differently, if a consumer called L'Occitane at its toll-free number and verbally provided their email address to a L'Occitane customer service representative over the phone, that "communication" would be exempt under Section 631(b) – because, again, Section 631(a) "shall not apply to" any "public utility, or telephone company, engaged in the business of providing communications services

---

[9]     To be clear, L'Occitane believes that most, if not all, of the individual Defendants did not "communicate" with L'Occitane through its website – in terms of communications that fall under CIPA. Rather, they appear to have to simply visited L'Occitane's website, in coordination with Zimmerman Reed on information and belief, and *perhaps* scrolled the website. L'Occitane does not have that information for at least two reasons. First, it does *not* track individual website visitors, but relies on anonymized and aggregated data concerning how website visitors generally interact with L'Occitane's website. Second, the Defendants did not provide L'Occitane individualized notice "describing the facts and circumstances (including any relevant documentation)" concerning their Dispute, which is a condition precedent (among other requirements) to formal arbitration under the Terms and Conditions the Defendants seek to weaponize against L'Occitane. *See* Informal Dispute Resolution, *available at* https://www.loccitane.com/en-us/pages?fdid=terms-conditions#11.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 18 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

and facilities" or the "use of any … service furnished and used pursuant to the tariffs of a public utility." Cal. Penal Code § 631(b)(1)-(2).

56. But under the Defendants' view *and* the view of some courts,[10] L'Occitane receiving that *same* information through a communications service provided by any vendor *other than* a public utility **would be committing a crime**, everything else being equal.

57. It is difficult to ascribe any limiting factors to this view of CIPA as applied to modern communications and information services. For instance, by some accounts there are over 130 million Gmail accounts in the US alone. Under Defendants' view, how are everyday users of Gmail not "aiding and abetting" Google from "intercepting" communications to which *Google* is not a party? Likewise, under the Defendants' view, wouldn't their Internet service providers be "learning the content of communications in transit on a wire" when consumers receive communications from others?[11]

58. Or even more apples to apples, how is Zimmerman Reed's decision to use Google Analytics in connection with its website *any different* than L'Occitane's

---

[10] To be fair to these courts, they have not considered the constitutional issues raised here. They also do not even appear to have considered the California Supreme Court's binding holding in *Tavernetti* that Section 631 is limited to three – and only three – clauses, such that there is not a free-roaming "aiding and abetting" cause of action against parties to the communication.

[11] To be clear, in L'Occitane's view, it is meritless to apply CIPA Sections 631 and Section 632.7 to modern Internet data exchanges. While it is facially absurd to assert, like Defendants do here, that mouse clicks, scrolls, etc. are even communications within CIPA scope, the data associated with these interactions is also ***encrypted in transit*** when using L'Occitane's website and the analytics services at issue, such that it is impossible to "learn" their contents *in transit on wire*. Nor would anyone (rationally) characterize the third-party service providers as "reading or learning" the contents of such data simply by virtue of the data being stored on their servers in the cloud – waiting for *L'Occitane* employees to access it. Point being, "reading or learning" the contents of communications is a quintessentially *human* process, and no person is remotely attempting to read or learn the content of data that is encrypted in transit.

use of the *same* service? Either Zimmerman Reed is tacitly conceding[12] that it too is unlawfully "aiding and abetting" Google – just as it is accusing L'Occitane – or the claims Zimmerman Reed is orchestrating are entirely unprincipled shakedowns.

**CIPA SECTION 632.7**

59.     Defendants have also threatened L'Occitane with claims under Section 632.7. This statute provides in relevant part that:

> Every person who, without the consent of all of the parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. …  Cal. Penal Code § 632.7(a).

60.     Section 632.7 has the same exclusions for public utilities, and use of public utility services, as Section 631 detailed above. *See* Cal. Penal Code § 632.7(b)(1)-(2).

61.     Section 632.7 was a later addition to CIPA. As one California court has detailed, this statute was introduced because "the author of the bill … was concerned that 'under [then] current law' [Section 632.6 passed in 1990], it [was] only illegal to 'maliciously' intercept a conversation transmitted between [cordless telephones]. There [was] no prohibition against recording a conversation transmitted between cellular or cordless telephones." *Granina v. Eddie Bauer LLC,* No. BC569111, 2015 WL 9855304, at *3 (Cal.Super. Dec. 2, 2015). In other words, the California

---

[12]     Think about just some of the implications of this position as applied to a law firm. Is Zimmerman Reed tacitly conceding it is disclosing attorney-client communications to Google without its clients' express consent? Are they at the very least ethically conflicted from representing their clients in these matters if zealous advocacy here would necessarily imperil Zimmerman Reed under a penal law?

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 20 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

Legislature was of the view that the older sections of CIPA did not apply to even newer forms of *telephone calls*.[13]

62.     As a result of this coverage gap, Section 632.7 was adopted to address an "**exclusive list** of five types of **calls** …: a communication **transmitted between** (1) two cellular radio telephones, (2) a cellular radio telephone and a landline telephone, (3) two cordless telephones, (4) a cordless telephone and a landline telephone, or (5) a cordless telephone and a cellular radio telephone. According to this list of included types of telephones, the communication **must have** a cellular radio or cordless telephone **on one side**, and a cellular radio, cordless, or landline telephone **on the other side**." *Montantes v. Inventure Foods*, No. CV-14-1128-MWF RZX, 2014 WL 3305578, at *4 (C.D. Cal. July 2, 2014) (emphasis added); *see also Byars v. Hot Topic, Inc.*, No. 22-1652-JGB-KKX, 2023 WL 2026994, at *11 (C.D. Cal. Feb. 14, 2023) (dismissing Section 631 claim because chat-service provider is extension of website operator, and dismissing Section 632.7 claim **with prejudice** because that statute "applies only to communications involving two telephones. Plaintiff admits that Defendant was not using a telephone").

63.     L'Occitane has no record that it ever communicated with any of the individual Defendants in a telephone-to-telephone conversation. The individual Defendants have never provided L'Occitane notice of any such telephone conversation(s), including the facts and circumstances surrounding any such conversation(s). And in fact, the Defendants' arbitration demands only refer to the Defendants visiting L'Occitane's Website. Still, Zimmerman Reed has threatened to pursue Section 632.7 claims against L'Occitane.

///

///

---

[13]     One can only imagine how the Legislature would react to Section 631 being applied to encrypted data exchanges over the Internet concerning anonymized website page views.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 21 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

**The Ninth Circuit Recently Found Oregon's Nearly Identical "Wiretapping" Statute To Be Facially Unconstitutional**

64.     The Ninth Circuit recently invalidated Oregon's substantially similar two-party consent "wiretapping" law in *Project Veritas v. Schmidt*, 72 F.4th 1043 (9th Cir. 2023).

65.     More specifically, the Ninth Circuit invalidated Oregon's wiretapping law on First Amendment grounds because, just like CIPA, "the rules imposed … vary depending on the activity being recorded." *Id.* at 1057.

66.     Oregon's law has nearly identical content-based exemptions as those contained in CIPA, and which were at the root of the Court of Appeals' analysis and conclusion that such content-based restrictions are facially unconstitutional:

| Oregon Revised Statute 165.540(5)(a) | Cal. Penal Code Section 633.5 |
|---|---|
| • The statute's prohibitions "do not apply to: (a) A person who records a conversation during **a felony that endangers human life**;" | • "Sections **631**, 632, 632.5, 632.6, and **632.7** do not prohibit one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of extortion, kidnapping, bribery, **any felony involving violence against the person** … . |

67.     CIPA has even more content-based exemptions, as there are additional statutory sections that favor certain recordings over others. *See, e.g.,* Cal. Penal Code §§ 633.1, 633.2, 633.6, and 633.8.

68.     While Defendants may argue that Sections 631 and 632.7 are ostensibly content neutral, Oregon Code Section 164.540(1)(c), the statutory section invalidated in *Project Veritas*, ***was also content neutral***. But it was the content-based exceptions in *other statutory* sections that led to Section 164.540(1)(c)'s invalidation – **just like CIPA is structured**. That is, CIPA Section 633.5 (among others) operates in an

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 22 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

indistinguishable manner to make Sections 631 and 632.7 *not* content neutral, and thus Defendants are attempting to enforce a facially unconstitutional statute against L'Occitane.

69.   The Ninth Circuit independently held Oregon's comparable law "is also not a valid time, place, or manner restriction because it does not leave open ample alternative channels for communication." *Project Veritas*, 72 F.4th at 1068.

70.   Likewise, as detailed above, CIPA's exemption of *only* public-utility services similarly does not leave open ample alternative channels for communication.

**47 U.S.C. § 230**

71.   The Communications Decency Act ("CDA"), 47 U.S.C. § 230, confers two broad immunities to providers of interactive computer services ("ICS"). Specifically, Section 230(c)(1) mandates that no ICS provider shall be treated as the publisher or speaker of the content supplied by a user. While particularly relevant here, Section 230(c)(2) separately immunizes an ICS provider for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected. 47 U.S.C. § 230(c).

72.   As the Seventh Circuit has ruled, "§ 230(c) as a whole makes [ICS providers] indifferent to the content of information they host or transmit: whether they do (subsection (c)(2)) or do not (subsections (c)(1)) take precautions, there is no liability under either state or federal law." *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 668-671 (7th Cir. 2008) (emphasis added).

73.   L'Occitane qualifies as a provider of an interactive computer service, as its website is an "information service … that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2). *See, e.g., Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1065 (C.D. Cal. 2002), *aff'd on other*

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 23 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

*grounds*, 339 F.3d 1119 (9th Cir. 2003) (holding that website operator was a provider of ICS because "many thousands of members are able to access and use a searchable database maintained on Defendants' computer servers."); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6, 1171-72 (9th Cir. 2008) (holding that "the most common interactive computer services," which are granted immunity under Section 230, "are websites").

74.     Fraud and spam detection practices have expressly been found to fall within Section (c)(2)'s good Samaritan protections, including by the Ninth Circuit: *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019) ("Congress wanted to give internet users tools to avoid not only violent or sexually explicit materials, but also harassing materials. Spam, malware and adware could fairly be placed close enough to harassing materials to at least be called 'otherwise objectionable' while still being faithful to the principle of *ejusdem generis*.").

75.     The CDA expressly preempts state laws that are inconsistent with it.  *See* 47 U.S.C. 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

76.     Many of the third-party technologies L'Occitane utilizes in connection with the provision of its website are for the purpose of detecting fraud and abuse. For example, the service provided by Forter is one of the three "tracking technologies" Defendants specifically complain about. Forter's *sole* purpose, however, is to detect and prevent fraudulent transactions.

///

///

///

///

///

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 24 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

# CLAIMS

# COUNT I

**Under *Project Veritas*, CIPA Sections 631 and 632.7 Unconstitutionally Discriminate In Favor Of Some Content In Violation Of The First Amendment**

77.     Plaintiff L'Occitane incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78.     Under California law, an individual may openly record certain types of communications under certain circumstances. However, that same person may not openly record other communications without specifically notifying the parties to the communication and obtaining their consent. Cal. Pen. Code §§ 630, 631, 633.5.

79.     For instance, CIPA "[does] not prohibit one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of extortion, kidnapping, bribery, any felony involving violence against the person. . ." Cal. Pen. Code § 633.5.

80.     Independently, CIPA is unconstitutionally discriminatory as applied because it expressly exempts content that is transmitted by only certain third-party service providers (public utilities), but everything else equal, makes unlawful the same functions as the data processors L'Occitane contracts with to assist with its Website based solely on their regulatory status, or lack thereof. Cal. Pen. Code § 631(b)(1).

81.     Specifically, Cal. Pen. Code § 631(b) expressly exempts "the services and facilities of the public utility" from the scope of CIPA, but does not exempt the services of information service providers. The only way CIPA can be considered constitutional today is if new entrants into the marketplace share the same protections as traditional public utilities, that is, if CIPA does not favor particular service providers over others. Sections 631 and 632.7, however, do expressly the opposite:

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 25 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

they favor traditional telecommunications service providers over competing information service providers, even if they would be transmitting the same type of information.

82. The California Invasion of Privacy Act operates as a grant of government permission for telecommunications service providers to openly "record" certain events without requiring subjects to be "specifically informed" or provide informed consent. In our everyday e-commerce environment, comparable Internet service providers and information service providers are not afforded this same favorable status, which leaves the application of CIPA to their same "communication" activities patently discriminatory.

83. By extension, and under the Defendants' view of CIPA, this criminalizes users of basic forms of modern communications based solely on whether their service providers are public utilities or not, everything else being equal.

84. The California Invasion of Privacy Act permits what is an impermissible divide by favoring communications occurring via traditional public utility networks over those occurring via modern e-commerce internet platforms. The law cannot be said to advance any interest in privacy in the twenty-first century because it selectively penalizes – without compelled speech – modern information services, without similarly encumbering activity occurring over public utility networks. Because of this, CIPA is unconstitutional on its face and as applied as discriminatory content restrictions on speech.

85. Further, as a "Certified B Corporation," L'Occitane promotes a more equitable, inclusive, and regenerative economy. L'Occitane's "Reduce, Recycle, React" program, described on the Website, aims at minimizing waste through waste-reduction measures implemented in its factories, and educating individuals about the same. L'Occitane's Website also espouses its stand against animal testing for beauty products and its values and commitment to supporting producers, respecting biodiversity and empowering women.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 26 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

86.     In *Citizens United*, the United States Supreme Court held that the government may not, under the First Amendment to the Constitution of the United States, suppress political speech on the basis of the speaker's corporate identity. *See Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 365 (2010). A portion of L'Occitane's activities is focused on policy advocacy, and certain speech on the Website, detailed above, is non-commercial in nature, addressing policy issues L'Occitane is concerned with. But given that L'Occitane also utilizes third-party supplied analytics tools on the policy advocacy portions of its Website, CIPA would – under Defendants' view – also criminalize political speech.

87.     L'Occitane seeks (1) declaratory relief that CIPA violates the First Amendment of the U.S. Constitution as an unlawful content restriction on speech, and (2) injunctive and equitable relief as is necessary to protect L'Occitane from Defendants' claims to the contrary.

## COUNT II

**Under *Project Veritas*, CIPA Is Also An Unconstitutional Time, Place And Manner Restriction On Speech In Violation Of The First Amendment Of The U.S. Constitution**

88.     Plaintiff L'Occitane incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

89.     Cal. Penal Code § 631 acts as a general rule forbidding the secret recording of any conversation unless all parties to it are specifically informed. As stated in Count I, the law exempts "the services and facilities of the public utility" from the scope of CIPA, but it does not also afford this right to the modern equivalent of traditional public utilities: internet service providers. Cal. Pen. Code § 632.6(b)(1).

90.     CIPA is suspiciously under and overinclusive in its permissions and restrictions. It is underinclusive because it allows the nonconsensual recording and/or services provided by one group of technology service providers (public utilities),

while denying a similar right to other technology service providers. It is overinclusive because it maintains a nearly all-out ban for any e-commerce service provider, besides traditional utility companies, from all forms of recording communications without obtaining informed consent.

91.     By denying third-party service providers the right to "record" "communications" in a nearly blanket fashion, California bans modern, law-abiding, e-commerce service providers from the ability to conduct their business. This goes too far, as these modern service providers are the equivalent of the "state of the art" telecommunications companies of 1967.

92.     Similarly, it makes little sense for other sections of CIPA, such as Section 632, to protect only "confidential" communications from recording at their destination without the consent of all parties, but then (ostensibly) protect *all* communications in transit, regardless of any expectation of privacy or confidentiality concerns.   This is particularly the case for the setup lawsuits that are currently flooding California courts, and which L'Occitane is now being threatened with through mass arbitration, that arise from "litigation testers" manufacturing "communications," if any, with out-of-state retailers over the public Internet.

93.     L'Occitane seeks (1) declaratory relief that CIPA is unconstitutional on its face as an unconstitutional time, place and manner restriction on speech in violation of the First Amendment of the U.S. Constitution, and (2) injunctive and equitable relief as is necessary to protect L'Occitane from Defendants' claims to the contrary.

## <u>COUNT III</u>

### CIPA Section 631 Is Void for Vagueness Under the Fifth and Fourteenth Amendments to the U.S. Constitution.

94.     Plaintiff L'Occitane incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 28 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

95.     Laws must give ordinary people fair notice of what conduct is being punished. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws that are too vague are unenforceable because they fail to establish standards for the public that are sufficient to guard against arbitrary enforcement. *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Further, principles of statutory interpretation require that acts of a legislative body receive uniform interpretation, regardless of whether the law is invoked in an administrative, civil, or criminal case. *See Clark v. Martinez*, 543 U.S. 371, 380 (2005); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

96.     To determine whether a statute is unconstitutionally vague, courts consider whether the law: (1) fails to provide a person of ordinary intelligence fair notice of what is prohibited; or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement. *See United States v. Williams*, 553 U.S. 285, 304 (2008).

97.     The Due Process Clauses of the U.S. Constitution forbid federal and state governments from punishing someone without first affording them "due process of law." U.S. Const. amends. V, XIV. As the Supreme Court explained in *United States v. Davis*, "[in] our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). To punish conduct as criminal, a statute must afford "ordinary people" fair notice of what the law makes a crime. *Id*. A criminal law fails to meet this standard when it is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

98.     CIPA is a criminal statute within the California Penal Code providing criminal punishments for those who violate its various sections, including significant jail time, as well as potentially uncapped statutory damages that implicate Eighth Amendment concerns. *See, e.g.*, Cal. Pen. Code §§ 631, 632.7 (detailing the extent

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 29 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

1   of the punishments available for the crimes described in those sections).

2   99.   CIPA is hardly a model of clarity required for a statute to survive

3   scrutiny under the vagueness doctrine. Any exercise in statutory interpretation must

4   start with the text of the written law, using the ordinary presumption that a legislature

5   "says in a statute what it means and means in a statute what it says there." *Connecticut*

6   *Nat. Bank v. Germain*, 503 U.S. 249, 253-53 (1992). Further, when interpreting

7   statutes, "[courts] begin with the plain, commonsense meaning of the language used

8   by the Legislature [and if] the language is unambiguous, the plain meaning controls."

9   *People v. Johnson*, 57 Cal. 4th 250, 260 (2013). Unfortunately for CIPA, its language

10  and scope are ambiguous and any attempt at a "plain meaning" fails to control.

11  100.   Even courts admit that what constitutes a protected communication

12  within the scope of CIPA lacks any clarity and its plain meaning within the statute is

13  not evident. *See, e.g., Greenley v. Kochava, Inc.*, No. 22-CV-01327-BAS-AHG, 2023

14  WL 4833466, at *16 (S.D. Cal. July 27, 2023) ("The statute does not provide clarity

15  on the definition of 'contents,' and **so courts have penciled in a dividing line**.")

16  (emphasis added). By definition, if courts are forced to "pencil in" the meaning of

17  key terms in CIPA to provide guardrails, CIPA is necessarily too vague.

18  101.   It is not only "contents" that prove fatally vague; CIPA is replete with

19  vague terms that confuse its purpose and provide encouragement to Defendants who

20  attempt to weaponize an unconstitutional statute against a compliant business and

21  obtain seriously discriminatory enforcement.

22  102.   For example, the scope of "persons" even subject to CIPA seemingly

23  depends on what section is at issue. The California Legislature has defined a "person"

24  subject to the Penal Code to **only** embrace "a corporation as well as a natural person,"

25  and has not *generally* updated the Penal Code to include additional forms of

26  businesses, such as LLCs, within the Code's overall scope. *See* Cal. Pen. Code § 7.

27  Based on this limited scope, the California Court of Appeal previously interpreted

28  the Penal Code as *not* applying to business forms that were *not* corporations. *People*

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 30 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

1   *v. Schomig*, (1925) 74 Cal.App. 109, 113 (holding that "no mention is made of

2   copartnerships" and it was a "fact that the copartnership itself **as a separate entity**

3   **may not be punished**" and further holding that only natural persons in their

4   individual capacities could be liable given Penal Code Section 7's limited scope).

5   103.   Notably, the California Legislature *has* updated *other* CIPA statutory

6   sections to include certain business forms within the scope of "persons" subject to

7   those *particular* sections. For example, Section 632 provides in relevant part that

8   "[*f*]*or the purposes of* **this section**, 'person' means an individual, business

9   association, partnership, corporation, limited liability company, or other legal entity."

10   Cal. Pen. Code § 632(b) (emphasis added). Clearly, the Legislature knows how to

11   broaden the scope of entities subject to CIPA – *if* it wishes to do so.

12   104.   It is a basic tenet of statutory interpretation that the Legislature is

13   presumed to intend a distinction when it uses particular language in one section but

14   excludes it in another. *See, e.g., People v. McCallum* (2020) 55 Cal. App. 5th 202,

15   212. The inconsistent definition of "person" throughout the statute makes the statute

16   unenforceable as it does not allow a business like L'Occitane to clearly understand

17   whether or not the law applies to it – such as here when L'Occitane is accused of

18   "aiding and abetting" an LLC (Google) or a French SAS (Contentsquare) that are not

19   "persons" capable of violating either Sections 631 or 632.7. This is a violation of the

20   due process clauses under the Fifth and Fourteenth Amendments to the U.S.

21   Constitution.

22   105.   If Defendants intend to enforce a Cold War-era telephone wiretapping

23   criminal statute against a modern website operator for the activities of its service

24   providers, they cannot rely on an antiquated law that has failed to keep up with the

25   times. As a result, it is unclear whether L'Occitane is "aiding and abetting" "persons"

26   covered by the statutory sections at issue. If the target of the litigation cannot

27   ascertain, as an "ordinary person," whether it is covered by the law, the state of

28   California cannot provide the business with due process of law and the statute must

1    be void for vagueness.

2    106.   L'Occitane seeks (1) declaratory relief that CIPA Sections 631 and

3    632.7, and by extension Defendants' actions attempting to enforce an

4    unconstitutional law against L'Occitane, violate the Fifth and Fourteenth

5    Amendments of the U.S. Constitution, and (2) injunctive and equitable relief as is

6    necessary to protect L'Occitane from Defendants' conduct in violation of the Fifth

7    and Fourteenth Amendments of the U.S. Constitution.

8

9                              **COUNT IV**

10   **Defendants Did Not Enter an Agreement with L'Occitane**

11   107.   Plaintiff L'Occitane incorporates by reference the allegations contained

12   in all preceding paragraphs of this complaint.

13   108.   The basic fundamentals of a legally binding contract are that it must

14   include an offer outlining what is going to be provided, an acceptance of that offer,

15   and consideration, or something of value exchanged between the parties.

16   109.   L'Occitane must have necessarily made an offer to Defendants as a

17   condition precedent of any binding contract between the parties, which is not possible

18   by Defendants' own admission. Indeed, Zimmerman Reed has admitted that the

19   individual Defendants never had any knowledge of any purported "offer" by

20   L'Occitane, but rather that Zimmerman Reed attorneys *later* "reviewed the Terms &

21   Conditions to determine the appropriate forum and procedures for dispute resolution

22   and Claimant now understands that there is a clause requiring dispute resolution in

23   arbitration before AAA."

24   110.  L'Occitane did not invite acceptance to its Terms by attorneys

25   manufacturing mass arbitration and claiming to later "review" L'Occitane's Terms.

26   111.  Rather, the Terms invite acceptance "[b]y placing an order for

27   Merchandise through loccitane.com/en-us or any L'Occitane-owned or affiliated

28   Internet sites or Stores. . .  you accept these Terms of Use and agree to be bound by

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

them." The overwhelming majority – in excess of 90%, based on L'Occitane's investigation into the initial 103 claims filed with AAA – never placed an order for Merchandise through the Website, also resulting in no consideration to L'Occitane.

112.    Further, a significant percentage of the remainder only placed orders to fraudulently generate a setup CIPA claim in coordination with Zimmerman Reed – after being informed they were no longer authorized to use the Website, making any agreement voidable by L'Occitane.

113.    L'Occitane seeks (1) declaratory relief that L'Occitane and Defendants have not entered an agreement, and (2) injunctive and equitable relief as is necessary to protect L'Occitane from Defendants' claims to the contrary.

## **COUNT V**

### **Even If Defendants Did Enter an Agreement with L'Occitane, Defendants Have Not Satisfied the Informal Dispute Resolution Process**

114.    Plaintiff L'Occitane incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

115.    Even if individual Defendants are able to establish that the three elements of offer, acceptance, and consideration have been satisfied, and that they did not fraudulently engage in transactions on the Website solely for purposes of generating bogus CIPA claims, Defendants did not satisfy the Informal Dispute Resolution process that is a condition precedent to arbitration.

116.    L'Occitane's Website Terms provide the rules for any informal dispute resolution process are as follows: "In the event of any controversy, claim, action or dispute **arising out of or related to any transaction conducted on the Websites**, or the breach, enforcement, interpretation, or validity of this Agreement or any part of it ("Dispute"), **the party** asserting the Dispute shall first try in good faith to settle such Dispute by providing written notice to the other party (by first class or registered mail) **describing the facts and circumstances** (including any relevant

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 33 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

documentation) of the Dispute and allowing the receiving party 30 days in which to respond to or settle the Dispute."

117.  This informal dispute resolution provision is, by itself, a condition precedent to invoking the Arbitration Agreement in the Terms. The Terms state, "**To the extent you cannot resolve any Dispute through the informal dispute resolution procedure described above**, a Dispute shall be resolved through binding individual arbitration ("Arbitration Agreement")."

118.  The facts and circumstances surrounding each individual claim and the supporting documentation showing each individual's supposed interaction with the Website has not been provided. Defendants have further indicated that they do not plan to provide such information. Defendants' letter dated September 6, 2023 does not satisfy this requirement, and they have never cured this deficiency.

119.  Based on the foregoing, L'Occitane seeks (1) declaratory relief that Defendants have not satisfied the informal dispute resolution process, and (2) injunctive and equitable relief as is necessary to protect L'Occitane from Defendants' claims to the contrary.

## COUNT VI

**Preemption of CIPA Pursuant to the Communications Decency Act
47 U.S.C. § 230**

120.  Plaintiff L'Occitane incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

121.  Through its operation of its Website, L'Occitane provides an interactive computer service, in that L'Occitane provides information services – including, but not limited to, the publishing of electronic content and the ability of multiple website visitors to retrieve such information via the Internet from L'Occitane's server(s).

122.  L'Occitane utilizes the services of various technology vendors in connection with its website that are used in good faith to detect and/or deter fraud,

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 34 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

harassing conduct and use of its website, and/or otherwise objectionable material and conduct on its website.

123.   The services provided by Forter, for instance, are used by L'Occitane exclusively for fraud prevention and protection.

124.   The services provided by Google Analytics and Contentsquare also allow L'Occitane to collect (anonymized and/or aggregate) data concerning Website visitor interactions on the Website, which data can be and is used by L'Occitane to improve its Website, cybersecurity defenses, and/or similarly detect fraudulent or otherwise objectionable activities conducted by potential bad actors on L'Occitane's Website.

125.   Defendants seek to penalize and hold L'Occitane liable under CIPA for L'Occitane's actions above that L'Occitane voluntarily utilizes in good faith to restrict access to material and/or conduct that L'Occitane considers harassing or otherwise objectionable.

126.   The Communications Decency Act provides in relevant part that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

127.   To the extent that CIPA Sections 631 and Section 632.7 survive Constitutional scrutiny and/or are held to be enforceable as a general matter, Defendants' actions to hold L'Occitane liable under CIPA under these facts are in violation of, and preempted by, the Communications Decency Act.

128.   L'Occitane seeks (1) declaratory relief that Defendants' actions violate the Communications Decency Act, and (2) injunctive and equitable relief as is necessary to protect L'Occitane from Defendants' conduct in violation of the Communications Decency Act.

///

///

///

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 35 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

## COUNT VII

### Violation of Computer Fraud and Abuse Act
### 18 U.S.C. § 1030

129.   Plaintiff L'Occitane incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

130.   L'Occitane's computers and servers are involved in and affect interstate and foreign commerce, and are protected computers under 18 U.S.C. § 1030(e)(2).

131.   Zimmerman Reed sent a form demand letter to L'Occitane on September 6, 2023, claiming that "approximately 2,250 of [its] clients … may present" claims against L'Occitane under Sections 631 and 632.7 of CIPA.

132.   On October 6, 2023, counsel for L'Occitane provided the following notice to the Defendants:

> L'Occitane notifies you here that anyone associated with your firm, firms you are working with on these matters, any and all undisclosed clients, Claimants, or any other individuals you represent now or in the future, **are no longer authorized to visit or view the L'Occitane Website, https://www.loccitane.com/,** as well as any webpages located at this domain. Please instruct your clients, employees, agents, contractors and co-counsel that they should cease and desist from any attempt to access the foregoing website, provide any information to L'Occitane, or otherwise attempt to set up any lawsuit against L'Occitane or its affiliate companies, under CIPA or otherwise.

133.   On October 20, 2023, Zimmerman Reed sent to counsel for L'Occitane a spreadsheet containing the first and last names of approximately 3,144 "clients represented by Zimmerman Reed ('Claimants') who intend to advance the claims asserted in the September 6 letter."

134.   In other words, Zimmerman Reed and its clients manufactured approximately 1,000 more purported CIPA claims against L'Occitane compared to Zimmerman Reed's initial form demand letter.

135.   Based on the very limited number of putative Claimants who L'Occitane could ascertain in its business records – such as by cross-referencing email addresses

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 36 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

submitted through L'Occitane's website against data submitted with AAA filings – L'Occitane could see that a substantial percentage of this limited subset of putative Claimants were attempting to manufacture CIPA *after* L'Occitane's October 6, 2023 notice detailed above.

136. For example, one of the Defendants who L'Occitane believes to be named Veronica Eshelby registered on L'Occitane's website by submitting her email address on October 11, 2023. And as far as L'Occitane can discern, she did not do anything else on the website, such as purchase anything.

137. Thus, on information and belief, Ms. Eshelby accessed L'Occitane's website *after* L'Occitane provided unequivocal notice that she was not authorized to do so, and she did so for the purpose of manufacturing a CIPA claim against L'Occitane.

138. By doing so, Ms. Eshelby obtained information from a protected computer that she was not authorized to access.

139. On information and belief, numerous other Defendants accessed L'Occitane's website and obtained information from L'Occitane's protected computer after being expressly informed through Zimmerman Reed that they were not authorized to do so. For example, another claimant made a purchase on December 28, 2023, months after being on notice not only of L'Occitane's privacy practices, but also that she was no longer authorized to access the Website.

140. On information and belief, Zimmerman Reed through its attorneys, employees, and agents, continued to access L'Occitane's website, and conspired with the other Defendants to access L'Occitane's website, to obtain information from L'Occitane's protected computer, after being expressly informed that they were not authorized to do so.

141. Defendants have engaged in a civil conspiracy to commit the above-described activities in order to knowingly and willfully manufacture putative CIPA claims and other potential claims for the purpose of extorting an *in terrorem*

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 37 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

settlement or other monetary payment(s) from L'Occitane, and have communicated threats to continue accessing L'Occitane's website without authorization and with the intent to continue manufacturing extortionary CIPA claims.

142.   Defendants have knowingly and willfully engaged in the above-described activities to cause L'Occitane damages.

143.   L'Occitane has suffered, and continues to suffer, damages and loss by reason of these violations, including, without limitation, harm to L'Occitane's content, computer systems, and increased data storage costs, expenses, including attorneys' fees and lost employee time associated with being forced to investigate the unauthorized access and abuse of its computers and servers, and other losses and damage in an amount to be proven at trial, and well in excess of $5,000 aggregated over a one year period.

144.   In addition, L'Occitane has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate it for injuries inflicted by Defendants.

145.   L'Occitane seeks (1) declaratory relief that Defendants' actions are in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, (2) injunctive and equitable relief as is necessary to protect L'Occitane from Defendants' conduct in violation of the Computer Fraud and Abuse Act, and (3) L'Occitane's damages, including its reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

Wherefore, L'Occitane prays for the following relief:

1.   A declaratory judgment that CIPA Sections 631 and 632.7 are unconstitutional content-based restrictions on speech.

2.   A declaratory judgment that CIPA Sections 631 and 632.7 are unconstitutional time, place, and manner restrictions on speech.

3.   A declaratory judgment that CIPA Section 631 is void for vagueness.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 38 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

4.      Preliminary and permanent injunctive relief enjoining enforcement of CIPA against L'Occitane by restraining Defendants, their employees, representatives, agents, and all persons or entities acting in concert with them during pendency of this action and thereafter perpetually from asserting claims under CIPA arising under the same facts and circumstances against L'Occitane.

5.      In the alternative, to the extent CIPA is held to be constitutional and enforceable, and that the use of a Google Analytics implicates CIPA, a declaration that Zimmerman Reed's use of Google Analytics violates CIPA, Zimmerman Reed has unclean hands, and/or such further relief that the Court feels is warranted as a result of Zimmerman Reed engaging in conduct that it accuses others as being criminal.

6.      A declaratory judgment that L'Occitane has not formed an agreement, to arbitrate or otherwise, with the Defendants, or in the alternative, if any agreements exist between L'Occitane and particular individual Defendants (to the extent such individuals can prove the existence of a valid contract on an individual basis), that such individuals are in breach of the Informal Dispute Resolution provision of L'Occitane's Terms, and award L'Occitane its damages resulting from such breach.

7.      Preliminary and permanent injunctive relief that (a) restrains all Defendants, their employees, representatives, agents, and all persons or entities acting in concert with them during pendency of this action and thereafter perpetually from seeking to compel L'Occitane to arbitrate any claim with the foregoing individuals, and (b) stays all arbitration proceedings during pendency of this action.

8.      Preliminary and permanent injunctive relief that restrains all Defendants, their employees, representatives, agents, and all persons or entities acting in concert with them during pendency of this action and thereafter perpetually from accessing L'Occitane's Website.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 39 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

9.     An award to L'Occitane of restitution and damages, including, but not limited to, liquidated, compensatory, statutory, treble damages, and punitive damages, as permitted by law.

10.    Plaintiff's reasonable costs and attorney's fees pursuant to the Computer Fraud and Abuse Act or any applicable statute or authority, and further relief the Court may grant in its discretion.

11.    And any other relief that the Court deems just and appropriate.

Dated: February 8, 2024                    **ARENTFOX SCHIFF LLP**

By:*/s/Allan E. Anderson*
        Allan E. Anderson
        Adam D. Bowser
        Andrea M. Gumushian
        Attorneys for Plaintiff
        L'OCCITANE, INC.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

Case No. 2:24-cv-1103

- 40 -

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF