1  CALEB L. MARKER (SBN 269721)
      caleb.marker@zimmreed.com
2  ZIMMERMAN REED LLP
   6420 Wilshire Blvd, Suite 1080
3  Los Angeles, CA 90048
   (877) 500-8780 Telephone
4  (877) 500-8781 Facsimile
5
   *Attorneys for the Claimants*
6  *Appearing Specially for this Motion*
7
8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| L'OCCITANE, INC., | Case No. 2:24-cv-01103-PA-RAO |
| Plaintiff, | *Assigned to the Honorable Percy Anderson* |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE CLAIMANTS' MOTION TO COMPEL ARBITRATION** |
| Zimmerman Reed LLP; and 3,144 Of Its Purported Clients, | |
| Defendant(s). | Date:          April 1, 2024<br>Time:          1:30 P.M.<br>Courtroom:   9A |
| | Complaint Filed: February 8, 2024<br>Trial Date:       TBD |

1

# TABLE OF CONTENTS

2  I.    INTRODUCTION...................................................................................... 1

3  II.   BACKGROUND......................................................................................... 3

4        A.    The Parties ..................................................................................... 3

5              1.  Claimants ............................................................................ 3

6              2.  Plaintiff L'Occitane, Inc. ................................................... 3

7        B.    L'Occitane's Website ..................................................................... 4

8        C.    The Arbitration Agreement............................................................ 6

9        D.    L'Occitane and Claimants Agree to the Arbitration Agreement ................. 7

10       E.    Claimants Initiated the Informal Dispute Resolution Procedure Under the

11             Arbitration Agreement.................................................................... 8

12       F.    Proceedings To Date in AAA. ....................................................... 9

13       G.    L'Occitane's Complaint filed in This Court ............................... 11

14 III.  STANDARD OF REVIEW ..................................................................... 12

15 IV.   LEGAL STANDARD.............................................................................. 12

16 V.    ARGUMENT ........................................................................................... 14

17       A.    L'Occitane and Claimants Entered into a Contract to Resolve the Claims at

18             Issue Only in Arbitration. ........................................................... 14

19             1.  The Parties Agreed to Arbitrate Their Claims. ................... 14

20                 (a) Consent or Assent........................................................ 15

21                 (b) Consideration.............................................................. 18

22             2.  The Parties Also Agreed Not to Consolidate Claims. ......... 19

23       B.    The Terms Falls Under the Scope of the FAA ........................... 20

24       C.    The Arbitration Agreement Clearly and Unmistakably Delegates All

25             Questions of Arbitrability to The Arbitrator............................... 20

26             1.  Presence of a Delegation Clause in the Arbitration Agreement Means All

27                 Questions of Arbitrability Are for the Arbitrator ................ 21

28

2. In the Alternative, L'Occitane's Claims Fall Within the Scope Of the Arbitration Agreement .................................................................................. 22

D.    L'Occitane's Claims Against Claimants Should Be Dismissed. ............... 25

VI.    CONCLUSION .................................................................................................. 25

MEM. OF POINTS AND AUTHORITIES ISO CLAIMANTS' MOTION TO COMPEL

1

**TABLE OF AUTHORITIES**

2

Page(s)

**Cases**

3

4
*Ahern v. Fiserv, Inc.*,
   No. 23-cv-07753, 2023 WL 8945697 (C.D. Cal. Dec. 8, 2023) ..............................22

5

6
*Augustine v. Lenovo*,
   No. 22-cv-2027, 2023 WL 4938050 (S.D. Cal. Aug. 2, 2023) ..................................10

7

8
*Avecilla v. Live Nation Entm't, Inc.*,
   No. 23-cv-1943, 2023 WL 5354401 (C.D. Cal. Aug. 7, 2023) ..................................12

9

10
*Batory v. Sears, Roebuck & Co.*,
   124 Fed. Appx. 530 (9th Cir. 2005) ........................................................................18

11

12
*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022) ...........................................................................15, 18

13

14
*Bernstein v. PayReel, Inc.*,
   No. 23-cv-2575, 2023 WL 5505872 (C.D. Cal. July 5, 2023) ..................................13

15

16
*Brennan v. Opus Bank*,
   796 F.3d 1125 (9th Cir. 2015) ......................................................14, 20, 21, 22, 25

17

18
*Byars v. Goodyear Tire and Rubber Co.*,
   No. 5:22-cv-01358, 2023 WL 1788553 (C.D. Cal. Feb. 3, 2023)..............................10

19

20
*Caremark, LLC v. Chickasaw Nation*,
   43 F.4th 1021 (9th Cir. 2022) ........................................................................13, 14

21

22
*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
   207 F.3d 1126 (9th Cir. 2000) ......................................................................20, 23

23
*Circuit City Stores, Inc. v. Najd*,
   294 F.3d 1104 (9th Cir. 2002) ..............................................................................18

24

25
*Citizens Bank v. Alafabco, Inc.*,
   539 U.S. 52 (2003) ..............................................................................................13

26

27
*Collins v. Macy's Inc.*,
   No. CV-19-02572-PHX-GMS, 2019 WL 5188749 (D. Ariz. Oct. 15, 2015) ............18

28

iii

*CompuCredit Corp. v. Greenwood*,
  565 U.S. 95 (2012) .................................................................................. 12

*D'Angelo v. Penny Opco, LLC*,
  No. 23-cv-0981, 2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) ............ 10, 17

*Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.*,
  840 F.2d 685 (9th Cir. 1988) ..................................................................... 1

*Dvorsky v. Axis Glob. Sys., LLC,*,
  No. CV 17-422 DMG (AJWX), 2017 WL 7079459 (C.D. Cal. June 15, 2017) ......... 25

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ........................................................................... 13, 15

*Garcia v Yeti Coolers, LLC*,
  No. 2:23-cv-02643, 2023 WL 5736006 (C.D. Cal. Sept. 5, 2023) ............ 10

*Gerber v. Riordan*,
  649 F.3d 514 (6th Cir. 2011) ..................................................................... 1

*Gold v. Illumina, Inc.*,
  No. 22-CV-05036-JST, 2023 WL 4830126 (N.D. Cal. 2023) .................... 18

*Gutierrez v. Converse, Inc.*,
  No. 2:23-cv-06547, 2023 WL 8939221 (C.D. Cal. Oct. 27, 2023) .......... 10, 17

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) ........................................................... 3, 13, 17, 20, 21

*Hopgood v. Experian Info. Sols., Inc.*,
  No. 22-cv-01400, 2024 WL 629861 (C.D. Cal. Feb. 13, 2024) ......... 15, 16, 18

*In re Yahoo Mail Litig.*,
  307 F.R.D. 577 (N.D. Cal. 2015) ............................................................. 10

*Jacobs v. Garcetti*,
  No. 22-cv-08010, 2024 WL 500073 (C.D. Cal. Feb. 5, 2024), *report and
  recommendation adopted*, No. 222CV08010DOCKES, 2024 WL 493882 (C.D. Cal.
  Feb. 7, 2024) ............................................................................................. 1

*Javier v. Assurance IQ, LLC*,
    No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022)........................... 15, 17, 24

*Jialu Wu v. iTalk Glob.*,
    No. 20-cv-207150, 2020 WL 8461696 (C.D. Cal. Oct. 21, 2020) ............................ 13

*Kaufman v. Papa John's Int'l, Inc.*,
    No. 22-cv-1492, 2024 WL 171363 (S.D. Cal. Jan. 12, 2024) ................................. 10

*KKE Architects, Inc. v. Diamond Ridge Dev. LLC*,
    No. 07-cv-06866, 2008 WL 637603 (C.D. Cal. Mar. 3, 2008) ................................. 23

*Knutson v. Sirius XM Radio Inc.*,
    771 F.3d 559 (9th Cir. 2014) ................................................................................ 14

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019).......................................................................................... 24

*Lane v. XYZ Venture Partners, L.L.C.*,
    322 F. App'x 675 (11th Cir. 2009).......................................................................... 1

*LeBoeuf v. NVIDIA Corp.*,
    833 F. App'x 465 (9th Cir. 2021)......................................................................... 20

*Lee v. Tesla Energy Operations, Inc.*,
    No. 20-cv-11097, 2021 WL 3619896 (C.D. Cal. Apr. 26, 2021).................. 13, 14, 25

*Licea v. Jockey Int'l, Inc.*,
    No. 23STCV02906, 2023 Cal. Super. LEXIS 69728 (L.A. Cnty. Super. Ct. Aug. 11,
    2023)...................................................................................................................... 10

*Licea v. Men's Wearhouse, LLC*,
    No. 23STCV02964, 2023 Cal. Super. LEXIS 46082 (L.A. Cnty. Super. Ct. July 24,
    2023)...................................................................................................................... 10

*Ligorria v. Loomis Armored US LLC*,
    No. 22-CV-7116, 2023 WL 3272397 (C.D. Cal. Feb. 28, 2023) ........................... 13

*McClung v. AddShopper, Inc.*,
    No. 23-CV-01996-VC, 2024 WL 189006 (N.D. Cal. Jan. 17, 2024)........................ 17

*McKee v. Audible, Inc.*,
    No. 17-cv-1941, 2017 WL 7388530 (C.D. Cal. Oct. 26, 2017) ........................ 12, 17

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ....................................................................... 15

*Mohamed v. Uber Techs., Inc.*,
   848 F.3d 1201 (9th Cir. 2016) .................................................................. 21

*Momot v. Mastro*,
   652 F.3d 982 (9th Cir. 2011) .................................................................... 21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ...................................................................................... 12

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ............................................................ 15, 24

*Patrick v. Running Warehouse, LLC*,
   No. 22-56078, 2024 WL 542831 (9th Cir. Feb. 12, 2024) .............. 3, 13, 20

*Reflex Media, Inc. v. Vibe Media, Inc.*,
   No. 16-cv-2243, 2016 WL 11000047 (C.D. Cal. July 18, 2016) ............... 21

*Rent-A-Ctr., W., Inc. v. Jackson*,
   561 U.S. 63 (2010) ............................................................................. 13, 20

*Republic Int'l Corp. v. Amco Eng'rs, Inc.*,
   516 F.2d 161 (9th Cir. 1975) ...................................................................... 1

*Revitch v. New Moosejaw, LLC*,
   No. 18-cv-06827, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) .......... 10, 23

*Ribas v. Clark*,
   38 Cal. 3d 355 (1985) ............................................................................... 10

*S.S. by & through Stern v. Peloton Interactive, Inc.*,
   566 F. Supp. 3d 1019 (S.D. Cal. 2021) ..................................................... 20

*Saleh v. Nike, Inc.*,
   562 F. Supp. 3d 503 (C.D. Cal. 2021) ....................................................... 10

*San Diego City Firefighters, Local 145 v. Bd. of Admin.*,
   206 Cal. App. 4th 594 (2012) .................................................................... 18

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ........................................................ 15

*Serafin v. Balco Properties Ltd., LLC*,
  235 Cal. App. 4th 165 (2015) ................................................. 16, 18

*Simula Inc. v. Autoliv, Inc.*,
  175 F.3d 716 (9th Cir. 1999) ....................................................... 23

*Strotz v. Dean Witter Reynolds*,
  223 Cal. App. 3d 208 (1990), *overruled on other grounds by Rosenthal v. Great W.
  Fin. Secs. Corp.*, 14 Cal. 4th 394 (1996) .................................... 18

*Tompkins v. 23andMe, Inc.*,
  No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. 2014), *aff'd on other
  grounds*, 840 F.3d 1016 (9th Cir. 2016) ...................................... 19

*U.S. EEOC v. Justin Vineyards & Winery LLC*,
  No. 22-cv-6039, 2023 WL 3555474 (C.D. Cal. Apr. 12, 2023)................... 12

*UL LLC v. Space Chariot Inc.*,
  250 F. Supp. 3d 596 (C.D. Cal. 2017) ............................................ 5

*Union Pac. R. Co. v. Zimmer*,
  87 Cal. App. 2d 524 (1948) .................................................. 16, 18

*Zherka v. Ryan*,
  52 F. Supp. 3d 571 (S.D.N.Y. 2014) ............................................. 1

**Statutes**

9 U.S.C. § 2 ........................................................................ 12, 13

18 U.S.C. § 1030 ....................................................................... 11

Cal. Civ. Code § 1550 .................................................................. 15

Cal. Civ. Code § 1588 ("A ...................................................... 15, 16, 18

Cal. Civ. Code § 1614 ................................................................. 18

Cal. Penal Code §§ 631 ............................................................... 1, 4

1

**Rules**

2

Fed. R. Civ. P. 4 ....................................................................................... 1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. OF POINTS AND AUTHORITIES ISO CLAIMANTS' MOTION TO COMPEL

# I.   INTRODUCTION

The underlying dispute in this matter revolves around claims that Claimants, who were users of Plaintiff L'Occitane, Inc.'s ("L'Occitane") website, have made against L'Occitane. Claimants allege that L'Occitane violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 *et seq.*, and other laws because L'Occitane and third parties surreptitiously tracked their online communications while using the website. Numerous courts have upheld CIPA's privacy protections in similar online contexts and, but for an arbitration agreement in L'Occitane's Terms of Use ("Terms"), Claimants could have pursued these claims in Federal Court as a class action. However, L'Occitane's enforceable arbitration agreement mandated that all disputes relating to Claimants' use of L'Occitane's website be resolved in arbitration before the American Arbitration Association ("AAA"), including any disputes relating to the arbitrability of any claims pursuant to its delegation clause. Further, the arbitration agreement prohibited Claimants' participation in any class or collective proceeding. Thus, in November 2023, some Claimants began filing individual demands for arbitration with the AAA. Claimants who filed demands are represented by the law firm of Zimmerman Reed LLP ("ZR") in the arbitrations before AAA and ZR makes a limited appearance to present this Motion.[1]

---

[1]  The Complaint identifies "Zimmerman Reed LLP" and "3,144 Of Its Purported Clients" and Defendants. This Memorandum refers to the law firm of Zimmerman Reed LLP as "ZR" and the "3,144 Of Its Purported Clients" for arbitration proceeding as "Claimants." Claimants are further defined in the Declaration of Caleb Marker ("Marker Decl.") ¶ 3.

To ZR's knowledge, no Claimants have yet been served with the Complaint. *Id.* ¶ 4. "A federal court does not have jurisdiction over a defendant unless the defendant has been served properly under Fed. R. Civ. P. 4." *Jacobs v. Garcetti*, No. 22-cv-08010, 2024 WL 500073, at *4 (C.D. Cal. Feb. 5, 2024), *report and recommendation adopted*, 2024 WL 493882 (C.D. Cal. Feb. 7, 2024) (citing *Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988)). ZR only makes a limited special appearance in this case at this time for purposes of presenting this Motion to Compel Arbitration. *Id.* ZR and Claimants do not waive any personal jurisdiction or service requirements under Federal Rule of Civil Procedure 4 and/or other law, which have not been complied with by Plaintiff. ZR and Claimants reserve the right to raise arguments and defenses relating to insufficient process, insufficient service of process, lack of personal jurisdiction, lack of subject matter jurisdiction, and any and all other defenses under the Federal Rules of Civil Procedure or other rules, statutes, and/or other law. *Garcetti*, 2024 WL 500073, at *4; *see also Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011); *Republic Int'l Corp. v. Amco Eng'rs, Inc.*, 516 F.2d 161, 165 (9th Cir. 1975); *Zherka v. Ryan*,

Flouting its contractual obligations under its own Terms, L'Occitane responded to Claimants' arbitration demands by filing the instant Complaint in this Court purporting to name 3,144 Claimants and their law firm, ZR, as Defendants. The claims presented in L'Occitane's Complaint consist primarily of L'Occitane's counterclaims and affirmative defenses to the CIPA claims filed by some Claimants in the arbitration proceedings before AAA (Counts I–IV), as well as certain arbitrability challenges (Counts V–VI). Remarkably, L'Occitane and its attorneys allege in a final count, without *any* factual basis, that the CIPA claims were "manufactured" as part of a "conspiracy" (Count VII). Rather than raise or cross-file those claims in AAA as required by its own arbitration agreement, L'Occitane is attempting to improperly seek relief from this Court. L'Occitane insulated itself from any significant liability in class, collective, and joint proceedings through its arbitration agreement, but when faced with numerous individual arbitration demands in its chosen forum, it breached its own agreement while bemoaning that a decades-old law is suddenly unconstitutional. What L'Occitane really seeks is the right to absolute immunity in *every* forum, something that is unavailable under the Federal Arbitration Act or any other law.

L'Occitane's conduct is improper and this Court, respectfully, should not entertain its claims against Claimants for three primary reasons. First, all claims brought by L'Occitane against Claimants are subject to a straightforward arbitration agreement mandating that all disputes related to the use of L'Occitane's website and L'Occitane's online tracking practices be resolved only in arbitration. Second, the arbitration agreement contains a clear delegation clause requiring any disputes over the arbitrability of claims be resolved only by the arbitrator. Finally, despite the clear restriction on the filing of any class, coordinated, or consolidated proceedings, L'Occitane has improperly joined its purported claims against *over three thousand consumers* in a single action.

L'Occitane's conduct should not be countenanced by this Court, as the Supreme

---

52 F. Supp. 3d 571, 577 (S.D.N.Y. 2014); *Lane v. XYZ Venture Partners, L.L.C.*, 322 F. App'x 675, 678 (11th Cir. 2009).

Court has confirmed that a court may not "rule on the potential merits of the underlying claim that is assigned by contract to an arbitrator." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). Further, the Supreme Court has confirmed that if the contract contains a delegation clause, then the Court "possesses no power to decide the arbitrability issue." *Id.*; *see also Patrick v. Running Warehouse, LLC*, No. 22-56078, 2024 WL 542831, at *7 (9th Cir. Feb. 12, 2024) (same).

Accordingly, Claimants respectfully request that the Court grant this Motion and compel L'Occitane to arbitrate all of its purported claims against Claimants before the AAA on an individual basis, including any disputes regarding the arbitrability of the claims. Once compelled to arbitration, L'Occitane's Complaint should be dismissed so proceedings can continue in AAA.

## II.     BACKGROUND

**A.     The Parties**

### 1.     Claimants

Claimants are individuals who allege that, at relevant times during the past twelve months, they accessed and used L'Occitane's website while in California and had their interactions and communications while using the website tracked by a third party without their prior consent. *See* Compl. Exs. 2 (ECF 1-2) at 2–4 & 4 (ECF 1-4) at 1. Some, but not all, Claimants previously commenced individual Demands for Arbitration ("Demands") against L'Occitane before the AAA. *See, e.g.*, Marker Decl. Ex. A.  An exemplar copy of one of the Demands filed by the 2,018 Claimants who commenced arbitration proceedings in AAA is attached as to the Declaration of Caleb Marker as Ex. A. *Id.* ¶ 2-3.

### 2.     Plaintiff L'Occitane, Inc.

L'Occitane is an online retailer that sells beauty and personal care products through the L'Occitane website (the "Website").[2] Compl. ¶¶ 8–9. Unbeknownst to Claimants, L'Occitane entered into agreements with third parties, whereby the third parties

---

[2] *See* L'OCCITANE, www.loccitane.com/en-us.

embedded certain software codes on the Website that allowed L'Occitane to monitor and track Website visitors' interactions and communications, such as keystrokes, mouse movements and clicks, scrolling, input of information, etc. Marker Decl. Ex. A ¶¶ 1, 18.

Certain Claimants filed individual Demands against L'Occitane with AAA, alleging that L'Occitane's tracking conduct violated CIPA and other laws. *See* Marker Decl. Ex. A. CIPA contains a prohibition against unauthorized taps or connections, including those involving internet communications, without the prior consent of the other person and provides for certain statutory remedies in the event of a violation. *See* Cal. Pen. Code §§ 631 *et seq.*

**B.     L'Occitane's Website**

Claimants reasonably expected that their visits to L'Occitane's Website would be private. *See* Marker Decl. Ex. A ¶ 14. However, as Claimants allege in their Demands, L'Occitane's Website contained software that allowed third parties to immediately track or intercept user communications and behavior, including clicks, keystrokes, scrolls, and page views. *See id.* ¶ 18. Importantly, the Website begins tracking a user's communications and behavior from the moment the user lands on the Website, which means the user starts to be tracked and CIPA claims accrue before the user could ever review or consent to any tracking or terms of use, privacy policies, or the like. *Id.* ¶ 16.

To the best of Claimants' knowledge and recollection, the Website failed to present them with a pop-up disclosure, clickwrap, or affirmative consent form alerting them that visits to the Website were monitored or recorded before the tracking commenced. *Id.* The Website did not disclose the identities of specific third parties involved in tracking activities or their use of intercepted communications before the Website's tracking activities began and Claimants' CIPA and other claims accrued. *Id.* Claimants never clicked on any L'Occitane privacy policy or similar policy of any third party or otherwise indicated or provided their affirmative agreement to the terms of any such policy before the Website's tracking activity began and their CIPA and other claims accrued. *Id.* ¶ 15.

A screenshot of L'Occitane's Website from Archive.org's Wayback Machine is

4

attached as Exhibit C to the Marker Declaration.[3] From the screenshot, one can see what Claimants saw: The Website's homepage covers about twelve computer screens' worth of space when scrolling from top to bottom. Not until the very bottom of the final screen does a small hyperlink for L'Occitane's "Terms and Conditions" appear. *See* Marker Decl. Ex. C; Figure 1 below.



*Figure 1: Bottom of Website*

L'Occitane's Website does not require users to provide *prior* consent to any third party's tracking activity through a clickwrap agreement or the equivalent when a user first accesses the Website. *See* Marker Decl. Ex. A ¶¶ 1, 8, 14, 21; *see also* Ex. C. Instead, L'Occitane provides a small, inconspicuous hyperlink to its Terms at the bottom of the Website's homepage, which users are not required to review or accept before first browsing the Website, but by then the tracking activities have already commenced. *Id.* Ex. A ¶ 16. Website users must actually scroll down several screens/pages before they can even reach the hyperlink to the Website's Terms, which appears in a font size that is much smaller than the rest of the Website's body text and is otherwise not highlighted to users through the use of any bolding, italicization, or underlining. *Id.* Ex. A ¶ 21; *see also* Ex. C. In sum, nothing jumps out to users to alert them that their privacy rights are (and have been for several screens or more) being violated. Thus, the Website's tracking activities and the user's accrual of CIPA claims occurs *before* a Website user is even able to review the Website's Terms, which include L'Occitane's privacy policy. *Id.* As

---

[3] "Courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[.]" *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 604 (C.D. Cal. 2017).

discussed in the Argument section below, the Ninth Circuit has held that, under CIPA, a post-violation disclosure does not ameliorate a prior privacy violation.

Moreover, the pop-up window that L'Occitane references in paragraph 16 of its Complaint likewise is not a clickwrap agreement. Marker Decl. Ex. A ¶ 14. The box or banner quickly disappears when a user accesses the Website and starts scrolling. Website users are not required to click or otherwise indicate consent to anything presented in the pop-up window. *Id.* Ex. A ¶¶ 16, 21.

## C.   The Arbitration Agreement.

If a user ultimately reached the bottom of the Website and clicked on the "Terms and Conditions" hyperlink, the user is taken to "Terms of Use" ("Terms"), drafted by L'Occitane. The Terms contain a mandatory "Arbitration Agreement," which assigns jurisdiction over their disputes solely to AAA and delegates jurisdiction to resolve any disputes over the arbitrability of any claim solely to the AAA arbitrator. *See* Marker Decl. Ex. B at 1, 31–33. Specifically, the Terms provide in relevant part:

**Introduction**

***The following terms and conditions ("Terms of Use") govern your use of our Websites*** and apply when you purchase products on our Websites and in Stores, including gift cards and e-gift cards ("Merchandise"), from L'Occitane. ***Your continued use of the Websites constitutes your agreement to follow and be bound by the Terms of Use (the "Agreement")***…

\*\*\*

**Dispute Resolution and Arbitration Agreement**

**Informal Dispute Resolution**

… [B]oth you and L'Occitane agree to the following dispute resolution procedure: In the event of any controversy, claim, action or dispute ***arising out of or related to any transaction conducted on the Websites, or the breach, enforcement, interpretation, or validity of this Agreement or any part of it ("Dispute")***, the party asserting the Dispute shall first try in good faith to settle such Dispute by providing written notice to the other party (by first class or registered mail) describing the facts and circumstances (including any relevant documentation) of the Dispute and allowing the receiving party 30 days in which to respond to or settle the Dispute by providing written notice to the other party…describing the facts and

circumstances…of the Dispute and allowing the receiving party 30 days in which to respond to or settle the Dispute….

Both you and L'Occitane agree that this dispute resolution procedure is a condition precedent that must be satisfied prior to initiating any arbitration or filing any claim against the other party.

**Arbitration Agreement**

To the extent you cannot resolve any Dispute through the informal dispute resolution procedure described above, a Dispute shall be resolved through binding individual arbitration ("Arbitration Agreement"). You agree to give up your right to go to court to assert or defend your rights under this Agreement and with respect to any Dispute. ***You and L'Occitane expressly delegate to the arbitrator the authority to determine the arbitrability of any Dispute, including the scope, applicability, validity, and enforceability of this arbitration provision***.

…You agree that the arbitration shall be conducted by the American Arbitration Association ("AAA") pursuant to its Consumer Arbitration Rules ("AAA Rules"), as modified by this arbitration agreement.

…This Arbitration Agreement shall be governed by, and interpreted, construed and enforced in accordance with the Federal Arbitration Act.

*Id.* Ex. B at 1, 31–32 (emphasis added).

## D.     L'Occitane and Claimants Agree to the Arbitration Agreement

Both L'Occitane and Claimants agreed to the Arbitration Agreement. L'Occitane agreed the Arbitration Agreement because it drafted the Terms, which contain the Arbitration Agreement and published the Terms beneath a hyperlink on its Website. *See* Marker Decl. Ex. C. The Terms state that "both you and L'Occitane agree to the following dispute resolution procedure" for the resolution of a "Dispute." *Id.* Ex. B at 31. The Terms further state that "a Dispute shall be resolved through binding individual arbitration ('Arbitration Agreement')." *Id.* Ex. B. at 32.

Claimants also agreed to the Arbitration Agreement. The Terms govern the "use" of the Website, and there appears to be no genuine dispute that each Claimant "used" Website, despite L'Occitane's references to actual customers versus browsers or shoppers. *See id.* Ex. B at 1; Compl. ¶¶ 54 n. 9, 130–40. Claimants *did not initially agree* to the Terms at the moment the Website began tracking them because they were not

presented in an up-front clickwrap agreement that required attestation of consent before using the Website. *See* Marker Decl. Ex. A ¶¶ 14–16, 21. However, *after* Claimants had been tracked by the Website, each Claimant eventually learned of the Arbitration Agreement and consented to proceed with their individual Dispute in AAA, as set forth in the Arbitration Agreement, before filing. *See* Marker Decl. Ex. A ¶¶ 16, 21–23.

**E.    Claimants Initiated the Informal Dispute Resolution Procedure Under the Arbitration Agreement**

Claimants manifested their consent to the Arbitration Agreement by satisfying any pre-filing requirements needed to commence arbitration proceedings under the Terms. On September 6, 2023, pursuant to the Arbitration Agreement, ZR provided a pre-filing notice letter to L'Occitane describing Claimants' claims, the supporting legal basis and offering to discuss resolution of the disputes prior to any filing of arbitrations in AAA. Compl. Ex. 2 (ECF 1-2). On October 6, 2023, L'Occitane's counsel responded disputing the claims presented and not indicating any willingness to engage in further discussions on dispute resolution. *Id.* Ex. 3 (ECF 1-3). On October 23, 2023, ZR responded to L'Occitane's letter indicating that it understood from L'Occitane's October 6 letter that L'Occitane had no further interest in engaging in any other discussions in the mandatory pre-filing dispute resolution process and that a neutral arbitrator would need to resolve any disputes on the merits of the claims. Marker Decl. Ex. E. L'Occitane did not respond to the October 23 letter. Marker Decl. ¶ 11. There were no other pre-filing requirements needed to commence arbitration proceedings under the Terms.

Some Claimants further manifested their consent to the Arbitration Agreement by filing their Demands with AAA. In November and December 2023 and January 2024, ZR filed Demands for Arbitration on behalf of 2,081 Claimants against L'Occitane with AAA. *See* Marker Decl. Ex. A; Compl. ¶ 37, Ex. 5 (ECF 1-5), Ex. 6 (ECF 1-6). In February 2024, AAA accepted the arbitration demands. *See* Compl. ¶¶ 38–39, Ex. 7 (ECF 1-7), Ex. 8 (ECF 1-8). The remaining Claimants who have been named as defendants in this action are persons who provided pre-filing notice to L'Occitane but have not filed

1    Demands for Arbitration in AAA. Marker Decl. ¶ 3.

2    **F.    Proceedings To Date in AAA.**

3           Each Claimant's Demand for Arbitration filed with AAA alleges that L'Occitane's

4    tracking practices violate CIPA and other laws. *See* Marker Decl. Ex. A. In their Demand,

5    each filing Claimant indicated that: (1) they had previously used the Website, and (2)

6    provided their consent to arbitrate their disputes on an individual basis before the AAA:

7           2. Within the past 12-month period, Claimant [Claimant] visited and used
8           Respondent's [L'Occitane's] website (www.loccitane.com) and had their
            activities subject to tracking programs embedded on the L'Occitane website,
9           without affirmative consent. Such conduct is unlawful under the statutes
            (including the California Invasion of Privacy Act ("CIPA"),…
10                                                    **
11          21.    This dispute is subject to the L'Occitane Terms & Conditions
            published on the www.L'Occitane.com website that were in effect at the
12          time Claimant's claim accrued. ("Terms of Use" or "Terms"). One must
            access the www.L'Occitane.com website and scroll down (subjecting
13          themselves to the tracking) before one can even reach the hyperlink to the
            Terms, if it is noticed at all. While as noted above, the Terms of Use are not
14          part of a clickwrap agreement, prior to providing pre-filing notice and filing
            this Demand for Arbitration, Claimant's counsel reviewed the Terms &
15          Conditions to determine the appropriate forum and procedures for dispute
            resolution and ***Claimant now understands that there is a clause requiring***
16          ***dispute resolution in arbitration before AAA.*** This does not mean that
            Claimant provided affirmative consent in advance to the challenged tracking
17          practices described: Claimant did not.
18
            22. Claims against L'Occitane are to be filed in this arbitration forum if they
19          relate to Claimant's use of the www.loccitane.com website. The Terms of
            Use require Claimant to present any and all claims in arbitration before the
20          American Arbitration Association on an individual basis….

21   Marker Decl. Ex. A ¶¶ 2, 21–22 (exemplar copy of the Demands filed and confirming

22   that each individual demand filed contained substantially similar language).

23          Claimants' "Disputes" fell within the scope of the Arbitration Agreement as they

24   (1) were related to transactions conducted on the Websites, *i.e.*, communications on the

25   Website that were tracked by L'Occitane and the third parties it dealt with; and/or (2)

26   involved the interpretation or validity of the any part of the Terms, including the

27   Arbitration Agreement and any privacy policy. *Id.* Ex. A ¶¶ 22–23; *id.* Ex. B at 31.

28

The specific claims presented here have been upheld by federal and state courts in California. *See Revitch v. New Moosejaw, LLC*, No. 18-cv-06827, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) (citing *Ribas v. Clark*, 38 Cal. 3d 355, 360–61 (1985)); *see also Byars v. Goodyear Tire and Rubber Co.*, No. 5:22-cv-01358, 2023 WL 1788553 (C.D. Cal. Feb. 3, 2023); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 521 (C.D. Cal. 2021); *Garcia v Yeti Coolers, LLC*, No. 2:23-cv-02643, 2023 WL 5736006 (C.D. Cal. Sept. 5, 2023); *Kaufman v. Papa John's Int'l, Inc.*, No. 22-cv-1492, 2024 WL 171363 (S.D. Cal. Jan. 12, 2024); *McClung v. Addshopper, Inc.*, No. 23-cv-019962024, WL 189006 (N.D. Cal. Jan. 17, 2024); *Gutierrez v. Converse, Inc.*, No. 2:23-cv-06547, 2023 WL 8939221 (C.D. Cal. Oct. 27, 2023); *D'Angelo v. Penny Opco, LLC*, No. 23-cv-0981, 2023 WL 7006793 (S.D. Cal. Oct. 24, 2023); *Augustine v. Lenovo*, No. 22-cv-2027, 2023 WL 4938050 (S.D. Cal. Aug. 2, 2023).[4] While L'Occitane argues the "Cold War-era" CIPA to be unconstitutional or preempted, no court has found that to be the case.

While the CIPA claims presented by Claimants would likely be appropriate to bring in a single class proceeding,[5] L'Occitane's Terms specifically bar any class, coordinated or collective proceedings. Instead, the Terms includes the Arbitration Agreement that mandates that each user arbitrate any dispute on an individual basis before the AAA. Marker Decl. Ex. B at 32–33. As a result, despite the commonality of the practices being contested and the availability of common proof, 2,081 Claimants complied with the Arbitration Agreement and filed individual Demands with AAA. The remaining Claimants were in the process of complying with the Terms' pre-filing notice and waiting period requirements when they (and their legal counsel) were hauled into this Court as defendants by L'Occitane. *See* Marker Decl. ¶ 3.

---

[4] *See also Licea v. Jockey Int'l, Inc.*, No. 23STCV02906, 2023 Cal. Super. LEXIS 69728 (L.A. Cnty. Super. Ct. Aug. 11, 2023); *Licea v. Men's Wearhouse, LLC*, No. 23STCV02964, 2023 Cal. Super. LEXIS 46082 (L.A. Cnty. Super. Ct. July 24, 2023).

[5] *See generally In re Yahoo Mail Litig.*, 307 F.R.D. 577, 591 (N.D. Cal. 2015) (granting class certification of action alleging CIPA violations).

**G.      L'Occitane's Complaint filed in This Court**

Rather than responding to the Demands with its affirmative defenses or utilizing AAA's Rules to address any disputes over arbitrability of the claims filed,[6] on February 8, 2024, L'Occitane filed a Complaint against ZR and Claimants. The Complaint asserts what appears to be predominantly affirmative defenses or counterclaims against the claims already filed by Claimants in AAA. More specifically, Counts I–III challenge the claims filed by Claimants against L'Occitane in AAA by seeking to overturn CIPA as an unconstitutional statute. Counts IV and V challenge the arbitrability of the claims filed by Claimants against L'Occitane in AAA. Count VI presents an affirmative defense to the claims filed in AAA by claiming that CIPA is preempted by a federal law. Count VII alleges a claim for violation of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030, claiming without factual basis or even remote compliance with Rule 9(b) that the claims filed in AAA or otherwise presented by Claimants were all "manufactured" and "setup" as part of a "conspiracy."

All of L'Occitane's claims in the Complaint directly relate to Claimants' use of the Website and/or the interpretation of the Terms. Therefore, if anything, L'Occitane's claims should be part of the same proceedings filed in AAA. *See* AAA Consumer Rule R-2(d) (permitting counterclaims); R-14(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."). Further, L'Occitane's Complaint attempts to bypass the Terms' anti-consolidation clause by joining claims against over three thousand people in a single

---

[6] *See generally* AMERICAN ARBITRATION ASSOCIATION, MASS ARBITRATION SUPPLEMENTARY RULES at MA-6 (Jan. 15, 2024), *available at* https://www.adr.org/sites/default/files/Mass_Arbitration_Supplementary_Rules.pdf; AMERICAN ARBITRATION ASSOCIATION CONSUMER RULES at R-14 (Sept. 1, 2014), *available at* https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf; AMERICAN ARBITRATION ASSOCIATION, SUPPLEMENTARY RULES FOR MULTIPLE CASE FILINGS (Aug. 1, 2021), *available at* https://www.adr.org/sites/default/files/Supplementary_Rules_MultipleCase_Filings.pdf. That AAA even has "mass arbitration" rules confirms that such proceedings have now become ordinary in the post-*Concepcion* world of arbitration.

action. Finally, the Complaint is a transparent attempt to ignore the delegation clause in the Arbitration Agreement, which requires AAA to resolve disputes over arbitrability. In doing so, it is notable that L'Occitane even filed its Complaint against Claimants that it asserts made purchases on the Website—claims which L'Occitane itself concedes satisfy even its overly narrow test for mandatory arbitration. *See* Compl. ¶¶ 34, 111, 139 & Ex. 3 (ECF 1-3) (L'Occitane's October 6 letter) at 4.

### III.   STANDARD OF REVIEW

"While the Court may not review the merits of the underlying case, in deciding a motion to compel arbitration, it may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party." *McKee v. Audible, Inc.*, No. 17-cv-1941, 2017 WL 7388530, at *2 (C.D. Cal. Oct. 26, 2017). "[I]n deciding a motion to compel arbitration, a court may consider evidence as long as it could be presented in a form that would be admissible at trial." *U.S. EEOC v. Justin Vineyards & Winery LLC*, No. 22-cv-6039, 2023 WL 3555474, at *2 (C.D. Cal. Apr. 12, 2023) (Anderson, J.).

### IV.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. A written arbitration provision within such a contract "shall be valid, irrevocable, and enforceable," and a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate" may file a motion in the district court for an order compelling arbitration in the manner provided for in the arbitration provision. *Id.* §§ 2, 4. The FAA establishes "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "It requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Avecilla v. Live Nation Entm't, Inc.*, No. 23-cv-1943, 2023 WL 5354401, at *3 (C.D. Cal. Aug. 7, 2023) (Anderson, J.).

When deciding a motion to compel arbitration, the Court engages in the following analysis: First, the Court determines the threshold issue of whether the parties formed a contract that has an arbitration provision, regardless of the arbitration provision's applicability or enforceability. *See Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) ("[C]ontract-formation issues are always matters for judicial resolution."); *see also Jialu Wu v. iTalk Glob.*, No. 20-cv-207150, 2020 WL 8461696, at *2 (C.D. Cal. Oct. 21, 2020). Whether the parties formed a contract is resolved under "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Bernstein v. PayReel, Inc.*, No. 23-cv-2575, 2023 WL 5505872, at *2 (C.D. Cal. July 5, 2023) (Anderson, J.).

Second, if the parties formed a contract that has an arbitration provision, then the Court determines whether the contract falls under the scope of the FAA. The scope of the FAA is broad: It covers contracts evidencing a "transaction involving commerce," which encompasses a wide range of transactions "within the flow of interstate commerce." 9 U.S.C. § 2; *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). Parties can agree that their contract falls under the scope of the FAA. *See Ligorria v. Loomis Armored US LLC*, No. 22-CV-7116, 2023 WL 3272397, at *2 (C.D. Cal. Feb. 28, 2023) (Anderson, J.) ("As the arbitration agreement provides, it is 'governed by the Federal Arbitration Act.'").

Third, if the parties formed a contract that has an arbitration provision and the contract falls under the scope of the FAA, then the Court determines whether the contract contains a delegation clause that delegates to the arbitrator all questions of arbitrability, such as whether the parties have agreed to arbitrate, whether their arbitration provision covers a particular controversy, and whether the arbitration provision is enforceable at all. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *Caremark*, 43 F.4th at 1029; *Lee v. Tesla Energy Operations, Inc.*, No. 20-cv-11097, 2021 WL 3619896, at *3 (C.D. Cal. Apr. 26, 2021) (Anderson, J.).

Finally, if the contract contains a delegation clause, then the Court "possesses no power to decide the arbitrability issue." *Schein*, 139 S. Ct. at 527; *see also Patrick*, 2024

13

WL 542831, at *7 (same). "[I]f the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Caremark*, 43 F.4th at 1030.

Thus, when an arbitration provision contains a delegation clause, there is nothing further for the Court to do but to compel the dispute to arbitration and dismiss the case. *Brennan v. Opus Bank*, 796 F.3d 1125, 1134 (9th Cir. 2015); *Lee*, 2021 WL 3619896, at *5.

## V.    ARGUMENT

In this case, the pleadings, exhibits, and declarations establish the following: First, L'Occitane and Claimants formed a contract—the Terms—that contains the Arbitration Agreement. The claims presented in the Complaint (and Claimant's Demands) fall within the scope of arbitrable disputes as they relate to transactions on the websites and the applicability of provisions in the Terms. Second, the Terms falls under the scope of the FAA because L'Occitane and Claimants agreed that the FAA applies (in the Terms) and the Terms evidence a transaction involving commerce. Third, the Terms' Arbitration Agreement contains a delegation clause that clearly and unmistakably delegates to the arbitrator all questions and disputes over arbitrability. Finally, because of the delegation clause, this Court, respectfully, possesses no power to decide questions of arbitrability, and there is nothing further for the Court to do but to compel the dispute to arbitration before AAA and dismiss the claims against Claimants.

**A.    L'Occitane and Claimants Entered into a Contract to Resolve the Claims at Issue Only in Arbitration.**

**1.    The Parties Agreed to Arbitrate Their Claims.**

The first issue for the Court to determine is whether L'Occitane and Claimants formed a contract that has an arbitration provision. *See Caremark*, 43 F.4th at 1030. "[T]he party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio*

14

1  *Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

2      In determining whether the parties formed a contract, federal courts apply state-
3  law principles of contract formation. *See First Options*, 514 U.S. at 944; *see also Berman*
4  *v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Here, California law
5  governs.[7] *See Berman*, 30 F.4th at 855; *see also id.* at 864 (applying California's choice-
6  of-law analysis when a court is exercising federal-court jurisdiction and agreeing that
7  California state law applies) (Baker, J., concurring). Under California law, the formation
8  of a contract requires: (1) parties capable of contracting; (2) the consent of those parties;
9  (3) a lawful object; and (4) a sufficient cause or consideration. Cal. Civ. Code. § 1550.
10 Only consent (also called "assent") and consideration are possibly at issue in this case.

11          *(a)     Consent or Assent*

12      The parties must manifest their mutual consent or assent to the terms of the
13 agreement in order to form a contract. *Berman*, 30 F.4th at 855–56. "Parties traditionally
14 manifest assent by written or spoken word, but they can also do so through conduct." *Id.*
15 The conduct of a party is effective as a manifestation of his or her assent if he or she
16 "intends to engage in the conduct and knows or has reason to know that the other party
17 may infer from his conduct that he assents." *Id.* Even if a party does not initially consent
18 to a contract, a party may later ratify or agree to a contract "by subsequent consent." Cal.
19 Civ. Code § 1588 ("A contract which is voidable solely for want of due consent, may be
20 ratified by a subsequent consent."); *see also Hopgood v. Experian Info. Sols., Inc.*, No.
21 22-cv-01400, 2024 WL 629861, at *4 (C.D. Cal. Feb. 13, 2024) ("Under California law,
22 a party may ratify a contract through his conduct, even though he was not originally a
23 signatory to the contract."); *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL
24 1744107, at *2 (9th Cir. May 31, 2022) (Bumatay, J., concurring) (stating that California

25 
26 [7] In the event L'Occitane argues that New York law governs the issue of contract formation, "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d
27 Cir. 2017) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)). Thus, the Court need not decide which State's law governs "because both California and New York law
28 dictate the same outcome." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

contract law allows for after-the-fact ratification, but privacy torts/CIPA require prior consent (citing Cal. Civ. Code § 1588)).

Here, L'Occitane consented to the Arbitration Agreement because it drafted the Terms, which contains the Arbitration Agreement, and told users that "your continued use of the Websites constitutes your agreement to follow and be bound by the Terms of Use." *See* Marker Decl. Ex. B at 1. The Terms state that "both you and L'Occitane agree to the following dispute resolution procedure" for the resolution of a "Dispute." *Id.* Ex. B at 31. The Terms further state that "a Dispute shall be resolved through binding individual arbitration ('Arbitration Agreement')." *Id.* Ex. B. at 32.

Claimants also consented to the Arbitration Agreement. The Terms govern the "use" of the Website. Marker Decl. Ex. B at 1. There appears to be no genuine dispute that each Claimant "used" Website, despite L'Occitane's references to actual customers versus browsers or shoppers. *See* Compl. ¶¶ 54 n. 9, 130–40. While Claimants *did not initially agree* to the Terms at the moment the Website began tracking them—because they were not presented in an up-front clickwrap agreement that required attestation of consent before using the Website—, after Claimants had been tracked by the Website, each Claimant learned of the Arbitration Agreement and agreed to proceed with their Dispute as set forth in the Arbitration Agreement. *See* Marker Decl. Ex. A ¶¶ 14–16, 21. Claimants manifested their consent to the Arbitration Agreement by following the Informal Dispute Resolution procedure and by filing Demands with AAA. *See* Compl. Exs. 2 (ECF 1-2), 4 (ECF 1-4), 8 (ECF 1-8); Marker Decl. Ex. A.

Indeed, courts have applied the principle of contract ratification to arbitration contracts. *See Hopgood*, 2024 WL 629861, at *4 (concluding that the party "ratified the TOU and the arbitration agreement" with his subsequent actions); *see also Union Pac. R. Co. v. Zimmer*, 87 Cal. App. 2d 524, 532 (1948) ("The fundamental test of ratification by conduct is whether the [ratifying party], with full knowledge of the material facts…has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification."); *Serafin v. Balco Properties Ltd., LLC*,

16

235 Cal. App. 4th 165, 176 (2015) ("Evidence confirming the existence of an agreement to arbitrate, despite an unsigned agreement, can be based, for example, on conduct from which one could imply either ratification or implied acceptance of such a provision." (internal quotation omitted)).

Here, each Claimant indicated his or her consent to the Arbitration Agreement by providing L'Occitane a pre-filing demand letter pursuant to the Agreement's Informal Dispute Resolution procedure. *See* Compl. Exs. 2 (ECF 1-2), 4 (ECF 1-4). Moreover, each Claimant further indicated his or her consent to the Arbitration Agreement by filing the Demand with AAA (while also reserving their argument that prior consent to the Website's tracking was not provided):

> 21.    This dispute is subject to the L'Occitane Terms & Conditions published on the www.L'Occitane.com website that were in effect at the time Claimant's claim accrued. ("Terms of Use" or "Terms"). One must access the www.L'Occitane.com website and scroll down (subjecting themselves to the tracking) before one can even reach the hyperlink to the Terms, if it is noticed at all. While as noted above, the Terms of Use are not part of a clickwrap agreement, prior to providing pre-filing notice and filing this Demand for Arbitration, Claimant's counsel reviewed the Terms & Conditions to determine the appropriate forum and procedures for dispute resolution and ***Claimant now understands that there is a clause requiring dispute resolution in arbitration before AAA***. This does not mean that Claimant provided affirmative consent in advance to the challenged tracking practices described: Claimant did not.
>
> 22. …The Terms of Use require Claimant to present any and all claims in arbitration before the American Arbitration Association on an individual basis….

Marker Decl. Ex. A ¶¶ 21–22.[8]

---

[8]   Separate and distinct from their consent to the Arbitration Agreement, Claimants allege that they did not provide *prior* consent to any user tracking by the third parties through any privacy policy or otherwise *before* the challenged tracking practices commenced and their CIPA claims accrued. Marker Decl. Ex. A ¶¶ 15–16, 22. Under CIPA *prior*, *not subsequent*, consent to the challenged wiretapping practices is required before the third-party tracking occurs by operation of the statute. *See Javier*, 2022 WL 1744107, at *2 ("The district court held that consent under §631(a) is valid even if given after the communication has taken place. We disagree…. Based on these statements by the California Supreme Court, we conclude that the California Supreme Court would interpret Section 631(a) to require the prior consent of all parties to a communication"); *see also McClung*, 2024 WL 189006, at *7 (*citing Javier*, 2022 WL 1744107); *Gutierrez*, 2023 WL 8939221; *D'Angelo*, 2023 WL 7006793.

Overall, Claimants' conduct manifested their consent to the Arbitration Agreement. *See* Cal. Civ. Code § 1588; *Berman*, 30 F.4th at 855–56; *Hopgood*, 2024 WL 629861, at *4; *Zimmer*, 87 Cal. App. 2d at 532; *Serafin*, 235 Cal. App. 4th at 176. Accordingly, both L'Occitane and Claimants consented to the Arbitration Agreement.

### *(b)   Consideration*

The Arbitration Agreement is also supported by valid consideration. Under California contract law, "[a] written instrument is presumptive evidence of a consideration," Cal. Civ. Code § 1614, and "all the law requires for sufficient consideration is the proverbial 'peppercorn,'" *San Diego City Firefighters, Local 145 v. Bd. of Admin.*, 206 Cal. App. 4th 594, 619 (2012). The Ninth Circuit has held, under California law, that parties' mutual "promise to be bound by the arbitration process itself serves as adequate consideration." *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002). In this regard, Claimants' agreements not to pursue litigation in court and instead be restricted to individual arbitration in AAA serves as sufficient consideration. *See Batory v. Sears, Roebuck & Co.*, 124 Fed. Appx. 530, *3 (9th Cir. 2005); *Gold v. Illumina, Inc.*, 2023 WL 4830126, *2 (N.D. Cal. 2023) ("Each party's promise to be bound by arbitration and forego a judicial forum for such disputes constitutes adequate consideration to support the agreement.").[9]

In addition, mutual consideration is provided through Claimants continued use of

---

L'Occitane's contrary position ignores this critical distinction on the timing of required consent between contract and CIPA (tort) claims, as confirmed by the Ninth Circuit in *Javier*. For CIPA claims, prior consent is required and retroactive consent is not permitted. *Javier*, 2022 WL 1744107, at *2. In contrast, for contract matters, subsequent or retroactive consent is permitted. *Id.* at *2. In any event, these are merits questions to be resolved by the arbitrator. *See Schein*, 139 S. Ct. at 527 (observing that when there is an arbitration agreement, the "underlying merits disputes" are for the arbitrator); *McKee*, 2017 WL 7388530, at *2 (same).

[9]   *See also Collins v. Macy's Inc.*, 2019 WL 5188749, at *3 (D. Ariz. Oct. 15, 2015) ("The consideration in this case is not Plaintiff's continued employment, however, but rather the fact that Macy's is also bound to arbitrate disputes"… a "promise to "submit to arbitration and to forego the option of a judicial forum for a specified class of claims constitutes sufficient consideration.") (citing *Circuit City*, 294 F.3d at 1108); *Strotz v. Dean Witter Reynolds*, 223 Cal. App. 3d 208, 216 (1990), *overruled on other grounds by Rosenthal v. Great W. Fin. Secs. Corp.*, 14 Cal. 4th 394 (1996) ("Where an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other.").

18

the Website where they are exposed to product listings and advertisements. L'Occitane attracts potential consumers such as Claimants to its Website for the purposes of product promotion, advertisement, and potential sales, while consumers such as Claimants browse its Website for information, product pricing, potential purchases, or even entertainment. A mutual exchange of consideration therefore takes place (even aside from the tracked data in dispute) through such use. L'Occitane's Website itself indicates that use of the website is a sufficient exchange to support a valid "agreement." *See* Marker Decl. Ex. B at 1 ("Your continued *use* of the Websites constitutes your agreement to follow and be bound by the Terms of Use (the "Agreement")…." (emphasis added)).

Contrary to L'Occitane's expected argument, the Terms are not restricted to consumers that make purchases. Further, courts routinely find that users who did not make purchases, but instead provided captive attention to advertisements when browsing a free website, entered valid arbitration agreements. *See, e.g.*, *Whalen v Facebook, Inc.*, 2022, WL 19934419 (N.D. Cal. Apr. 11, 2022) (compelling arbitration of privacy law claims of Facebook users based on agreement to arbitrate); *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752 (N.D. Cal. 2014), *aff'd on other grounds*, 840 F.3d 1016 (9th Cir. 2016) (granting motion to compel arbitration finding that an agreement to arbitrate introduced post-purchase was valid consideration).

Accordingly, both L'Occitane and Claimants provided consideration for the Arbitration Agreement. Therefore, the evidence establishes that L'Occitane and Claimants formed a contract to arbitrate their claims.

### 2. The Parties Also Agreed Not to Consolidate Claims.

The Arbitration Agreement also prohibits the filing of any class, coordinated or consolidated proceedings by Claimants or L'Occitane, as follows:

> You and L'Occitane agree that each may bring claims against the other in arbitration only in your or their respective individual capacities and in so doing you and L'Occitane hereby waive the right to a trial by jury, to assert or participate in a class action lawsuit or class action arbitration (either as a named-plaintiff or class member), and to assert or participate in any joint or consolidated lawsuit or joint or consolidated arbitration of any kind.

*See* Marker Decl. Ex. B at 32–33. L'Occitane violated this provision by consolidating claims against over three thousand Claimants in the Complaint filed. Those claims should be compelled to arbitration proceedings in AAA on an individual basis.

**B.     The Terms Falls Under the Scope of the FAA**

The next issue for this Court to determine is whether the Terms evidences a transaction involving commerce so that it falls under the scope of the FAA. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Here, the Terms state that this "Arbitration Agreement shall be governed by, and interpreted, construed, and enforced in accordance with, the Federal Arbitration Act." Marker Decl. Ex. B at 32. Moreover, the Complaint alleges that Claimants from California accessed and used the Website and that L'Occitane is a citizen of New York, and that L'Occitane's "computers and servers are involved in and affect interstate and foreign commerce." *See* Compl. ¶¶ 5–7, 130. Accordingly, the Terms falls under the scope of the FAA. *See Chiron*, 207 F.3d at 1130; *S.S. by & through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1042 (S.D. Cal. 2021).

**C.     The Arbitration Agreement Clearly and Unmistakably Delegates All Questions of Arbitrability to The Arbitrator**

The next issue is whether the Arbitration Agreement clearly and unmistakably delegates questions of arbitrability to the arbitrator. *See Brennan*, 796 F.3d at 1130. "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr*, 561 U.S. at 68–69; *Brennan*, 796 F.3d at 1130. Critically, if the parties have clearly and unmistakably delegated questions of arbitrability to the arbitrator, "a court may not override the contract," and the court has "no power to decide the arbitrability issue." *Schein*, 139 S. Ct. at 529; *see Patrick*, 2024 WL 542831, at *7 (same). "That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Schein*, 139 S. Ct. at 527; *see also LeBoeuf v. NVIDIA Corp.*, 833 F. App'x 465, 466 (9th Cir. 2021) ("Any dispute

20

as to the scope of that agreement, and whether Appellants' claims fall outside the agreement, must be determined by the arbitrator under the License Agreement's delegation clause." (citing *Schein*, 139 S. Ct. at 530)); *Reflex Media, Inc. v. Vibe Media, Inc.*, No. 16-cv-2243, 2016 WL 11000047, at *4 (C.D. Cal. July 18, 2016) (Anderson, J.) (finding "that an agreement to arbitrate exists between the parties. Beyond this limited review, the issue of the existence and validity of an arbitration agreement has been delegated to the arbitrator to decide in the first instance" (citing *Brennan*, 796 F.3d at 1130)).

## 1.   Presence of a Delegation Clause in the Arbitration Agreement Means All Questions of Arbitrability Are for the Arbitrator

Here, the Arbitration Agreement contains a straightforward delegation clause, assigning sole jurisdiction to resolve any dispute over the arbitrability of claims or the scope of the Arbitration Agreement to the AAA arbitrators, not to any court. The Arbitration Agreement confirms this as follows:

> You and L'Occitane expressly delegate to the arbitrator the authority to determine the arbitrability of any Dispute, including the scope, applicability, validity, and enforceability of this arbitration provision.

Marker Decl. Ex. B at 32.

Courts routinely find such language is enforceable and constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016); *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011).

Moreover, the Terms also state: "You agree that the arbitration shall be conducted by the [AAA] pursuant to its Consumer Arbitration Rules." Marker Decl. Ex. B at 32. Rule 14(a) of AAA Consumer Arbitration Rules provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Rule 14(b) states that the arbitrator "shall have the power to

determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause."[10]

Courts routinely find the incorporation of AAA rules enforceable and constitutes clear evidence that contracting parties agreed to arbitrate arbitrability. *See, e.g.*, *Brennan*, 796 F.3d at 1130 ("[I]ncorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."); *Ahern v. Fiserv, Inc.*, No. 23-cv-07753, 2023 WL 8945697, at *6 (C.D. Cal. Dec. 8, 2023) (same).

Accordingly, L'Occitane's attempt to bypass the Arbitration Agreement by filing its counterclaims in a competing lawsuit in federal court asking it to decide issues of arbitrability instead of AAA is without merit, contrary to the language of the Arbitration Agreement, and contrary to United States Supreme Court precedent. All claims should be compelled to individual arbitration.

## 2.    In the Alternative, L'Occitane's Claims Fall Within the Scope Of the Arbitration Agreement

Even assuming, *arguendo*, that the Court must consider arbitrability, L'Occitane's claims in the Complaint fall within the scope of arbitrable disputes. The Arbitration Agreement describes a "Dispute" as "any controversy, claim, action or dispute arising out of or related to any transaction conducted on the Websites, *or* the breach, enforcement, interpretation, or validity of this Agreement or any part of it ('Dispute')." Marker Decl. Ex. B at 31 (emphasis added). Therefore, at least two categories of claims must be arbitrated: (1) any claim or dispute related to any transaction conducted on the Website; or (2) any claim or dispute related to the breach, enforcement, interpretation, or validity of any part of the Terms. The claims here satisfy both.

First, like those in Claimant's Demands filed in AAA, all claims presented in

---

[10] AMERICAN ARBITRATION ASSOCIATION, CONSUMER ARBITRATION RULES (2014), *available at* https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf.

L'Occitane's Complaint are claims *related to* any transaction conducted on the L'Occitane Website, namely the communications that were intercepted by the embedded third-party tracking codes and then provided to L'Occitane. Contrary to L'Occitane's prior arguments, the term "transaction" is not narrowly defined to only involve product purchases. The word "purchase" does not appear in the clause. While the term transaction may apply to a completed sale, it is broader and applies to other things including "communicative action or activity involving two parties or things that reciprocally affect or influence each other."[11] Marker Decl. Ex. F. This would certainly include the interception of communications through use of the third-party tracking codes in dispute here. *See Revitch*, 2019 WL 5485330, at *1–2 (denying a motion to dismiss CIPA claims where, as here, an online retailer hired a third-party technology company to monitor website visitors' website activities, stating "[plaintiff's] interaction with the Moosejaw website is communication within the meaning of section 631"). Supporting this, L'Occitane affirmatively states in the Terms that the Terms "govern[s] your use of our Websites." Marker Decl. Ex. B at 1.

Courts in this Circuit recognize the language "related to" and "connected to" in the arbitration clause of a contract to be broad and presumptively inclusive of disputes arising from the relationship created by the contract. *See, e.g.*, *KKE Architects, Inc. v. Diamond Ridge Dev. LLC*, No. 07-cv-06866, 2008 WL 637603, at *6 (C.D. Cal. Mar. 3, 2008) ("Here, the arbitration clause to which the parties agreed is broad. It applies to 'any claim, dispute, or other matter in question arising out of or related to' the contract. Courts have held that use of similar phrases connotes an expansive arbitration provision."). The scope of this type of arbitration provision is "broad and far reaching." *Chiron*, 207 F.3d at 1131. As explained in *Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999):

Every court that has construed the phrase 'arising in connection with' in an

---

[11]    *Transaction*, Merriam-Webster (11th ed.), *available at* https://www.merriam-webster.com/dictionary/transaction; *see also* Marker Decl. Ex. G (*Transaction*, COLLINS DICTIONARY (13th ed.), *available at* https://www.collinsdictionary.com/us/dictionary/english/transaction ("transaction … an interaction of an individual with one or more other persons")).

arbitration clause has interpreted that language broadly. We likewise conclude that the language "arising in connection with" reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.

To require arbitration, [plaintiffs'] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability."

Further, the Supreme Court has "repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019). While L'Occitane incorrectly and narrowly interprets the scope of Arbitration Agreement to apply only to those who made purchases on the Website, it even violates even that low standard by filing suit against those Claimants that it concedes made purchases. *See* Compl. ¶¶ 22, 34, 111, 139.

Second, the claims presented by L'Occitane are those related to the breach, enforcement, interpretation, or validity of any part of the Terms and therefore fall within the scope of the Arbitration Agreement. As an initial matter, the current dispute over the interpretation and enforcement of the arbitration clause obviously falls within this clause and therefore, requires resolution in arbitration. In addition, a disputed issue central to the claims presented by both sides is whether L'Occitane's privacy policy, found in a different part of the Terms, applies and whether its post-tracking disclosure absolves it of liability under CIPA. *See* Compl. ¶¶ 16–17, 27–28 (citing privacy policy); Marker Decl. Ex A. ¶¶ 15, 21–23.

Privacy policies do not bind users "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Nguyen*, 763 F.3d at 1178–79. Moreover, even when a website's terms are conspicuous and the website prompts users to take affirmative action, CIPA itself requires "the *prior consent* of all parties to a communication." *Javier*, 2022 WL 1744107, at *2 (emphasis added).

24

Accordingly, the claims presented by L'Occitane and Claimants fall within the scope of the Arbitration Agreement and under *Schein* must be presented to the AAA arbitrators for resolution, not this Court.

**D.    L'Occitane's Claims Against Claimants Should Be Dismissed.**

Based on the foregoing, this Court should compel L'Occitane's claims against Claimants to arbitration and dismiss the claims against Claimants from the case. *See Brennan*, 796 F.3d at 1134 (affirming the district court's order dismissing the action in favor of arbitration); *Lee*, 2021 WL 3619896, at *5 (granting motion to compel arbitration and dismissing claims without prejudice); *Dvorsky*, 2017 WL 7079459, at *4 (granting motion to compel arbitration and dismissing action without prejudice where the court had concluded that the parties delegated the question of arbitrability to the arbitrator).

## VI.    CONCLUSION

For all reasons stated above, the Court should grant Claimants' Motion to Compel Arbitration and issue an order pursuant to the FAA: (1) compelling arbitration of all claims asserted by L'Occitane against Claimants; and (2) dismissing without prejudice the Complaint filed by L'Occitane against Claimants.

Respectfully submitted,

ZIMMERMAN REED LLP

Date: March 4, 2024          By:    /s/ Caleb Marker
                                    Caleb Marker
                                    6420 Wilshire Blvd, Suite 1080
                                    Los Angeles, CA 90048
                                    Telephone (877) 500-8780
                                    Facsimile (877) 500-8781
                                    Email: caleb.marker@zimmreed.com

                                    *Attorneys for the Claimants*
                                    *Appearing Specially for this Motion*