ALLAN E. ANDERSON (SBN 133672)
allan.anderson@afslaw.com
ADAM D. BOWSER (*pro hac vice*)
adam.bowser@afslaw.com
ANDREA M. GUMUSHIAN (SBN 342528)
andrea.gumushian@afslaw.com
**ARENTFOX SCHIFF LLP**
555 West Fifth Street, 48th Floor
Los Angeles, California 90013
Telephone: 213.629.7400
Facsimile: 213.629.7401

Attorneys for Plaintiff
L'OCCITANE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L'OCCITANE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>Zimmerman Reed LLP and 3,144 Of Its Purported Clients,<br><br>Defendant(s). | Case No. 2:24-cv-01103-PA-RAO<br><br>**L'OCCITANE'S OPPOSITION TO MOTION TO DISMISS**<br><br>Date:　　　April 18, 2024<br>Time:　　　1:30 p.m.<br>Ctrm:　　　9A<br><br><br>Judge:  The Hon. Percy Anderson<br><br>Complaint Filed: February 8, 2024 |

ARENTFOX SCHIFF LLP

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................8

THE COMPUTER FRAUD AND ABUSE ACT ........................................8

RELEVANT ALLEGATIONS.....................................................................10

STANDARD OF REVIEW .........................................................................13

ARGUMENT...............................................................................................14

I.    Defendants Have Violated The CFAA Under Its Plain Language...............14

    A.    Defendants have violated the plain language of 18 U.S.C. § 1030(a)(2)(C) ....................................................................14

    B.    Defendants have violated the plain language of 18 U.S.C. § 1030(a)(4)..................................................................18

    C.    Zimmerman Reed violated the plain language of 18 U.S.C. § 1030(b) ........................................................................22

    D.    L'Occitane has suffered a "loss" under the CFAA, entitling it to pursue a private right of action for the violations detailed above .......23

II.    Ninth Circuit Precedent Fully Supports L'Occitane's Claim .....................25

    A.    Numerous controlling cases support L'Occitane's CFAA Claim ........25

    B.    Defendant's Reliance On *hiQ* is Misplaced.........................................28

III.    Zimmerman Reed Is A Proper Party With Respect To L'Occitane's Constitutional And Communications Decency Act Claims.........................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*123 Los Robles LLC v. Metzler,*
2017 WL 10311210 (C.D. Cal. Aug. 14, 2017) ................................................... 27

*ACI Payments, Inc. v. Conservice, LLC,*
2022 WL 622214 (D. Utah Mar. 3, 2022) ........................................................... 21

*Allred v. Harris,*
14 Cal. App. 4th 1386 (1993) ............................................................................... 9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................... 13

*Barnstormers, Inc. v. Wing Walkers, LLC,*
No. EP-10-CV-261-KC, 2011 WL 1671641 (W.D. Tex. May 3,
2011) ................................................................................................................... 28

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................... 13

*Black v. Sullivan,*
48 Cal.App.3d 557 (1975) .................................................................................. 23

*Bowen v. Porsche Cars, N.A., Inc.,*
561 F. Supp. 3d 1362 (N.D. Ga. 2021) ............................................................. 21

*Cahill v. Liberty Mut. Ins. Co.,*
80 F.3d 336 (9th Cir. 1996) ............................................................................... 13

*Cobb v. Aurora Loan Servs., LLC,*
408 B.R. 351 (E.D. Cal. 2009) .......................................................................... 13

*Craigslist Inc. v. 3Taps Inc.,*
964 F. Supp. 2d 1178 (N.D. Cal. 2013) ................................................. 26, 27, 30

*Davis v. Scherer,*
468 U.S. 183 (1984) ........................................................................................... 13

*eBay Inc. v. Digital Point Solutions, Inc.*,
    608 F. Supp. 2d 1156 (N.D. Cal 2009).......................................................19, 20, 27

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ....................................................................................... 13

*Facebook Inc. v. Power Ventures*,
    844 F.3d 1058 (9th Cir. 2016)...................................................................24, 25

*Facebook, Inc. v. MaxBounty, Inc.*,
    274 F.R.D. 279 (N.D. Cal. 2011) ..............................................................*passim*

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022)................................................28, 29, 30, 31

*Keene Corp. v. U.S.*,
    508 U.S. 200 (1993) ..................................................................................... 17

*King v. St. Vincent's Hosp.*,
    502 U.S. 215 (1991) ..................................................................................... 17

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009).......................................................14, 16, 27, 30

*Multiven v. Cisco*,
    725 F. Supp. 2d 887 (N.D. Cal. 2010)...........................................................20

*NetApp v. Nimble Storage, Inc.*,
    41 F. Supp.3d 816 (N.D. Cal. 2014)...............................................................19

*People v. Bawden*,
    208 Cal.App.2d 589 (1962) ..........................................................................23

*Register.com, Inc. v. Verio, Inc.*,
    126 F. Supp. 2d 238 (S.D.N.Y. 2000) ...........................................................28

*Rickley v. Goodfriend*,
    212 Cal. App. 4th 1136 (2013)......................................................................23

*Rodriguez v. AT & T Mobility Servs. LLC*,
    728 F.3d 975 (9th Cir. 2013) ........................................................................29

*Russello v. U.S.*,
    464 U.S. 16 (1983) ....................................................................................... 17

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ........................................................................ 13

*Sw. Airlines v. Farechase, Inc.*,
   318 F. Supp. 2d 435 (N.D. Tex. 2004) ........................................... 28

*Ticketmaster L.L.C. v. Prestige Entertainment West, Inc.*,
   315 F. Supp. 3d 1147 (2018) ........................................................... 24

*Ticketmaster LLC v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......................................... 28

*U.S. v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ................................................*passim*

*Ubisoft, Inc. v. Kruk*,
   2021 WL 3472833 (C.D. Cal. July 9, 2021) .................................. 22

*United States v. Eckford*,
   77 F.4th 1228 (9th Cir.), *cert. denied*, 144 S. Ct. 521 (2023) ........... 29

*United States v. Morris*,
   928 F.2d 504 (2d Cir. 1991) ............................................................ 16

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) .................................................. 16, 26

*United States v. Trotter*,
   478 F.3d 918 (8th Cir. 2007) ........................................................... 14

*United States v. Valle*,
   807 F.3d 508 (2d Cir. 2015) ............................................................ 16

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) .................................................................... 21

*United States ex rel. Vatan v. QTC Med. Servs., Inc.*,
   721 F. App'x 662 (9th Cir. 2018) ................................................... 20

*Waln v. Dysart Sch. Dist.*,
   54 F.4th 1152 (9th Cir. 2022) ......................................................... 12

*Watters v. Breja*,
   No. 23-cv-03183, 2024 WL 201356 (N.D. Cal. Jan. 18, 2024) ........ 30

*Weingand v. Harland Fin. Solutions, Inc.*,
  No. C-11-3109 EMC, 2012 WL 2327660 (N.D. Cal. June 19, 2012) ..............27

*Wyatt v. Union Mortg. Co.*,
  24 Cal. 3d 773 (1979) ...................................................................................23

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,
  774 F.3d 1065 (6th Cir. 2014) .......................................................................24

**Statutes**

18 U.S.C. § 1030........................................................................8, 16, 22, 24

18 U.S.C. § 1030(a) ..............................................................................14

18 U.S.C. § 1030(a)(2)(A) .....................................................................17

18 U.S.C. § 1030(a)(2)(C) .................................................................*passim*

18 U.S.C. § 1030(a)(3) ....................................................................9, 16

18 U.S.C. § 1030(a)(4) .................................................................*passim*

18 U.S.C. § 1030(b) ........................................................................9, 22

18 U.S.C. § 1030(c)(4)(A)(i)(I) .............................................................26

18 U.S.C. § 1030(e)(2) ...........................................................................14

18 U.S.C. § 1030(e)(8) ...........................................................................10

18 U.S.C. § 1030(e)(11) ...............................................................10, 24, 26

18 U.S.C. § 1030(g) ...................................................................9, 10, 24

47 U.S.C. § 230...................................................................................31

47 U.S.C. § 230(e)(3) ..........................................................................32

**Other Authorities**

131 Cong. Rec. S11,872 (daily ed. Sept. 20, 1985) ....................................9

CACI No. 3600, "Conspiracy – Essential Factual Elements," *Judicial Council of California Civil Jury Instructions*, 2023 Edition..............................23

OPPOSITION TO MOTION TO DISMISS
Case No. 2:24-cv-01103-PA-RAO

S. Rep. No. 104-357 (1996) ........................................................................................... 17

Plaintiff L'Occitane, Inc. ("L'Occitane") respectfully opposes Defendant Zimmerman Reed LLP's Motion to Dismiss (ECF No. 26) (the "Motion").

## INTRODUCTION

The main issues before the Court are simple: does the Computer Fraud and Abuse Act ("CFAA") allow L'Occitane to revoke authorization to its Website through a targeted cease-and-desist letter? And if these digital trespassers refuse to leave, does the CFAA then authorize a private right of action when L'Occitane has suffered a loss as a result of these violations?  The answer to both questions is clearly "yes" under the plain language of the CFAA, and numerous controlling Ninth Circuit cases directly on point.

For its part, Zimmerman Reed wants the Court to judicially amend the CFAA to impose limitations on the type of private property protected in ways that would totally undermine the purpose (let alone the unambiguous text) of the statute. Protecting only computers with password protections is akin to the law of trespass protecting only landowners that have locked gates. That is not the law. Property owners are free to choose how they use their property and to whom they will allow access. That is the premise underlying the very concept of private property.

In short, L'Occitane's targeted cease-and-desist letter to the defendants, without more, revoked their authorization to access the Website. The defendants, including Zimmerman Reed, proceeded to access the Website at their peril under the CFAA after the October 6 cease-and-desist letter, which unequivocally revoked any prior authorization to access the Website. The Motion should therefore be denied in its entirety, as detailed below.

## THE COMPUTER FRAUD AND ABUSE ACT

The CFAA, 18 U.S.C. § 1030, is a 1986 law that by its plain terms protects *all* computers and *all information* on those computers from unauthorized access and fraudulent activity. 18 U.S.C. § 1030(a)(2)(C), (a)(4). Indeed, the entire purpose of

the CFAA is to provide computer owners with the same private property protections as the law of trespass. *See, e.g.*, 131 Cong. Rec. S11,872 (daily ed. Sept. 20, 1985) (describing the conduct proscribed as "akin to a trespass onto someone else's real property"). And just as the law of trespass does not require property owners to build a wall to exclude others from their property,[1] the plain language of the CFAA allows computer owners broad power to exclude third parties from their computers, without any requirement to deploy targeted technical obstacles.

Specifically, Section 1030(a)(2)(C) reads, in its entirety, as follows:

(a) Whoever--

(2) intentionally accesses a computer **without authorization** or exceeds authorized access, and thereby obtains--

(C) **information** from any protected computer; … shall be punished as provided in subsection (c) of this section. 18 U.S.C. § 1030(a)(2)(C) (emphasis added).[2]

Section 1030(a)(4) separately prohibits anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value … ." 18 U.S.C. § 1030(a)(4). In addition, Section 1030(b) extends liability for the foregoing violations to "[w]hoever conspires to commit or attempts to commit an offense under subsection (a) … ." *Id.* § 1030(b).

Section 1030(g) of the CFAA, in turn, creates a private right of action for violations of the foregoing provisions: "[a]ny person who suffers damage **or loss** by

---

[1]   *See Allred v. Harris*, 14 Cal. App. 4th 1386, 1390 (1993) ("[T]he right to exclude persons is a fundamental aspect of private property ownership.").

[2]   Zimmerman Reed's Motion is based on the false premise that only *private* information is protected under the CFAA, Motion at 15, but that is expressly not the case for claims arising under Section 1030(a)(2)(C). To the contrary, Congress did explicitly place such limitations in portions of the statute not implicated here. 18 U.S.C. § 1030(a)(3) (protecting "any nonpublic computer of a department or agency of the United States."). Under basic rules of statutory construction, that means the "nonpublic" limitations do not exist in the portions of the statute that are at issue here.

reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g) (emphasis added).[3] Relevant to this matter is the statutory requirement for: "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." The CFAA defines "loss" as "any reasonable cost to any victim, **including the cost of responding to an offense, conducting a damage assessment**, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) (emphasis added).

The unambiguous text of the CFAA thus protects *all* computers and *all information* on those computers from unauthorized access or fraudulent activity, and provides a private right of action for violations of the foregoing – including against persons conspiring with others to commit such violations – when there is a loss as defined in the CFAA. As detailed below, L'Occitane more than adequately alleged such violations and loss against both Zimmerman Reed and its purported clients, who are jointly engaged in pursuing baseless setup claims against L'Occitane – expressly including claims that arose only after L'Occitane unequivocally informed the defendants that they were not authorized to access the Website.

## **RELEVANT ALLEGATIONS**

Zimmerman Reed sent a demand letter to L'Occitane on September 6, 2023, claiming that "approximately 2,250 of [its unidentified] clients . . . may present" claims against L'Occitane under Sections 631 and 632.7 of CIPA. Compl. ¶ 131. On October 6, 2023, counsel for L'Occitane provided the following cease-and-desist

---

[3]     Zimmerman Reed's Motion is based on the sleight of hand that L'Occitane does not allege *damages* – a separately defined term – to its computer systems. Motion at 16; 18 U.S.C. § 1030(e)(8). But claims for *losses* are independently actionable, as the statute is expressly written in the disjunctive: damage *or* loss.

notice to defendants revoking access to the Website:

> L'Occitane notifies you here that anyone associated with your firm, firms you are working with on these matters, any and all undisclosed clients, Claimants, or any other individuals you represent now or in the future, **are no longer authorized to visit or view the L'Occitane Website https://www.loccitane.com/**, as well as any webpages located at this domain. Please instruct your clients, employees, agents, contractors and co-counsel that they should cease and desist from any attempt to access the foregoing website, provide any information to L'Occitane, or otherwise attempt to set up any lawsuit against L'Occitane or its affiliate companies, under CIPA or otherwise.

*Id*. ¶ 132. On October 20, 2023, Zimmerman Reed sent to counsel for L'Occitane a spreadsheet containing the first and last names of approximately 3,144 "clients represented by Zimmerman Reed ('Claimants') who intend to advance the claims asserted in the September 6 letter." *Id*. ¶ 133. In other words, Zimmerman Reed and its clients manufactured approximately 900 more purported CIPA claims against L'Occitane compared to the approximately 2,250 in Zimmerman Reed's initial form demand letter. *Id*. ¶ 134. Based on the very limited number of putative Claimants who L'Occitane could ascertain in its business records – such as by cross-referencing email addresses submitted through L'Occitane's Website against data submitted with AAA filings – L'Occitane determined that a substantial percentage of this limited subset of putative Claimants were attempting to generate CIPA claims *after* L'Occitane's October 6, 2023 cease-and-desist notice detailed above. *Id*. ¶ 135.

For example, one of the defendants who L'Occitane believes to be named Veronica Eshelby registered on L'Occitane's Website by submitting her email address on October 11, 2023, and she did not do anything else on the Website, such as purchase anything. *Id*. ¶ 136. Thus, Ms. Eshelby accessed L'Occitane's Website *after* L'Occitane provided unequivocal notice that she was not authorized to do so, and she did so, jointly with Zimmerman Reed, for the purpose of manufacturing a meritless CIPA claim against L'Occitane. *Id*. ¶ 137. By doing so, Ms. Eshelby obtained information from a protected computer that she was not authorized to access. *Id*. ¶

138. Numerous other defendants accessed L'Occitane's Website and obtained information from L'Occitane's protected computer after being expressly informed that they were not authorized to do so. *Id*. ¶ 139.

Zimmerman Reed through its attorneys, employees, and agents, continued to access L'Occitane's Website, and conspired with the other defendants to access L'Occitane's Website, to obtain information from L'Occitane's protected computer, after being expressly informed that they were not authorized to do so. *Id*. ¶ 140. Defendants have engaged in a civil conspiracy to commit the above-described activities in order to knowingly and willfully manufacture baseless CIPA claims and other potential claims for the purpose of extracting an *in terrorem* settlement or other monetary payment(s) from L'Occitane, which Zimmerman Reed and its putative clients would jointly benefit from if their scheme is successful. *Id*. ¶ 141. Further, both Zimmerman Reed, on behalf of itself and its putative clients, have communicated threats to continue accessing L'Occitane's Website without authorization and with the intent to continue manufacturing CIPA claims. *Id*.

Defendants have knowingly and willfully engaged in the above-described activities to cause L'Occitane loss. *Id*. ¶ 142. Indeed, these setup claims are being orchestrated by Zimmerman Reed despite Zimmerman Reed **using the same technology on its website**. *Id.* ¶ 58;[4] *see also* ECF No. 20 at 1-3. L'Occitane has

---

[4]    As also noted in the Complaint, Zimmerman Reed filed CIPA claims for over 150 Claimants who do not even live in California. *Id.* ¶ 39. It is reasonable to infer that if Zimmerman Reed is willing to file claims that must have a California nexus for individuals that do not live in California, they will similarly file claims on behalf of a substantial number of individuals who visited the Website, if at all, only after being expressly informed not to. Indeed, L'Occitane *has determined* – and specifically alleged – that Zimmerman Reed is in fact filing such setup claims on behalf of individuals who visited the Website after October 6, 2023. The real question is *how prevalent* these post-October 6, 2023 setup claims are that Zimmerman Reed is jointly pursuing with its putative clients. But that will require discovery into information exclusively in the possession of Zimmerman Reed and/or its putative clients, because again, L'Occitane has no evidence that **over 90%** of the putative Claimants even visited the Website. *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1160–

suffered, and continues to suffer, loss by reason of these violations, including, without limitation, harm to L'Occitane's content, computer systems, and increased data storage costs, expenses, including attorneys' fees and lost employee time associated with being forced to investigate the unauthorized access of its computers and servers, well in excess of $5,000 aggregated over a one-year period. *Id*. ¶ 143. In addition, L'Occitane is entitled to injunctive relief against both Zimmerman Reed and its putative clients because they expressly take the position that L'Occitane cannot stop them from accessing the Website. Indeed, that is the whole (erroneous) point of Zimmerman Reed's Motion.

## **STANDARD OF REVIEW**

On a motion to dismiss, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Cobb v. Aurora Loan Servs., LLC*, 408 B.R. 351, 353 (E.D. Cal. 2009) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)); *see also Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) (Allegations of material fact are taken as true and construed in the light most favorable to the non-moving party). To survive a motion to dismiss, a plaintiff needs to plead "only enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citations omitted).

---

61 (9th Cir. 2022) (ruling "information and belief" allegations even for events that occurred *in public* are permissible).

## ARGUMENT

## I.    Defendants Have Violated The CFAA Under Its Plain Language

The CFAA prohibits intentionally accessing a computer without authorization to obtain information from a protected computer and applies to a computer involved in interstate commerce. *See* 18 U.S.C. § 1030(a), (e)(2). As detailed in L'Occitane's underlying Complaint, defendants have violated the plain language of multiple sections of the CFAA after being expressly and directly informed that they were not authorized to access the Website.

### A.    Defendants have violated the plain language of 18 U.S.C. § 1030(a)(2)(C)

The CFAA prohibits "intentionally access[ing] a computer without authorization… and thereby obtain[ing]…information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). The term 'protected computer' means computers used in interstate or foreign commerce. 18 U.S.C. § 1030(e)(2). To state a claim under this section of the CFAA, L'Occitane must only allege that a defendant: (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4) from any protected computer, and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009). Courts have also held that computers used in interstate or foreign commerce include any computer connected to the internet. *See, e.g., U.S. v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012); *see also United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007).

L'Occitane more than adequately alleged these elements with specific facts, as detailed above. *See also* Compl. ¶¶ 129-145. L'Occitane clearly and unequivocally informed all defendants, through its October 6 letter, that defendants were not authorized to access L'Occitane's Website. Defendants' activity after October 6

establishes that defendants intentionally accessed L'Occitane's Website, provided through L'Occitane's protected computers. And they did so to obtain, and did obtain, information from the Website in order to setup their baseless CIPA claims – *after* being told not to. L'Occitane then suffered losses, as defined in the CFAA, in responding to these offenses in excess of $5,000. L'Occitane need not allege any more than this to provide defendants adequate notice of the claim.

Nevertheless, to put a finer point on it, in defendants' underlying CIPA claims, defendants are *not* claiming that they engaged in any actual "communication" with L'Occitane through the Website, as is required for a viable CIPA claim. Rather, it is defendants' purported "clicks, scrolls, **pages visited**," and the generic "interaction with the [L'Occitane] website" that is *the* basis of their purported claims. In other words, it is the very information provided by L'Occitane through its Website, and allegedly obtained by the defendants, that gives rise to their alleged claims. And this is precisely the information L'Occitane unequivocally informed defendants that they were not authorized to access – for the express purpose of stopping Zimmerman Reed and its putative clients from generating even more claims after L'Occitane was notified of their scheme. Zimmerman Reed's filing of CIPA claims – based on visits to the Website that occurred **after October 6, 2023** – provides more than sufficient evidence to establish that defendants accessed L'Occitane's Website without authorization and obtained information in violation of Section 1030(a)(2)(C) to further their scheme.

For their part, Zimmerman Reed's Motion largely hinges on their argument that L'Occitane cannot exclude the defendants from L'Occitane's otherwise publicly accessible Website, but must somehow develop technological barriers that target setup Claimants in advance.[5] Motion at 7-10. But most courts – including the Ninth

---

[5] Needless to say, this would effectively shut down L'Occitane's Website, because L'Occitane has no knowledge, e.g., of the Claimants' IP addresses or any other information that would allow L'Occitane to proactively block bad actors from

Circuit in a case directly on point – interpret the term "without authorization" to mean accessing or damaging a computer simply without permission. *See United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016) (concluding that the plain and ordinary meaning of "without authorization" means accessing a protected computer without permission).

In *Nosal*, the Ninth Circuit specifically interpreted the "without authorization" element as not entailing *any* technical barrier:

> Beginning in 1991, in construing [the CFAA], the Second Circuit recognized that 'authorization' is a word 'of common usage, **without any technical** or ambiguous meaning.' *United States v. Morris*, 928 F.2d 504, 511 (2d Cir. 1991). The court reaffirmed this holding in 2015, citing *Brekka* and stating that 'common usage of "authorization" suggests that one "accesses a computer without authorization" if he accesses a computer without permission to do so at all.' *United States v. Valle*, 807 F.3d 508, 524 (2d Cir. 2015).

*Nosal*, 844 F.3d at 1037 (emphasis added).  Further, through its analysis of the jury instructions at issue, the Ninth Circuit in *Nosal* adopted a plain-language reading of "without authorization." Specifically, the court discusses how circumventing a technological access barrier is **not required** for a violation of the CFAA, holding that "[n]ot only is such a requirement missing from the statutory language, but it would make little sense because some § 1030 offenses do not require access to a computer at all." *Id*. at 1038-39. **That holding is claim dispositive here**.

The Ninth Circuit's interpretation of "without authorization" is entirely consistent with basic rules of statutory construction. Specifically, subsection (a)(3) prohibits certain access to "nonpublic" United States government computers. 18 U.S.C. § 1030(a)(3) ("intentionally, without authorization to access any *nonpublic* computer of a department or agency") (emphasis added). By modifying computers with the word "nonpublic," Congress meant to exclude from protection "publicly

---

its Website. In any event, the plain language of the CFAA does not require L'Occitane to develop "Minority Report"-like blockers to keep out digital slip-and-fall claimants.

available" computers accessible "via an agency's World Wide Web site." S. Rep. No. 104-357, at 8 (1996). Congress chose *not* to do this in Section (a)(2)(C).

That is, the inclusion of "nonpublic" in subsection (a)(3) and exclusion of "nonpublic" from (a)(2)(C) is dispositive proof that the section at issue here protects both "public" and "nonpublic" computers. Congress knew exactly how to exclude from protection computers that are "publicly available" via a "World Wide Web site." S. Rep. No. 104-357, at 8. It specifically chose not to do so in Section (a)(2)(C).[6]

There are likewise no limitations on the type of information – public, private, personal, etc. – that is protected. Here again, "information" is not modified or qualified in the CFAA section at issue. And, here again, Congress *did* include modifiers elsewhere in the statute when discussing "information." *See* 18 U.S.C. § 1030(a)(2)(A) (barring unauthorized access to a computer to obtain "information contained in a financial record . . . or of a card issuer"). It therefore specifically and intentionally chose not to place such limitations on Section 1030(a)(2)(C).

At bottom, under the plain language of the statute, CFAA Section 1030(a)(2)(C) protects *all* information on *all* protected computers from unauthorized access – and that simply means to obtain information without permission. There can be no dispute here that L'Occitane specifically revoked permission to the defendants to access the Website in order to prevent further setup CIPA claims. When Zimmerman Reed and its putative clients *continued* to do so without permission after October 6 in order to set up their claims based on the information they obtained through their unauthorized access, they violated Section 1030(a)(2)(C) under its plain

---

[6] *See Keene Corp. v. U.S.*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (quoting *Russello v. U.S.*, 464 U.S. 16, 23 (1983)); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220-21 (1991) ("Given the examples of affirmative limitations on reemployment benefits conferred by neighboring provisions, we infer that the simplicity of subsection (d) was deliberate . . . to provide its benefit without conditions on length of service.").

language, and as interpreted by the Ninth Circuit.

**B.    Defendants have violated the plain language of 18 U.S.C. § 1030(a)(4)**

The CFAA also prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value." 18 U.S.C. § 1030(a)(4). As detailed in the Complaint, defendants came onto L'Occitane's Website after being told they were not allowed to, for the very purpose of obtaining the information necessary to set up fraudulent CIPA claims against L'Occitane.

Indeed, as thoroughly detailed in the Complaint, these setup claims are being filed despite the fact that *every* Website visitor from California (and other jurisdictions) are **immediately** informed on L'Occitane's Website of the use of the website technologies at issue through a conspicuous pop-up window. Compl. ¶ 16 (notifying visitors that they can easily change cookie settings, and that the "[u]se of our website and any of our services represents your consent to the use of cookies and acceptance of our Privacy Policy.").[7] That is, L'Occitane *is* obtaining consent to the use of its cookies, which do not even "record" communications – let alone in a way that would allow third parties to read their "contents" in transit on a wire. Compl. ¶

---

[7]    Zimmerman Reed gives the game away when it states "[i]f Zimmerman Reed's clients visited L'Occitane's website knowing they would be recorded to gin up a CIPA claim, then they would have done so with consent, ruining the claim entirely. Instead of raising that as a defense in arbitration … it fabricates a plainly unsupported CFAA conspiracy." Motion at 10 n.4. Zimmerman Reed does not deny that L'Occitane's website *does* provide conspicuous notice of its cookie policy and privacy policy immediately on the Website. Nor could it – it's publicly available to anyone visiting the Website in California and other jurisdictions. Instead, Zimmerman Reed's argument is effectively "L'Occitane, why don't you pay millions of dollars in AAA filing fees so you can defend yourself against our transparently meritless claims?" Zimmerman Reed presented L'Occitane with a Hobson's Choice, thinking it could force L'Occitane into paying millions of dollars in arbitration filing fees unless it negotiated a quick resolution. *That* is part of the fraudulent conspiracy L'Occitane is attempting to neutralize through the protections afforded by Congress in the CFAA.

57, n.11.[8]

Point being, the underlying "claim" is both factually *and* legally meritless – on CIPA's own (unconstitutional) terms – simply from a consent perspective. And nothing evidences the meritless nature of these setup claims more than the fact that ***Zimmerman Reed*** itself uses the ***same technology*** on its website – ironically ***while*** its putative clients are filling out unverified forms to launch these baseless claims. *Id.* ¶¶ 20-21, 58. And of course, Zimmerman Reed has even filed over 150 *California* Invasion of Privacy Act claims for individuals who do not even live in California. *Id.* ¶ 39. On top of that, and as detailed above, there are ample allegations detailing how Claimants have only visited the Website *after* being expressly informed that they were not authorized to do so – for the sole purpose of attempting to fraudulently induce an "agreement to arbitrate" to further this scheme.  These allegations clearly support a claim that the scheme orchestrated by Zimmerman Reed is one "knowingly and with intent to defraud" L'Occitane through these setup claims.

Oddly, Zimmerman Reed argues that L'Occitane's allegations of fraud do not satisfy Rule 9(b) – by citing a case that holds heightened pleading standards do *not* apply to CFAA fraud claims. Motion at 11 (citing *NetApp v. Nimble Storage, Inc.*, 41 F. Supp.3d 816, 833 (N.D. Cal. 2014) (holding that "most CFAA cases in this district have not applied Rule 9(b)'s pleading standards to all CFAA claims" and proceeding to analyze Section 1030(a)(4) claim under Rule 8 standard).  Similarly, the court in *eBay Inc. v. Digital Point Solutions, Inc.* ruled that eBay's CFAA allegations were properly pleaded, noting that "'fraud' under the CFAA only requires a showing of

---

[8]    Zimmerman Reed incorrectly asserts that "L'Occitane acknowledges courts have found those very claims valid." Motion at 12. As L'Occitane specifically alleged in its Complaint, however, "[t]o be clear, L'Occitane believes that most, if not all, of the individual Defendants did not 'communicate' with L'Occitane through its Website – in terms of communications that fall under CIPA." Compl. ¶ 54 n.9; *see also id.* ¶ 57 n.11 ("it is facially absurd to assert, like Defendants do here, that mouse clicks, scrolls, etc. are even communications within CIPA['s] scope"). Simply put, none of the CIPA cases Zimmerman Reed cites remotely hold that a consumer simply visiting a website constitutes a "communication" subject to CIPA.

unlawful access; there is no need to plead the elements of common law fraud to state a claim under the [CFAA]." *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal 2009); *see also Facebook, Inc. v. MaxBounty, Inc.,* 274 F.R.D. 279, 284 (N.D. Cal. 2011) (same); *Multiven v. Cisco,* 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010) ("For purposes of the CFAA, '[t]he term "defraud" ... simply means wrongdoing and does not require proof of common law fraud.' ") (citation omitted). Simply put, L'Occitane has adequately alleged the facts necessary to establish a Section 1030(a)(4) violation, and even Zimmerman Reed's authority confirms that Rule 9(b)'s heightened pleading standard does not apply here.[9]

As for the remaining element of "obtain[ing] anything of value," defendants expressly contend that the very act of coming onto the Website – without more – allows them to establish a CIPA claim *and* enforce L'Occitane's arbitration clause. If defendants can argue they have "obtained something of value" by simply using L'Occitane's Website (if they even did), such that the arbitration agreement is enforceable through adequate consideration, they cannot then simultaneously argue they obtained nothing of value to defend against L'Occitane's CFAA claim. Simply put, defendants cannot have it both ways.

Put differently, defendants cannot logically argue their "agreement" with L'Occitane is supported by consideration when it is convenient for them, while simultaneously claiming they have not "obtained anything of value" when that position suits them. Yet this is exactly what defendants are doing here. Indeed, in defendants' own Motion to Compel Arbitration (ECF No. 21) filed concurrently with Zimmerman Reed's Motion to Dismiss (ECF No. 26), defendants argue that "mutual

---

[9]    To be sure, L'Occitane's allegations documenting the post October 6 activity on its Website to set up these fraudulent claims are incredibly detailed, such that L'Occitane should satisfy Rule 9 in any event. *See United States ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 663 (9th Cir. 2018) (holding that pleading on information and belief satisfies Rule 9(b)'s particularity requirement when information is exclusively in defendant's possession).

consideration is provided through Claimants **continued use of the Website**. . .” ECF No. 21-2 at 18-19 (emphasis added).[10] Not only are defendants arguing that they obtained something of value from L'Occitane's Website, defendants further undercut their own Motion to Dismiss by admitting they *continued to access* L'Occitane's Website after being told not to, and they have no intention of stopping. These irreconcilable arguments are ultimately self-defeating for defendants. Again, they cannot have it both ways.

Defendants' reliance on *Van Buren v. United States*, 141 S. Ct. 1648 (2021), for the proposition that defendants' improper motives are somehow irrelevant is also entirely misplaced. Motion at 10. The issue in *Van Buren* was about *exceeding* a previously granted limited authorization to access a network, not a claim under Section 1030(a)(4). That is, in *Van Buren*, the U.S. Supreme Court resolved a circuit split, holding that “[a]n individual ‘exceeds authorized access’ when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off-limits to him. Pp. 1654-1662.” *Van Buren* at 374. Since then, numerous courts have recognized that *Van Buren*'s holding only applies to the “exceeds authorized access” prong of the CFAA, and does not similarly limit the “without authorization prong.” *See, e.g., ACI Payments, Inc. v. Conservice, LLC*, 2022 WL 622214, at *9 (D. Utah Mar. 3, 2022); *Bowen v. Porsche Cars, N.A., Inc.*, 561 F. Supp. 3d 1362, 1370 (N.D. Ga. 2021). At bottom, this case involves allegations that defendants accessed a protected computer “without authorization,” for a fraudulent purpose – which necessarily makes their improper motives relevant – and therefore *Van Buren* has no application to this case. L'Occitane has therefore adequately alleged a claim against Zimmerman Reed (and

---

[10]     For the avoidance of doubt, L'Occitane vigorously disputes that this digital flash mob attempting to use L'Occitane's Website as an ATM for setup CIPA claims provides any value *to L'Occitane*. In other words, the “value” is solely to Zimmerman Reed and its co-conspirator clients who are attempting to jointly shakedown L'Occitane, and then split the proceeds from their unauthorized access to the Website.

the remaining defendants) under the plain language of Section 1030(a)(4).

### C.   Zimmerman Reed violated the plain language of 18 U.S.C. § 1030(b)

Simply put, the mass arbitration schemes at issue here are entirely plaintiffs' lawyer-driven phenomena. No one could plausibly believe that 3,144 separate individuals just happened to independently reach out to Zimmerman Reed to pursue (meritless) CIPA claims against L'Occitane – claims that are based on the *same* website analytics technologies Zimmerman Reed itself uses. Compl. ¶¶ 20-21. That is why L'Occitane directed that the defendants cease and desist accessing the Website and expressly alleged that "Zimmerman Reed is orchestrating [these] entirely unprincipled shakedowns." *Id* ¶ 58. Further, Zimmerman Reed is doing so "for the purpose of extracting an *in terrorem settlement* or other monetary payment(s) from L'Occitane," which the individual defendants would collectively share with Zimmerman Reed. *Id.* ¶ 141. In fact, Zimmerman Reed independently paid thousands of dollars to AAA to advance this conspiracy. *Id.* ¶ 37. And this scheme involves thoroughly documented setup arbitration claims that only arose *after* L'Occitane unequivocally revoked authorization through its October 6, 2023 cease-and-desist letter. *Id.* ¶¶ 34, 136-139.

These allegations go well beyond heightened pleading standards, let alone Rule 8's notice pleading standards that actually apply to CFAA claims.  That is, to state a claim under 18 U.S.C. § 1030(b), a plaintiff must allege only that a defendant "conspire[d] to commit or attempt[ed] to commit an offense under [§ 1030] subsection (a)." *See Ubisoft, Inc. v. Kruk*, 2021 WL 3472833, at *3 (C.D. Cal. July 9, 2021). In *Ubisoft*, Judge Gee held a Section 1030(b) claim is sufficiently pled when the Complaint includes allegations that defendants conspired with their customers to engage in activities prohibited by the CFAA. *Id*. at *4. As detailed above, L'Occitane easily meets this standard.

More than that, California courts also hold that conspiracies can be inferred from the circumstances: "[c]onspiracies are typically proved by circumstantial

evidence. '[S]ince such participation, cooperation or unity of action is difficult to prove by direct evidence, it can be inferred from the nature of the act done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.'" *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1166 (2013) (quoting *People v. Bawden*, 208 Cal.App.2d 589, 596-597 (1962); *Black v. Sullivan*, 48 Cal.App.3d 557, 566 (1975)). In *Wyatt v. Union Mortg. Co.*, for example, the court explained that "the requisite concurrence and knowledge 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' **Tacit consent** as well as express approval will suffice to hold a person liable as a coconspirator." *Wyatt v. Union Mortg. Co.,* 24 Cal. 3d 773, 784 (1979) (internal citations omitted, emphasis added).[11]

Here, L'Occitane sufficiently pled a direct conspiracy, with Zimmerman Reed expressly orchestrating the scheme. It is the hub of this conspiracy. But the Court may also independently infer the conspiracy from the fact that Zimmerman Reed is not only pursuing setup claims that *Zimmerman Reed itself* would be liable for by using the same technologies on its website,[12] but it is also expressly filing such meritless claims on behalf of Claimants that visited the Website after being expressly informed not to. The Court thus can and should properly infer that Zimmerman Reed is knowingly filing these setup claims on behalf of individuals that were in violation of Section 1030(a)(2)(C) and (a)(4) as established above.

    **D.**     **L'Occitane has suffered a "loss" under the CFAA, entitling it to**

---

[11]    *Accord* CACI No. 3600, "Conspiracy – Essential Factual Elements," *Judicial Council of California Civil Jury Instructions*, 2023 Edition, p. 708.

[12]    L'Occitane respectfully submits that Zimmerman Reed's own use of the ***identical technology on its own website*** is necessarily relevant to Zimmerman Reed's motives and the legitimacy of the underlying mass arbitration scheme. Zimmerman Reed is accusing L'Occitane of ***criminal conduct*** for the **same thing** Zimmerman Reed is doing **to its own putative clients**. This is not something that Zimmerman Reed should be able to shrug off with "it's different when we do it."

**pursue a private right of action for the violations detailed above**

Zimmerman Reed's Motion entirely ignores that suffering a "loss" as defined by the CFAA is independently sufficient to pursue a private right of action, and "damage" is not required. *See* Motion at 16-17. That is, the CFAA provides that "[a]ny person who suffers damage ***or loss*** by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. . ." 18 U.S.C. § 1030(g). And "loss" means any reasonable cost to any victim, including the cost of responding to an offense. 18 U.S.C. § 1030(e)(11). L'Occitane has sufficiently pled requisite loss to state a claim under 18 U.S.C. § 1030, and Zimmerman Reed does not argue otherwise.[13]

Here, L'Occitane's loss is indistinguishable from the losses suffered by Ticketmaster and Facebook. L'Occitane has already incurred, and will continue to incur, substantial costs, in excess of the statutory minimum of $5,000, to ascertain, confirm the identities of individual Claimants who purportedly "transacted" with L'Occitane through its Website, and otherwise respond to the defendants' CFAA violations. L'Occitane has received no indication from defendants that they intend to comply with L'Occitane's unequivocal cease-and-desist notification, which means L'Occitane expects to continue incurring further costs due to the defendants' behavior.

At bottom, L'Occitane has more than adequately alleged multiple violations of

---

[13]     *See Ticketmaster L.L.C. v. Prestige Entertainment West, Inc.,* 315 F. Supp. 3d 1147, 1172 (2018) (holding that costs incurred over $5,000 to determine the identity of individuals accessing Ticketmaster's website was sufficient "loss" to sustain Ticketmaster's CFAA claim against Defendants); *Facebook Inc. v. Power Ventures*, 844 F.3d 1058, 1066 (9th Cir. 2016) (crediting "loss" under the CFAA where "employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding" to the defendant's actions). The $5,000 loss may comprise solely "costs," solely "lost revenues" or "consequential damages," or a combination of both. *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073 (6th Cir. 2014).

the CFAA – both directly against Zimmerman Reed, and in its capacity as the leader of this conspiracy to file fraudulent CIPA claims for setup visits to the L'Occitane Website that occurred only *after* authorization was unequivocally revoked.  Given the substantial costs L'Occitane has incurred, L'Occitane is entitled to pursue its well-pled CFAA claims against Zimmerman Reed pursuant to the private right of action authorized by Congress.

## II.    Ninth Circuit Precedent Fully Supports L'Occitane's Claim

While L'Occitane's claims are fully supported by the plain language of the statute, as detailed below, ample Ninth Circuit precedent also supports L'Occitane's claims.  In contrast, Zimmerman Reed's position is supported solely by an interlocutory order on a motion for preliminary injunction that merely held the moving party "raised serious questions" – questions the Court here must answer in L'Occitane's favor under the prior panel rule.

### A.    Numerous controlling cases support L'Occitane's CFAA Claim

In a Ninth Circuit case directly on point, *Facebook* at 1066 (9th Cir. 2016), Facebook claimed Power Ventures violated the CFAA when it made use of *public* information from Facebook.com without Facebook's permission. Relevant here, Facebook sent a cease-and-desist letter instructing Power Ventures to terminate its activities. *Id*. at 1063. Even after receiving the cease-and-desist letter, Power Ventures continued its activities, acknowledging that it "took, copied, or made use of data from Facebook.com without Facebook's permission." *Id*. After two months, Facebook filed an action claiming Power Ventures violated the CFAA, among other things.

In analyzing whether the defendant lacked authorization to access Facebook's (publicly available) website and information thereon, the Ninth Circuit ruled that Facebook's cease-and-desist letter was all that was required to revoke authorization: "a defendant can run afoul of the CFAA … when such permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship … will not excuse liability." *Id.* at 1067. Indeed, the Court of Appeals credited the fact that

"Facebook expressly rescinded that permission when Facebook issued its written cease and desist letter … the record shows unequivocally that Power knew that it no longer had authorization to access Facebook's computers, but continued to do so anyway." **That is exactly this case.**

The Court further held that Facebook suffered a "loss" within the meaning of the CFAA. "The statute permits a private right of action when a party has suffered a loss of at least $5,000 during a one-year period." *Id*. at 1066; 18 U.S.C. § 1030(c)(4)(A)(i)(I). The Court further explained: "[t]he statute defines 'loss' to mean 'any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id*.; 18 U.S.C. § 1030(e)(11). In assessing whether Facebook met the $5,000 monetary threshold, the Court stated: "[i]t is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions. Accordingly, Facebook suffered a loss under the CFAA." *Id*. at 1066. Again, **that is exactly this case**.

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) further supports L'Occitane's position. In *Nosal*, the Court of Appeals unequivocally stated that circumventing a technological barrier is not required to establish a violation under the statute: "[n]ot only is such a requirement missing from the statutory language, but **it would make little sense** because some [CFAA] offenses do not require access to a computer at all." *Id*. at 1038-39 (emphasis added).

In another case directly on point, *Craigslist Inc. v. 3Taps Inc*., 964 F. Supp. 2d 1178 (N.D. Cal. 2013), fully supports L'Occitane's position that a cease-and-desist letter can properly revoke authorization under the CFAA, without more. In that case, 3Taps was scraping Craigslist's website in order to obtain the publicly available information on the site. *Id*. at 1180. In response to 3Taps' scraping activity, Craigslist

"sent a cease-and-desist letter to 3Taps, informing it that 'you and your agents, employees, affiliates, and/or anyone acting on your behalf are no longer authorized to access, and are prohibited from accessing craigslist's website or services for any reason.'" *Id*. at 1180-81. The Court's key consideration was whether Craigslist "had the power to revoke, on a case-by-case basis, the general permission it granted to the public to access the information on its website." *Id*. at 1182. 3Taps argued that Craigslist had no power to "de-authorize" anyone, but could not point to any language in the CFAA to support that conclusion. *Id*. at 1182. The Court stated, "the Ninth Circuit's interpretation of the CFAA's phrase 'without authorization' confirms that **computer owners have the power to revoke the authorization they grant**." *Id*. at 1183 (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009)) (emphasis added).[14]

And just like Zimmerman Reed argues here, the court rejected the defendant's argument in *eBay v. Digital Point Solutions* that access to the eBay website is always "authorized" under the CFAA because "eBay is a public website that may be accessed by anyone," and thus upheld eBay's CFAA claim. 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (further holding that "'fraud' under the CFAA only requires a showing of unlawful access"); *see also Weingand v. Harland Fin. Solutions, Inc.*, No. C-11-3109 EMC, 2012 WL 2327660, at *3 (N.D. Cal. June 19, 2012) (concluding that "[p]revious Ninth Circuit authority (un-altered by *Nosal* ) indicates that if a former employee accesses information without permission, **even if his prior log-in information is still operative as a technical matter**, such access would violate the

---

[14]   Conversely, courts have dismissed CFAA claims where, unlike this case, there is no allegation that defendants lacked authorization to access a protected computer. In *123 Los Robles LLC v. Metzler*, 2017 WL 10311210 (C.D. Cal. Aug. 14, 2017), the plaintiff's complaint did not allege that defendant was ever notified that his authorization to access the records at issue had been revoked. Notably, the court specifically ruled that, "[u]nlike in *Nosal II* and *Facebook*, the [complaint] here does not allege that Metzler was ever **explicitly notified** that the LLC had revoked his authorization to access Plaintiff's financial records." *Id*. at *3 (emphasis added).

CFAA.") (emphasis added); *Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1113 (C.D. Cal. 2007) ("It appears likely that Plaintiff will be able to prove that Defendant gained unauthorized access to . . . Plaintiff's protected computers" connected to the Internet via the non-password protected website www.ticketmaster.com).[15]

At bottom, consistent with the plain language of the statute, Ninth Circuit precedent – which has never been overturned – directly supports L'Occitane's CFAA claim: a targeted cease-and-desist letter, without more, revokes authorization to an otherwise public website. And the statute protects *all* information on a protected computer. The defendants, including Zimmerman Reed, proceeded to access the Website at their peril under the CFAA after the October 6 cease-and-desist letter, which unequivocally revoked any prior authorization to access the Website under this binding authority.

### B.   Defendant's Reliance On *hiQ* is Misplaced

Zimmerman Reed's Motion is primarily based on the false premise that "the Ninth Circuit has expressly rejected the legal theory L'Occitane relies on for its Complaint." Motion at 2; *see also id.* at 7-10 (summarizing *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), to argue that visiting a public website does not violate the CFAA). As detailed below, however, there is nothing final about the *hiQ* decision by its own terms, and the Court is bound by the Ninth Circuit precedent detailed above under the prior panel rule in any event.

---

[15]    Numerous other cases from outside the Ninth Circuit also uphold CFAA claims involving privately-owned, non-password protected, Internet-connected computers like L'Occitane's. *See, e.g., Sw. Airlines v. Farechase, Inc.*, 318 F. Supp. 2d 435, 438-40 (N.D. Tex. 2004) (access to non-password protected Southwest Airlines website could be unauthorized under the CFAA); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 251-53 (S.D.N.Y. 2000) (access to non-password protected www.register.com via "automated search robot" was unauthorized access under the CFAA); *Barnstormers, Inc. v. Wing Walkers, LLC*, No. EP-10-CV-261-KC, 2011 WL 1671641, at *9 (W.D. Tex. May 3, 2011) (accessing non-password protected website after website owner explicitly requested that defendants not do so was "unauthorized access" under the CFAA).

As an initial matter, *hiQ* is a deferential, interlocutory opinion on a motion for preliminary injunction, and *not* final law. Indeed, as stated in the first paragraph of the decision, "[a]t the preliminary injunction stage. . . we focused on whether hiQ had raised **serious questions** on the merits of the factual and **legal issues** presented to us, as well as on the other requisites for preliminary relief." *Id.* at 1184-85 (emphasis added). Simply put, there is nothing *controlling* about *hiQ* on its own terms, as the panel simply determined hiQ had raised "serious questions" – not that hiQ was actually correct on the law and would ultimately prevail.[16]

Perhaps even more crucially, it is difficult to see how hiQ could do anything more than raise "serious questions" to *potentially* be considered by *en banc* review, because the *Nosal* and *Facebook* decisions detailed above *are* binding, controlling precedent in this Circuit under the prior panel rule, and they are directly on point for L'Occitane's CFAA claim. Under the prior panel rule, a Court of Appeals panel (and district courts) are bound to apply a prior panel decision. *See United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir.), *cert. denied*, 144 S. Ct. 521 (2023) ("Generally, a panel opinion is binding on subsequent panels unless and until overruled by an *en banc* decision of this circuit"); *see also Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) ("we are bound by prior panel decisions … and can only reexamine them when their 'reasoning or theory' of that authority is 'clearly irreconcilable' with the reasoning or theory of intervening higher authority.").

---

[16]   It should also be noted that *hiQ* is clearly distinguishable on the facts, as the data at issue was LinkedIn member profile data, which "LinkedIn specifically disclaims ownership of the information users post to their personal profiles: according to LinkedIn's User Agreement, members own the content and information they submit or post to LinkedIn and grant LinkedIn only a non-exclusive license." *Id.* at 1185.  In contrast, L'Occitane's Terms specifically provide that the "IP and software on our Website may be used **only as a shopping resource**. Any other use … is strictly prohibited." *See* L'Occitane, *Terms & Conditions*, L'Occitane en Provence, https://www.loccitane.com/en-us/pages?fdid=terms-conditions#9 (emphasis added).  Thus, L'Occitane expressly limits the use of its Website to e-commerce (which does not include setting up CIPA claims), and it does not disclaim any ownership in the material posted on its Website like LinkedIn.

Here, Zimmerman Reed relies almost exclusively[17] on the *non-final* decision in *hiQ*, while failing to address both *Facebook* and *Nosal*. As detailed above, the holdings in *Facebook* and *Nosal* control this case. These cases remain good law; no *en banc* panels of this circuit have reversed these decisions, and they remain binding on the Court. Further, the Court of Appeals in *LVRC Holdings LLC v. Brekka* similarly concluded that "a person uses a computer 'without authorization' under [the CFAA] when the person has not received permission to use the computer for any purpose . . . or when the employer **has rescinded permission to access the computer and the defendant uses the computer anyway**." *Brekka*, 581 F.3d at 1135 (emphasis added). In short, *three final* Court of Appeals decisions stand for the proposition that targeted revocation of authorization is effective under the CFAA – without more.

Indeed, the *Craigslist* court followed the Ninth Circuit's prior precedent in *Brekka*, concluding in an indistinguishable case that:

> "As the "ordinary, contemporary, common meaning" of the word indicates, and as *Brekka* expressly held, "authorization" turns on the decision of the "authority" that grants—or prohibits—access. In *Brekka,* the authority was the employer. Here, it is Craigslist. Craigslist gave the world permission (i.e., "authorization") to access the public information on its public website. Then, just as *Brekka* instructed that an "authority" can do, it rescinded that permission for 3Taps. Further access by 3Taps after that rescission was "without authorization." *Craigslist*, 964 F. Supp. 2d at 1183-84.

This precedent is directly in line with the facts before this Court and must be followed here. In contrast, the prior panel rule precludes any interpretation that *hiQ* silently

---

[17]     Zimmerman Reed also cites *Watters v. Breja*, No. 23-cv-03183, 2024 WL 201356, at *3 (N.D. Cal. Jan. 18, 2024), but that case is clearly distinguishable. A lawyer attempted to sue his former client after *the client* logged into *his own credit card account* to dispute a payment he previously made to the lawyer. The credit card company never attempted to restrict access to its website to the client customer, while the lawyer attempted to stand in the shoes of the credit card company to "enforce" its terms of service to argue that the client's access – to his own credit card account – was somehow unauthorized. That case is as ridiculous as it is irrelevant to the facts here.

reversed this prior precedent through an interlocutory decision that merely held "serious questions" were raised. For these reasons, defendants' reliance on *hiQ* is entirely misplaced, and this Court should interpret the CFAA consistent with its plain language and according to the earlier – and binding – Ninth Circuit precedent detailed above.

## III.   Zimmerman Reed Is A Proper Party With Respect To L'Occitane's Constitutional And Communications Decency Act Claims

Through its Complaint, L'Occitane seeks declaratory and injunctive relief that Zimmerman Reed *and* its putative clients are attempting to profit off a state law that is both unconstitutional under the First, Fifth and Fourteenth Amendments, and preempted under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"). Compl. ¶¶ 77-106, 120-128.[18] For its part, Zimmerman Reed argues that L'Occitane lacks "standing" to pursue these claims against Zimmerman Reed because "neither declaratory nor injunctive relief against Zimmerman Reed could redress any actual or threatened injury to L'Occitane." Motion at 19.

This is a demonstrably false premise. As detailed in the Complaint and above, Zimmerman Reed is *the* entity orchestrating this scheme to enforce an unconstitutional and preempted state law against L'Occitane, from which Zimmerman Reed intends to directly profit. *See, e.g.,* Compl. ¶¶ 58, 141. If Zimmerman Reed is enjoined from pursuing the setup claims it is manufacturing with its putative clients, that would redress the actual *and* threatened injuries L'Occitane is facing. On top of that, Zimmerman Reed is specifically filing claims under California's Unfair Competition Law and Consumer Legal Remedies Act, which authorize an award for attorneys' fees in certain circumstances, and Zimmerman Reed is specifically requesting such relief in the underlying AAA proceedings.

---

[18]   These claims entail Counts I-III, and VI, which are clearly lodged against all defendants, while Counts IV and V are expressly lodged against the individual defendants.

Compl., Ex. 2 at 3; *see also* ECF No. 22-1 (arbitration demand specifically requesting attorney fees). Thus, Zimmerman Reed – and Zimmerman Reed alone – is threatening to violate L'Occitane's Constitutional rights, *and* make L'Occitane pay for "privilege." Again, these actual and threatened injuries could *only* be redressed by *Zimmerman Reed* being prevented from seeking the relief that *Zimmerman Reed* is seeking on its own behalf from L'Occitane. L'Occitane therefore clearly has standing to pursue these claims directly against Zimmerman Reed.

Separately, the CDA provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. 230(e)(3). And as detailed in the Complaint, *Zimmerman Reed* is the entity bringing causes of action that are clearly inconsistent with the CDA, given that L'Occitane uses the services at issue in good faith to detect and/or deter fraud, harassing conduct, and otherwise objectionable material and conduct on its Website. Compl. ¶¶ 120-128. In other words, simply by bringing these arbitration claims preempted by the CDA on behalf of its putative clients, Zimmerman Reed is violating the plain language of the CDA.

At bottom, L'Occitane is facing actual and threatened injuries exclusively from Zimmerman Reed, and L'Occitane therefore clearly has standing to pursue its Constitutional and CDA claims directly against Zimmerman Reed. Accordingly, there is no basis to dismiss Counts I-III and VI as to Zimmerman Reed.

Dated: March 25, 2024        **ARENTFOX SCHIFF LLP**

By:*/s/Allan E. Anderson*
     Allan E. Anderson
     Adam D. Bowser
     Andrea M. Gumushian
     Attorneys for Plaintiff
     L'OCCITANE, INC.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff L'OCCITANE, INC., certifies that this brief complies with the 25 page limit set by Paragraph 6(b) of the Court's Standing Order (ECF No. 13).

Dated: March 25, 2024                    */s/Allan E. Anderson*

                                         Allan E. Anderson