1   ALLAN E. ANDERSON (SBN 133672)
    allan.anderson@afslaw.com
2   ADAM D. BOWSER (*pro hac vice*)
    adam.bowser@afslaw.com
3   ANDREA M. GUMUSHIAN (SBN 342528)
    andrea.gumushian@afslaw.com
4   **ARENTFOX SCHIFF LLP**
    555 West Fifth Street, 48th Floor
5   Los Angeles, California 90013
    Telephone: 213.629.7400
6   Facsimile: 213.629.7401

7   Attorneys for Plaintiff
    L'OCCITANE, INC.
8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12   L'OCCITANE, INC.,                    Case No. 2:24-cv-01103-PA-RAO

13                  Plaintiff,            **PLAINTIFF L'OCCITANE, INC.'S
                                          OPPOSITION TO DEFENDANTS'
14         v.                             MOTION TO COMPEL
                                          ARBITRATION**
15
     Zimmerman Reed LLP and 3,144 Of Its
16   Purported Clients,
                                          Date:    April 1, 2024
17                  Defendant(s).         Time:    1:30 p.m.
                                          Ctrm:    9A
18
                                          Judge:  The Hon. Percy Anderson
19
                                          Complaint Filed:  February 8, 2024
20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 9

II.   ARGUMENT ..................................................................................................... 10

    A.   Legal Standard ........................................................................................ 10

    B.   Defendants' Motion Should Be Denied Because They Fail to Set Forth Any
        Evidence of an Agreement to Arbitrate ................................................... 13

    C.   Defendants Cannot Enforce an Illusory Contract .................................... 16

    D.   The Scope of the Terms Does Not Encompass the Disputes, and Claims
        Related to Use of the Website Are Expressly Excluded ........................... 19

        1.   Continued Use *After* Completing a Transaction Is Required ................ 21

        2.   Defendant's Definition of "Transaction" Does Not Make Sense in the
            Context of L'Occitane's Business And the Terms, Which Expressly
            Exclude Liability Or Any Remedy for Use of the Website ................... 22

        3.   Even If Defendants' Definition of "Transaction" Is Correct, There Was
            No Meeting of the Minds ....................................................................... 25

        4.   The Terms Do Not Contemplate Acceptance after the Fact ................. 26

        5.   There Is No Consideration: Nothing of Value Has Been Exchanged .... 27

    E.   Even If Defendants Have an Enforceable Agreement, They Are in Breach
        of the Informal Dispute Resolution Process ............................................. 29

    F.   L'Occitane's Claims Preclude Arbitration And Cannot Be Resolved by an
        Arbitrator ................................................................................................. 30

III.  CONCLUSION .................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Tech's., Inc. v. Commc'n Workers*,
   475 U.S. 643 (1986) ....................................................................................... 13, 21

*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022) ......................................................................... 17, 19

*Calomiris v. Woods*,
   727 A.2d 358 (Md. 1999) ..................................................................................... 23

*Cape Flattery Ltd. v. Titan Mar., LLC*,
   647 F.3d 914 (9th Cir. 2011) ............................................................................... 10

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ............................................................................. 31

*Casa del Gaffe Vergnano S.P.A. v. ItalFlavors, LLC*,
   816 F.3d 1208 (9th Cir. 2016) ............................................................................. 14

*Chiron Corp. v. Ortho Diagnostic Sys's, Inc.*,
   207 F.3d 1126 (9th Cir. 2000) ............................................................................. 11

*Circuit City Stores, Inc. v. Najd*,
   294 F.3d 1104 (9th Cir. 2002) ............................................................................. 27

*Elyaoudayan v. Hoffman*,
   104 Cal. App. 4th 1421 (2003) ............................................................................ 26

*Esparza v. Sand & Sea, Inc.*,
   2 Cal. App. 5th 781 (2016) .................................................................................. 25

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ............................................................................. 31

*Freitas v. Cricket Wireless*,
   LLC, No. C 19-7270 WHA, 2022 WL 1082014 (N.D. Cal. Apr. 11,
   2022) .................................................................................................................... 16

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
   561 U.S. 287 (2010) ............................................................................................ 21

*Guifi Li v. A Perfect Franchise, Inc.*,
   No. 5:10–CV–01189–LHK, 2011 WL 2293221 (N.D. Cal. June 8, 2011) ................................................................................. 11

*Harris v. Tap Worldwide, LLC*,
   248 Cal. App. 4th 373, 203 Cal.Rptr.3d 522 (2016) ........................................ 18

*Hill v. Quicken Loans Inc.*,
   No. ED CV 19-0163 ........................................................................... 15

*Int'l Marble & Granite of Colo., Inc. v. Cong. Fin. Corp.*,
   465 F. Supp. 2d 993 (C.D. Cal. 2006) ................................................... 29

*J.B.B. Inv. Partners Ltd. v. Fair*,
   37 Cal. App. 5th 1 (2019) .................................................................. 25

*Jackson v. Amazon.com, Inc.*,
   65 F.4th 1093 (9th Cir. 2023) ..................................................... 17, 19

*Johnson v. Walmart Inc.*,
   57 F.4th 677 (9th Cir. 2023) ................................................. 11, 19, 21

*Knapke v. PeopleConnect, Inc.*,
   38 F.4th 824 (9th Cir. 2022) ............................................................. 12

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*,
   845 F.3d 979 (9th Cir. 2017) ............................................................. 12

*Leo Middle E. FZE v. Zhang*,
   No. 21-CV-03985-CRB, 2021 WL 11593016 (N.D. Cal. Nov. 2, 2021) ................................................................................................ 9

*Lopez v. Terra's Kitchen, LLC*,
   331 F. Supp. 3d 1092 (S.D. Cal. 2018) .......................................... 14

*Los Angeles Lakers, Inc. v. Fed. Ins. Co.*,
   591 F. Supp. 3d 672 (C.D. Cal.) ................................................. 21, 22

*Maggio v. Windward Capital Mgmt. Co.*,
   80 Cal. App. 4th 1210 (2000) ....................................................... 25

*Mattei v. Hopper*,
   51 Cal. 2d 119, 330 P.2d 625 (1958) ............................................ 18

ArentFox Schiff LLP

*McManigal v. Medicis Pharm. Corp.*,
  No. C07-4874 TEH, 2008 WL 618909 (N.D. Cal. Mar. 3, 2008) .........12, 15, 16

*McMillin Homes Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*,
  35 Cal. App. 5th 1042 (2019).................................................................................26

*Monster Energy Co. v. Schechter*,
  7 Cal. 5th 781 (2019)............................................................................................25

*Moua v. Optum Servs., Inc.*,
  320 F. Supp. 3d 1109 (C.D. Cal. 2018).................................................................17

*Navarro v. Mukasey*,
  518 F.3d 729 (9th Cir. 2008).................................................................................20

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014)........................................................................16, 19

*Penaloza v. Select Portfolio Servicing Inc.*,
  No. CV 14-02571-AB ............................................................................................29

*Perez v. Maid Brigade, Inc.*,
  No. C 07-3473 SI, 2007 WL 2990368 (N.D. Cal. Oct. 11, 2007) .....................11

*Property Calif. SCJLW One Corp. v. Leamy*,
  25 Cal. App. 5th 1155 (2018)..................................................................10, 14, 27

*Ringfree USA Corp. v. Ringfree Co.*,
  No. CV 06-7813 CAS (CTX), 2008 WL 11339112 (C.D. Cal. Aug.
  15, 2008).................................................................................................................13

*Russell v. Union Oil Co.*,
  7 Cal. App. 3d 110 (1970).....................................................................................25

*S.S. by & through Stern v. Peloton Interactive, Inc.*,
  566 F. Supp. 3d 1019 (S.D. Cal. 2021) ................................................................12

*Sanford v. MemberWorks, Inc.*,
  483 F.3d 956 (9th Cir. 2007)................................................................................12

*Schaefer v. Vegas Grand Condominiums Ltd. P'ship*,
  No. CV-S-05-0713-RLH (RJJ), 2005 WL 8161560 (D. Nev. Sept.
  8, 2005) ..................................................................................................................18

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*,
   925 F.2d 1136 (9th Cir.1991) ................................................................. 12

*Tompkins v. 23andMe, Inc.*,
   840 F.3d 1016 (9th Cir. 2016) ............................................................... 28

*Waller v. Truck Ins. Exchange, Inc.*,
   11 Cal. 4th 1 (1995) .............................................................................. 21

*Weddington Prods., Inc. v. Flick*,
   60 Cal. App. 4th 793 (1998) ................................................................. 26

*Whalen v. Facebook, Inc.*,
   No. 20-CV-06361-JST, 2022 WL 19934419 (N.D. Cal. Apr. 11,
   2022) ..................................................................................................... 28

*Wolsey, Ltd. v. Foodmaker, Inc.*,
   144 F.3d 1205 (9th Cir. 1998) ............................................................... 12

*Wright v. Yackley*,
   459 F.2d 287 (9th Cir. 1972) ................................................................... 9

*In re Zappos.com, Inc. Customer Data Sec. Breach Lit.*,
   893 F. Supp. 2d 1058 (D. Nev. 2012) ................................................... 18

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998) ....................... 31

**Statutes**

9 U.S.C. § 2 ............................................................................................. 13, 31

47 U.S.C. § 230(e)(3) .................................................................................... 30

Cal. Civ. Code § 1550 ................................................................................... 25

Cal. Civ. Code § 1550(4) .............................................................................. 27

Cal. Civ. Code §§ 1580 and 1581 ................................................................ 25

Cal. Civ. Code §§ 1605, 1606 ...................................................................... 27

Cal. Civ. Code § 1607 ................................................................................... 27

Cal. Civ. Code §§ 1638, 1639, 1644, and 1645 ........................................... 25

Cal. Civ. Code § 1641 ................................................................................... 23

Cal. Civ. Code § 1644 ................................................................................... 22

Cal. Civ. Code § 1648 ................................................................................... 22

Cal. Civ. Code § 1667 ................................................................................... 27

California Information Privacy Act ................................................... 10, 28, 31

Federal Arbitration Act ..................................................................... 11, 12, 31

The Communications Decency Act, 47 U.S.C. § 230 ..................... 10, 30, 31, 32

UCC § 2A-206:1 ........................................................................................... 26

**Other Authorities**

Fed. R. Civ. P. 5.1(c) .................................................................................... 32

Restatement (Second) of Contracts § 24 ...................................................... 20

Restatement (Second) of Contracts § 30 ...................................................... 26

Restatement (Second) of Contracts § 72 ...................................................... 27

Rule 5.1 ......................................................................................................... 32

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rule 12 ..................................................................................................................... 9

Rule 56 ............................................................................................................... 9, 12

Rule 56(c)(2) ......................................................................................................... 14

Rule 56(d) ...................................................................................................... 13, 32

## I.    **INTRODUCTION**

There is a massive problem with the defendants' Motion to Compel Arbitration[1] ("Motion"): they offer **_no_** admissible evidence to support it.  Indeed, there is **_zero_** evidence offered to substantiate that **_any_** of the purported Claimants ever visited L'Occitane's Website to support _their_ untenable legal theories, let alone for all 3,144 Claimants the Motion purportedly encompasses.  Given that motions to compel arbitration are governed by the summary judgment standard of Rule 56, and the moving party bears the burden of establishing their claim, **with admissible evidence**, the Claimants' complete failure to meet their burden here requires denial of the Motion on this basis alone.  It really is that simple: no evidence, no arbitration.

Even if the Court were to look past this fatal infirmity, the Motion is on even weaker grounds on the "merits" based on hornbook contract principles and the plain language of the Website Terms _the defendants_ seek to enforce – for multiple reasons.

First, the defendants' novel position that they were **_never_** aware of or agreed to the Terms, but can choose to enforce them in their sole discretion, is an ultimately self-defeating position.  By definition, there is no "mutuality of obligation" between the parties – which is required for any contract.  Put

---

[1]    As a threshold issue, the Motion is – likely deliberately – vague as to who is the movant before the Court – Zimmerman Reed or the individual defendants.  On the one hand, the "Claimants" are purporting to bring the Motion, but on the other, Zimmerman Reed states "_ZR only_ makes a limited special appearance in this case at this time for purposes of presenting this Motion to Compel Arbitration."  Motion at 1, n.1. If Zimmerman Reed is the actual party appearing before the Court to present the Motion, it should lack standing in its own capacity to request relief from the Court to enforce an "agreement" it is not a party to.  If the individual defendants are requesting relief from the Court, then they necessarily have made a general appearance.  _See Wright v. Yackley_, 459 F.2d 287, 291 (9th Cir. 1972); _Leo Middle E. FZE v. Zhang_, No. 21-CV-03985-CRB, 2021 WL 11593016, at *1 (N.D. Cal. Nov. 2, 2021) (a party waives defenses "if he requests affirmative relief or acts inconsistent with raising the defense–such as defending the suit on its merits").  Simply put, there are no "special appearances" in Federal Court outside of Rule 12 motions, and a motion to compel arbitration is not a Rule 12 motion.

differently, L'Occitane would *never* be able to enforce its Terms under the defendants' theory, giving the defendants a "free option" contract. And that is an illusory contract – which is no contract at all.

Second, both the Terms generally, and the arbitration clause specifically, only apply when a customer purchases a product from L'Occitane, and there is a dispute about *that* transaction. The Terms are not an open offer to arbitrate claims about the *use* of its Website. On the contrary, L'Occitane **unequivocally** disclaims *any* liability *or* remedy related to the use of its Website. The defendants are thus attempting to enforce an "agreement" that expressly does not exist – and which is not supported by any permitted acceptance or consideration to boot.

Third, even *if* the Terms were somehow part of a binding agreement between the parties, the defendants cannot enforce an agreement of which they are in breach. In short, a party to an agreement cannot enforce the *one* paragraph of the contract they like, while repudiating the rest. That is not how contracts work.

Finally, as set forth in L'Occitane's Complaint, the Communications Decency Act ("CDA"), 47 U.S.C. § 230, expressly prohibits any claims from being *brought* that are inconsistent with this law – which the defendants' claims clearly are. More than that, the California Information Privacy Act ("CIPA") is clearly unconstitutional under the recent Ninth Circuit precedent detailed in the Complaint. The Court should decline the defendants' invitation to assist them in violating the Constitution and the CDA. Ultimately, this Court provides the only forum where these issues can be resolved consistent with the Constitution, federal law, and the State of California's ability to intervene as a matter of a right to defend its laws – if it so chooses.

## II.   ARGUMENT

### A.   Legal Standard

Whether a dispute falls within the scope of an arbitration provision is a question of federal law unless the parties agree otherwise. *See Cape Flattery Ltd. v.*

*Titan Mar., LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (holding that courts should apply federal arbitrability law absent "clear and unmistakable evidence" that the parties agreed to apply non-federal arbitrability law); *see also Chiron Corp. v. Ortho Diagnostic Sys's, Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (stating that the Federal Arbitration Act limits a court's review to whether the dispute falls within the scope of the parties' agreement to arbitrate).

When a party moves to compel arbitration, a district court determines: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Johnson v. Walmart Inc*., 57 F.4th 677, 680 (9th Cir. 2023) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2020) (upholding denial of motion to compel arbitration where party correctly disputed the existence of an agreement that would encompass dispute; that is a question for the Court decide, not a question as to scope delegated to arbitrator).[2]  The movant on a motion to compel arbitration carries the burden to demonstrate any alleged contractual agreement with the plaintiff to arbitrate through admissible evidence. *See Guifi Li v. A Perfect Franchise, Inc*., No. 5:10–CV–01189–LHK, 2011 WL 2293221, at *2 (N.D. Cal. June 8, 2011); *Perez v. Maid Brigade, Inc*., No. C 07-3473 SI, 2007 WL 2990368, at *3 (N.D. Cal. Oct. 11,

---

[2]    Under this binding Ninth Circuit precedent, the defendants' argument that the presence of a delegation clause in the arbitration clause "means all questions of arbitrability are for the arbitrator," Motion at 21, is a clearly erroneous statement of the law generally, and as applied to this case.  Simply put, the *court* – and only the court – decided that Walmart's *much broader* arbitration agreement with Johnson, which also included a delegation clause, did not apply to the dispute at issue.  *Johnson*, 57 F.4th at 679-80 (detailing that agreement contained clause purporting to require arbitration for "all disputes arising out of … any aspect of the relationship between you and Walmart").  It is difficult to conceive of a broader arbitration clause, but even still, the Ninth Circuit affirmed the dispute in question (tire *service* agreement) was *not* encompassed by the agreement with the arbitration clause (tire *purchase* agreement).  Here too, the Terms and its arbitration clause apply to *purchases* conducted through the Website, and not mere "use" of the Website.  This is a difference in kind, not of a degree.  *Johnson* thus controls here, and it is strictly for the Court, and not any arbitrator, to decide that the Terms do not embrace the disputes.

2007).  Further, when ruling on a motion to compel arbitration, a court must apply the summary judgment standard of Federal Rule of Civil Procedure 56. *See Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 831 (9th Cir. 2022) (party seeking to compel arbitration could not establish agreement to do so based on factual disputes); *see also S.S. by & through Stern v. Peloton Interactive, Inc*., 566 F. Supp. 3d 1019, 1044 (S.D. Cal. 2021). In that vein, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. *Id*.

　　　Further, where, as here, a party opposes a motion to compel arbitration on grounds that the parties did not form an agreement to arbitrate, the court must give that non-moving party "the benefit of **all reasonable doubts and inferences** that may arise." *McManigal v. Medicis Pharm. Corp*., No. C07-4874 TEH, 2008 WL 618909, *1 (N.D. Cal. Mar. 3, 2008) (emphasis added) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc*., 925 F.2d 1136, 1141 (9th Cir.1991)); *see also Sanford v. MemberWorks, Inc*., 483 F.3d 956, 963 n. 9 (9th Cir. 2007) ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, **should give to the opposing party the benefit of all reasonable doubts and inferences that may arise**.") (emphasis added). Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement. *Id*.

　　　In determining the scope and validity of arbitration agreements, federal courts, as mandated by the Federal Arbitration Act ("FAA"), must apply state law principles that govern the formation and interpretation of contracts. *Wolsey, Ltd. v. Foodmaker, Inc*., 144 F.3d 1205, 1210 (9th Cir. 1998); *see also Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017). The court's primary function is to effectuate the mutual intentions of the contracting parties. *Wolsey*, 144 F.3d at 1210. Importantly, it is the jurisdiction of the Court, not an arbitrator, to

determine the existence of an agreement to arbitrate. *AT&T Tech's., Inc. v. Commc'n Workers*, 475 U.S. 643, 648 (1986).

Here, this responsibility lies with this Court, and in the absence of any tangible evidence, it becomes patently clear that no such agreements to arbitrate exist.

## B. Defendants' Motion Should Be Denied Because They Fail to Set Forth Any Evidence of an Agreement to Arbitrate

Defendants' Motion fails at the outset because it is not supported by *any* admissible evidence. Instead, defendants rely on nothing more than bare attorney argument after oddly asserting that "[t]here appears to be no genuine dispute that each Claimant 'used' Website, [*sic*]." Motion at 16. Of course, L'Occitane's Complaint *begins* with the unequivocal statement that it is seeking "to stop the Defendants from manufacturing arbitration claims *en masse* by simply visiting L'Occitane's website **(if at all)** …" Compl. ¶ 1 (emphasis added). Again, that is the first sentence of the first paragraph of the Complaint. L'Occitane then goes on to substantiate that it does not have *any* **records** for **over 90%** of the purported Claimants visiting the Website, and 30% of the remainder visited the Website only *after* having their authorization to do so expressly revoked, almost certainly for the purpose of fraudulently setting up these claims.[3] *Id.* ¶ 34; *see also id.* ¶ 54 n.9. For defendants to assert there is no dispute about their "use" of the Website is entirely false. It *is* disputed – and genuinely so, with *admissible evidence*. Pavlov Decl. ¶¶ 4-9.

---

[3]   Separate from supporting L'Occitane's CFAA claim, this conduct further corroborates L'Occitane's independent defense to any contract formation that the Claimants were visiting the Website for no purpose other than to fraudulently induce "agreements" to arbitrate for the purpose extracting *in terrorem* settlements. Such conduct would make any such agreements void. *See Ringfree USA Corp. v. Ringfree Co.*, No. CV 06-7813 CAS (CTX), 2008 WL 11339112, at *2 (C.D. Cal. Aug. 15, 2008) ("fraudulent inducement renders the entire contract void"); *see also* 9 U.S.C. § 2 (agreements to arbitrate are enforceable "save upon such grounds as exist **at law or in equity for the revocation of any contract**") (emphasis added). Given the complete absence of discovery in this case, and the defendants' exclusive possession of this information, L'Occitane is entitled to this information, as needed, to establish its defenses under Rule 56(d).

For their part, the sum total of defendants' showing of a purported "agreement" consists of two paragraphs that, in turn, cite two inadmissible exhibits. *See* Motion at 7-8 (citing Exhibits A and B). However, there is not a single *admissible fact* to support any agreement to arbitrate in either of the two cited exhibits, let alone admissible evidence to support 3,144 such agreements. Specifically, Exhibit A is an unsigned **and unverified** AAA demand for arbitration purportedly submitted on behalf of **one** of the defendants, Isabel Aguila.[4] And Exhibit B consists merely of L'Occitane's publicly available Terms.

Even if the AAA demand was admissible evidence, which it is not, there is no sworn statement by Ms. Aguila that she ever visited the Website, communicated anything to L'Occitane, or expressly agreed or assented to the Terms and arbitration. *See Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1099-1100 (S.D. Cal. 2018) (defendant's motion to compel arbitration denied where plaintiff did not assent to the Terms & Conditions and, therefore, was not bound by defendant's arbitration agreement). Indeed, there is not even a statement that she ever saw the Terms on L'Occitane's Website or was on notice thereof. *Id*. at 1099-1101. To the contrary, Exhibit A suggests that only Ms. Aguila's counsel reviewed them. *See* Exhibit A at ¶ 21 ("Claimant's counsel reviewed the Terms & Conditions to determine the appropriate forum and procedures for dispute resolution and Claimant now understands that there is a clause requiring dispute resolution in arbitration before AAA."). Accordingly, defendants failed to establish the *sine qua non* of mutual assent for Ms. Aguila. *See Casa del Gaffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1212 (9th Cir. 2016) ("The mutual intention to be bound" by contractual

---

[4]     For the avoidance of doubt, L'Occitane specifically objects under Rule 56(c)(2) that the Motion, including Exhibit A, is not supported by any admissible evidence.  There is no verified statement based on personal knowledge that the Court can properly consider anywhere in this unsigned exhibit.  Further, Mr. Marker's Declaration does not in any way suggest that he has any personal knowledge of the cookie-cutter allegations contained in the *one* arbitration demand included with the Motion.

terms "is the *sine qua non* of legally enforceable contracts and recognition of this requirement is nearly universal."). The same conclusion follows for the balance of the defendants for whom there is no shred of information, admissible or otherwise.

Not only do defendants fail to establish with admissible evidence that 3,144 separate agreements to arbitrate exist under *their theory*, L'Occitane genuinely disputes that there is such evidence, as detailed above. *See* Pavlov Decl. ¶¶ 4-9. When there is a disputed fact concerning the existence of an agreement to arbitrate, courts are unable to grant a motion to compel arbitration. *McManigal v. Medicis Pharm. Corp.*, No. C07-4874 TEH, 2008 WL 618909, at *3 (N.D. Cal. Mar. 3, 2008) (denying motion to compel arbitration because evidence offered by moving party was "questionable and not admissible" and declarant "failed to lay any foundation for her personal knowledge").

For example, in *Hill v. Quicken Loans Inc.*, No. ED CV 19-0163 FMO(SPx), 2020 WL 5358394, *5-6 (C.D. Cal. Aug. 5, 2020), the court denied the defendant's motion to compel arbitration because it found the defendant's evidence offered in support thereof insufficient to carry its burden of showing that there was an agreement to arbitrate. The court found that the defendant's primary evidence, the declaration of the General Counsel of their parent company, did not clearly establish that the declarant had any first-hand experience in programming, coding and maintaining software and websites, so it was unclear whether the declarant was competent or qualified to testify as to whether the subject software established that plaintiff clicked the relevant buttons, *i.e.*, whether the plaintiff signed the contract to arbitrate. In light of the questions plaintiff raised at the evidentiary hearing, the court found that the defendant's evidence offered was not sufficient to establish its burden that an agreement to arbitrate was formed.  That is exactly this case: defendants have put forth **zero** admissible evidence supporting their assertion that they even used the Website.

Here, like the declarant in *McManigal* and *Hill*, Mr. Marker's declaration

does not establish *any* personal knowledge of *any* of the "facts" he contends support defendants' position, including that L'Occitane and defendants formed a contract via L'Occitane's Terms of Use. *See also Freitas v. Cricket Wireless*, LLC, No. C 19-7270 WHA, 2022 WL 1082014, *6-7 (N.D. Cal. Apr. 11, 2022) (defendant's motion to compel denied where none of its declarants had personal knowledge of the formation of arbitration agreements via a text-message campaign). Instead, all that is offered is the evidentiarily meaningless assertion that the unsigned and unverified Demand for Arbitration *was filed* with the AAA.  Marker Decl. ¶ 2.

Needless to say, this statement does not in any way make *anything* within the unsigned and unverified Exhibit A admissible, even on behalf of the singular claimant, Ms. Aguila.  Simply put, that demand does not pertain to all defendants, nor does it prove that all defendants manifested any alleged acceptance or consent to, or were even on notice of, the Arbitration Agreement merely by visiting L'Occitane's Website. *See Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1176-77 (9th Cir. 2014) (customer had insufficient actual or constructive knowledge of defendant's Terms of Use and thus did not enter into an agreement with defendant to arbitrate his claims).  More to point, the Motion is not supported by any admissible evidence, based on personal knowledge, with the proper foundation and sworn testimony, that any individual defendant has ever *visited* L'Occitane's Website to support *their* untenable claim.

When giving the benefit of all reasonable doubts and inferences to L'Occitane, as the Court must, it is clear that the defendants have utterly failed to show that an agreement to arbitrate was formed and have entirely failed to substantiate their entitlement to relief through any admissible evidence. *McManigal*, 2008 WL 618909 at *1. Because a genuine issue of material fact exists, the Motion should be denied in its entirety. *Id.* at *3.

## C.   Defendants Cannot Enforce an Illusory Contract

Defendants' irreconcilable position that they *never* had notice of, or agreed

to, L'Occitane's Terms, but are nevertheless electing to proceed with enforcing the (inapplicable) arbitration agreement contained therein, is an ultimately self-defeating position under hornbook contract law.  Simply put, defendants are attempting to enforce an illusory contract, which by definition, is no contract at all. *Moua v. Optum Servs., Inc.*, 320 F. Supp. 3d 1109, 1113 (C.D. Cal. 2018).

More specifically, as the Ninth Circuit has frequently ruled, website Terms of Use must meet specific standards in order to be enforceable, including conspicuous notice of the hyperlinked Terms *and* "explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *See, e.g.*, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022); *see also Jackson v. Amazon.com, Inc*., 65 F.4th 1093, 1099 (9th Cir. 2023) ("Under California law and generally applicable principles of contract law, the burden is on … the party seeking arbitration to show … notice … and that there was mutual assent to the contractual agreement to arbitrate.").  In other words, the Ninth Circuit has consistently ruled there simply *cannot be* an enforceable agreement without notice.

In this case, however, the defendants' position is precisely that they ***never*** had notice of L'Occitane's Terms, and they contend (without evidence) to have visited the Website "without *any manifestation* of assent to the particular terms." Marker Decl., Ex. A ¶ 16 (emphasis added).  Indeed, their *express* position is that "[r]etroactive consent *is not valid*." *Id.* (emphasis added); *see also id.* ¶ 21 ("the Terms of Use *are <u>not</u> part of a clickwrap agreement*") (emphasis added).  In other words, their claims are predicated not only on *not* agreeing to L'Occitane's Terms (which contains the arbitration clause),[5] but *also* that such an agreement would be *impossible* to enter into after the fact.  Yet because the "Claimant's counsel

---

[5]     The Terms also contain L'Occitane's Privacy Policy.  Thus, when the defendants assert that they "did not agree to any Privacy Policy of [L'Occitane] … **at any time[,]**" it is by extension impossible that they've agreed to the Terms "at any time."  Marker Decl., Ex. A ¶ 15 (emphasis added).  The defendants are therefore effectively taking the position that they are enforcing the Terms that they *still* have not agreed to.

reviewed the Terms & Conditions to determine the ['] appropriate['] forum" – that somehow entitles Claimants to weaponize L'Occitane's very limited arbitration clause against it at their election.  "We never formed an agreement with L'Occitane, but we can force it to incur arbitration fees because our attorney later reviewed the Terms" is a self-defeating position under the illusory contract rule.

That is, an agreement is illusory, and no enforceable contract has been created, if a promisor is "free to perform or to withdraw from the agreement at his own unrestricted pleasure." *Mattei v. Hopper*, 51 Cal. 2d 119, 122, 330 P.2d 625 (1958). Generally, "[a] contract is unenforceable as illusory when one of the parties has the **unfettered or arbitrary right** to modify or terminate the agreement or assumes no obligations thereunder." *Harris v. Tap Worldwide, LLC*, 248 Cal. App. 4th 373, 385, 203 Cal.Rptr.3d 522 (2016) (emphasis added); *Schaefer v. Vegas Grand Condominiums Ltd. P'ship*, No. CV-S-05-0713-RLH (RJJ), 2005 WL 8161560, at *2 (D. Nev. Sept. 8, 2005) (In California, "[t]he rule of course is clear that a contract is lacking in mutuality where one party has the right to terminate it at any time at his pleasure.") (citation omitted).

The case of *In re Zappos.com, Inc. Customer Data Sec. Breach Lit.*, 893 F. Supp. 2d 1058 (D. Nev. 2012) is instructive.  There, the court found that "Zappos is free at any time to require a consumer to arbitrate and/or litigate anywhere it sees fit, while consumers are required to submit to arbitration … .  Because the Terms of Use binds consumers to arbitration while leaving Zappos free to litigate or arbitrate wherever it sees fit, there exists no **mutuality of obligation**. We join those other federal courts that find such arbitration agreements illusory and therefore unenforceable." *Id.* at 1066 (further holding that "there is no agreement where there is no acceptance, no meeting of the minds, and no manifestation of assent" and a "party *cannot assent* to terms of which it has no knowledge or constructive notice") (emphasis added).

If the Court were to replace "Zappos" with "the defendants" above, that is

exactly this case.  The defendants are taking the irreconcilable position[6] that they **never** agreed to the Terms, but somehow "there is a clause **requiring** dispute resolution in arbitration before AAA" that the defendants' attorneys just happened to discover.  Marker Decl., Ex. A ¶ 21 (emphasis added).  Simply put, under *Jackson*, *Berman*, *Nguyen*, and other Ninth Circuit precedent, there is **nothing** *requiring* the defendants to arbitrate anything with L'Occitane if they simply visited the Website without notice of the Terms.  And again, that is *defendants'* position.  Thus, there is a complete lack of mutuality of obligation because L'Occitane would never be able to enforce its Terms against consumers who lacked notice of the Terms.[7]  As a result, the defendants are attempting to enforce an illusory contract – which they cannot do under basic contract law.

### D.   The Scope of the Terms Does Not Encompass the Disputes, and Claims Related to Use of the Website Are Expressly Excluded

The defendants' attempt to enforce the Terms related to the underlying setup claims independently fails because the Terms generally, and the arbitration agreement specifically, only apply to products purchased through Website.  Simply put, L'Occitane never offered to arbitrate claims unrelated to product purchases.  And if there is no offer, there can be no agreement that the defendants can enforce.  *See Walmart*, 57 F.4th at 680. Indeed, the Terms unequivocally make clear that the Website is provided on an "AS IS" basis, and *any claims* related to *the use* of the

---

[6]      The case the defendants cite for the proposition that they can later ratify a contract is clearly distinguishable because the party actually clicked through the defendant's Terms of Service, with notice, and then continued to use and pay for the service subject to the Terms. *Hopgood v. Experian Info. Sols., Inc.*, No. 8:22-CV-01400-JWH-ADS, 2024 WL 629861, at *4 (C.D. Cal. Feb. 13, 2024).  To be clear, this case also never addresses the mutuality of obligation requirement for any contract.

[7]      To be clear, nor would L'Occitane attempt to because L'Occitane's Terms only apply to consumers who complete transactions.  That is why L'Occitane provides clear and conspicuous notice of its Terms during the checkout process, while its Privacy Policy is conspicuously disclosed to Website visitors located in California as soon as they arrive on the Website.  Compl. ¶ 16. That is, L'Occitane has no intention to bind casual Website visitors, or be bound itself, to the Terms by use alone.  If that were the case, L'Occitane would have included the Terms in its immediate pop-up disclosure.  It does not.

Website are expressly excluded from any liability.  More than that, the *sole* remedy for any complaints related to the use of the Website is to stop using the Website:

> IF YOU ARE DISSATISFIED WITH THE WEBSITES OR ANY MATERIALS ON THE WEBSITES, OR WITH ANY OF L'OCCITANE'S TERMS OF USE, **YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE WEBSITES.**

Again, that is the offer L'Occitane made through its Terms: take it or leave it. The defendants simply were not offered the ability to take the one part they like.  That is not how contracts work, expressly so pursuant to the very Terms above.  The Motion must be denied under the unambiguous language of the Terms as a result.[8]

Under Hornbook contract law, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to ***that bargain*** is invited and will conclude it." Restatement (Second) of Contracts § 24 (emphasis added). Under California's rules of contract interpretation, if contract language is clear, the courts give effect to its plain meaning, including its scope. *Navarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir. 2008).

Here, L'Occitane's Terms are unambiguous in their scope and their *limited* application. Specifically, the first paragraph of the Terms clearly states that the Terms apply *only* when a transaction has occurred between L'Occitane and a customer:

> The following terms and conditions ("Terms of Use") govern your use of our Websites and **apply when you purchase products** on our Websites and in Stores, including gift cards and e-gift cards

---

[8]     Independent of contract formation, a party also cannot enforce an agreement they have repudiated.  *In re Aller's Petition*, 47 Cal.2d 189, 195–96 (1956) ("such a repudiator has himself no right to arbitration").  By seeking relief and remedies expressly prohibited by the very Terms they seek to enforce, the defendants have clearly repudiated the Terms of the agreement they think exists.  See Minidoka Irrigation Dist. v. Dep't of the Interior, 154 F.3d 924, 926 (9th Cir. 1988) (repudiation occurs when party makes "unequivocal declaration" not to adhere to contract).

("Merchandise"), from L'Occitane. Your **continued** use of the Websites constitutes your agreement to follow and be bound by the Terms of Use ("Agreement"). By placing an order for Merchandise through loccitane.com/en-us or any L'Occitane-owned or affiliated Internet sites or Stores, . . . you accept these Terms of Use and agree to be bound by them. The Websites and stores are provided as a service to **our customers**.

The limited scope of L'Occitane's offer is clear in the plain language of the first sentence: the Terms "apply **when you purchase products on our Websites and in Stores**." A purchase is therefore required for the Terms to apply as a threshold matter.  Similarly, the arbitration clause within the Terms likewise applies to disputes "arising out of or related to any transaction conducted on the Websites." Thus, the offer made by L'Occitane – which necessarily defines the scope of any agreement – clearly and expressly requires a purchase as a condition precedent to the Terms' application.[9]  Further, mere use of the Website is excluded from any liability *or* remedy in the Limitation of Liability clause.

### 1.     Continued Use *After* Completing a Transaction Is Required

Courts "must give effect to every word or term employed by the parties" when interpreting a contract. *In re Crystal Prop.'s, Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001). Further, "the language in a contract must be interpreted as a whole, with consideration of the circumstances." *Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 591 F. Supp. 3d 672, 676 (C.D. Cal.), *adhered to on reconsideration,* 637 F. Supp. 3d 801 (C.D. Cal. 2022) (citing *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1 at 18-19 (1995).

---

[9]     As the Ninth Circuit reiterated last year, "[t]he 'first principle' of a court's arbitration decision is that '[a]rbitration is strictly a matter of consent ... and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" *Johnson*, 57 F.4th at 681 (9th Cir. 2023) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original) (citations and quotation marks omitted). As "arbitration is a matter of contract[,] ... a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (internal quotation marks and citations omitted).

L'Occitane's Terms clearly state—in the second sentence—that "***continued use** of the Website*" creates an agreement to "follow and be bound by" the Terms. In the context of the first sentence of the Terms, "continued use" can only logically mean one thing: *after* purchasing products on the Website.  The third and fourth sentences reinforce the point.

In drafting the Terms, L'Occitane chose to include "continued" to *modify* "use" to describe how a consumer can be bound by the Terms only after a purchase was made. If L'Occitane wanted to require only "use" of the Website to effectuate a binding agreement – as implied by defendants without any analysis of the surrounding context, Motion at 16 – L'Occitane would have done so.  That is, if L'Occitane wanted its Terms to apply to casual Website use, it would have drafted them to "apply when you purchase products on [*or use*] our Websites."  It did not. Again, the scope of the offer first requires a purchase, and *then* continued use, for the offer to apply.  Therefore, a purchase is required for a user to be bound by the Terms, followed by "*continued* use"[10] of the Website under its plain terms.  None of the defendants have provided any evidence that they fall within the Agreement as drafted, and the Motion should be denied on this independent ground.

### 2.    Defendant's Definition of "Transaction" Does Not Make Sense in the Context of L'Occitane's Business And the Terms, Which Expressly Exclude Liability Or Any Remedy for Use of the Website

As stated above, "the language in a contract must be interpreted as a whole, with consideration of the circumstances." *Lakers*, 591 F. Supp. 3d at 676.[11]  In other

---

[10]    For the avoidance of doubt, just as the defendants offered no admissible evidence that they used the Website, they also certainly did not offer any admissible evidence that they *continued* to use the Website, let alone after purchasing a product.

[11]    California courts, like others, use certain rules to guide their interpretation of a contract. Courts must look at the words of a contract according to their ordinary and popular meaning unless the words are used in a technical sense or given a special meaning by usage. Cal. Civ. Code § 1644. However broad a term may be in a contract, courts interpret it with respect to the parties' intentions. Cal. Civ. Code § 1648. A contractual term is ambiguous if a court finds that it has more than one reasonable interpretation. *Scheenstra v. Cal. Dairies, Inc.*, 213 Cal. App. 4th 370, 389-90 (2013). However, in

words, context is critical.  And just as the context of the Terms as whole requires a purchase for the Terms to apply, so too does the arbitration clause, which likewise applies "to any transaction conducted on the Websites."  In fact, as detailed below, the Terms expressly exclude *any* liability or remedy for use of the Website beyond discontinuing the use of the Website, making it impossible that L'Occitane agreed to arbitrate any claims at issue.

For their part, defendants attempt to employ an obscure definition of "transaction" that is inconsistent with the scope of the Terms' "purchase" requirement detailed above.  That is, they attempt to define "transaction" to mean "communicative action or activity involving two parties or things that reciprocally affect or influence each other."  Motion at 23. (citing "transaction" definition 2(b) in the Merriam-Webster online Dictionary)  Defendants, however, fail to substantiate any recorded instance of anyone[12] ever using "transaction" with that meaning, let alone how it would be reasonable in the context of L'Occitane's e-commerce Website that is *exclusively* focused on *financial* transactions.  In fact, when L'Occitane means "communication" in the Terms, it uses the term "communication."[13]  Thus, it is simply not reasonable to interpret the term "transaction" to also encompass "communicative action" in that context.

Again, context is key.  The Terms are replete with instances that make clear

---

determining if a provision is ambiguous, a California court must consider the entire agreement to clarify what the parties meant by the provision. Cal. Civ. Code § 1641. The Court should thus consider "whether language is susceptible of more than one meaning" in the context of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999).

12    Of course, not a single defendant has submitted any sworn statement contending that they reasonably understood "transaction" to mean "communicative action or activity … ." (Motion at 23).

13    "[Y]ou also authorize us to contact you by mail, email, telephone, or text with promotional communications" and "[p]lease note that even if you opt out of receiving marketing emails, we may continue to send you such communications by direct mail unless you opt out of direct mail." *See* L'Occitane, *Terms & Conditions*, L'Occitane en Provence, https://www.loccitane.com/en-us/pages?fdid=terms-conditions#9

that "transaction" is only properly understood to mean a *financial* transaction, and that L'Occitane is expressly disclaiming *any* liability with respect to the use of the Website generally:

- "The IP and software on our Website may be used **only as a shopping resource**. Any other use … of the IP on our Website is strictly prohibited."
- "We do this to ensure that the card details are still valid and that you have **sufficient funds** to complete the **transaction**."
- The foregoing Terms of Use govern **all transactions** between you and L'Occitane through our Websites and supersede all prior agreements and representations.
- OUR WEBSITES ARE PROVIDED BY L'OCCITANE ON AN "AS IS" AND "AS AVAILABLE" BASIS. …YOU ACKNOWLEDGE, BY YOUR USE OF OUR WEBSITES, THAT YOUR USE OF OUR WEBSITES IS AT YOUR SOLE RISK. … **NEITHER L'OCCITANE NOR ITS AFFILIATED OR RELATED ENTITIES … SHALL BE LIABLE TO ANY PERSON** OR ENTITY **FOR ANY** DIRECT OR INDIRECT LOSS, **DAMAGE** (WHETHER ACTUAL, CONSEQUENTIAL, PUNITIVE, SPECIAL OR OTHERWISE), INJURY, **CLAIM**, **OR LIABILITY BASED UPON OR RESULTING FROM YOUR USE** OR INABILITY TO USE ANY **OF THE WEBSITES**… IF YOU ARE DISSATISFIED WITH THE WEBSITES OR ANY MATERIALS ON THE WEBSITES, OR WITH ANY OF L'OCCITANE'S TERMS OF USE, **YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE WEBSITES.**

Thus, by its plain language, the Terms only use "transaction" specifically in the context of purchases and shopping.  But even more critically, the Terms expressly exclude L'Occitane's liability to *any* person, for *any* claim, based upon or resulting from their *use* of the Website.  Of course, the defendants' claims are

indisputably based upon their – unproven – use of the L'Occitane Website. Motion at 1 ("The underlying dispute in this matter revolves around claims that Claimants, **who were users** of Plaintiff L'Occitane's … website.") (emphasis added). As the Terms make unequivocally clear, however, the defendants' sole remedy was to stop using the Website. There is **no remedy** to complain about their use of the Website through arbitration, or otherwise. That is dispositive here.

### 3. Even If Defendants' Definition of "Transaction" Is Correct, There Was No Meeting of the Minds

Relatedly and in the alternative, even if there is any conceivable basis to credit the defendants' entirely strained interpretation of the Terms, there can be no agreement because there is a fundamental misunderstanding on the material terms.

Four elements are required to form a valid contract in California: parties capable of contracting; consent of all parties; a lawful object; and a sufficient cause or consideration. *See* Cal. Civ. Code § 1550; *J.B.B. Inv. Partners Ltd. v. Fair*, 37 Cal. App. 5th 1, 9 (2019). California courts typically refer to consent as "mutual assent;" this is established when an offer is communicated to the offeree, and the offeree communicates its acceptance to the offeror. *See Russell v. Union Oil Co.*, 7 Cal. App. 3d 110, 114 (1970). This "meeting of the minds" means that all parties to the contract must agree on **all the material terms**. *See* Cal. Civ. Code §§ 1580 and 1581; *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019). Whether there has been a meeting of the minds depends on the circumstances. *See, e.g.*, *Esparza v. Sand & Sea, Inc.*, 2 Cal. App. 5th 781, 788 (2016).

If a contract is in writing and unambiguous, California courts determine the parties' intent based solely on the words of the contract. Courts may not insert or excise terms or construe the language in any way that distorts the contract's meaning. *See* Cal. Civ. Code §§ 1638, 1639, 1644, and 1645; *Maggio v. Windward Capital Mgmt. Co.*, 80 Cal. App. 4th 1210, 1215 (2000). To be clear, that is L'Occitane's view: the Terms and the arbitration provision only apply, and the

scope of the offer is limited to, products purchased from L'Occitane.  Indeed, claims related to the use of the Website are ***expressly excluded from any liability or remedy.***  The defendants are attempting to enforce an agreement that does not exist.

But even if the Court were to credit the defendants' conflicting interpretation of what a "transaction" means, ambiguity is a defense to contract formation because their different interpretations of an essential contractual term prevented a meeting of the minds. *See, e.g.*, *McMillin Homes Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 35 Cal. App. 5th 1042, 1050-51 (2019); *Elyaoudayan v. Hoffman*, 104 Cal. App. 4th 1421, 1430 (2003); *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 797 (1998).  Thus, even if this Court agrees that defendants' strained definition of "transaction" is a reasonable one, there is necessarily no meeting of the minds on this point, and no contract has been formed.

### 4.    The Terms Do Not Contemplate Acceptance after the Fact

Independently, it is a basic principle of contract law that an offer operates to create power of acceptance in the offeree. Because the offeror has complete control of the offer, it is for the offeror to determine the nature and extent of the resultant power of acceptance. *See* 3 Hawkland UCC § 2A-206:1. "An offer may invite **or require** acceptance to be made . . . by performing . . . a specified act . . . ." Restatement (Second) of Contracts § 30 (emphasis added); *see also id*. § 30a comment. ("The offeror is the master of his offer. [T]he ***offeror is entitled to insist on a particular mode of manifestation of assent***.") (emphasis added).

As noted above, consistent with the Terms' exclusive application to purchases, L'Occitane specifically invites acceptance of its Terms at the point of sale via a click-through agreement.  Pavlov Decl. ¶ 10. Defendants either accepted the Terms at the point of sale by affirmatively checking a box stating that, by placing an order, "I agree to the Terms and Conditions and Privacy Policy," or defendants have no basis to argue that they accepted the Terms. Point being, defendants cannot just assert, in a conclusory manner, that these individuals "during

[*sic*] past year interacted on L'Occitane's" Website.  That is simply not how L'Occitane invites acceptance to its Terms, independent of their limited scope.

The Terms do not contemplate acceptance after the fact.  More than that, the Terms do not contemplate an "after-the-fact ratification" by "Claimant's counsel review[ing] the Terms & Conditions to determine the appropriate forum."  Marker Decl. Ex. A, ¶ 21.  Ultimately, L'Occitane is the master of its offer, and L'Occitane gets to define the manner of acceptance.  And that can only be accomplished through a purchase, as specified by L'Occitane's offer.

### 5.    There Is No Consideration: Nothing of Value Has Been Exchanged

California requires "a sufficient cause or consideration" for a contract to be formed.[14] Cal. Civ. Code § 1550(4). Consideration exists under California law when there is either: a benefit to the promisor; or a detriment or prejudice to the promisee. *See* Cal. Civ. Code §§ 1605, 1606. Consideration is valid only if it acts as an inducement to the original promise or is lawful within the meaning of California Civil Code Section 1667.[15] *See Property Calif. SCJLW One Corp. v. Leamy*, 25 Cal. App. 5th 1155, 1165 (2018); Cal. Civ. Code § 1607.

Defendants rely on the fact that some California courts have held that a mutual promise to be bound by an arbitration process is sufficient consideration for a contract to be formed. Motion at 18 (*citing Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002)). But that case is clearly distinguishable because it was in the employment context, where there is ample independent exchange of value between the parties: service for a paycheck.  *Id.*  But even as it relates to a "mutual promise to be bound," the defendants are *exclusively* using L'Occitane's arbitration clause as a *one-way ratchet*: L'Occitane, you get to pay AAA for my

---

[14]     "[A]ny performance which is bargained for is consideration." Restatement (Second) of Contracts § 72.

[15]     Section 1667 of the California Civil Code defines "Unlawfulness" as: "(1) Contrary to an express provision of law; (2) Contrary to the policy of express law, though not expressly prohibited; or (3) **Otherwise contrary to good morals.**" (emphasis added).

claims against you.  There is nothing *mutual* about this "promise."  The defendants are transparently attempting to enforce an illusory contract solely for the leverage it provides to extract an *in terrorem* settlement, as detailed above.

The defendants further argue that "courts routinely find that users who did not make purchases, but instead provided captive attention to advertisements when browsing a free website, entered valid arbitration agreements."  For this proposition, the defendants cite *Whalen v. Facebook, Inc.*, No. 20-CV-06361-JST, 2022 WL 19934419 (N.D. Cal. Apr. 11, 2022).  But that case does not even analyze consideration *at all*.  And the next and final case the defendants cite for this proposition, *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. 2014), aff'd, 840 F.3d 1016 (9th Cir. 2016) also never addresses this issue.  In fact, that case indisputably entailed consumers who "must visit the 23andMe website **to purchase** an online DNA testing kit." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1020 (9th Cir. 2016) (emphasis added).  Simply put, the defendants are not accurately representing the facts or the holdings of these cases.

Thus, there is not single case cited by the defendants that stands for the proposition that a business receives anything of value when individuals merely come onto a website, without more.  And here, a substantial and genuine dispute exists whether the defendants in fact visited the Website, and even if they did, whether they did so for the purpose of setting up claims against L'Occitane.[16]

In this instance, the arbitration agreement contained within the Terms is not supported by valid consideration where no purchase has been made. Mutual consideration is not provided through defendants' continued use of the Website, as nothing of value has been exchanged between the parties.

---

[16]    This would be the digital equivalent of arguing that department stores receive consideration when they're visited by a flash mob.  The department store clearly receives nothing of *value*, just as L'Occitane receives nothing but detriment when individuals attempt to use its Website like an ATM for setup CIPA claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.**   <u>**Even If Defendants Have an Enforceable Agreement, They Are in**</u>
<u>**Breach of the Informal Dispute Resolution Process**</u>

Even if defendants can successfully argue they have an enforceable agreement with L'Occitane, defendants are in breach of the informal dispute resolution process included in the Terms. And a "party in breach cannot enforce a contract." *Penaloza v. Select Portfolio Servicing Inc*., No. CV 14-02571-AB PJWX, 2014 WL 6910334, at *7 (C.D. Cal. Dec. 8, 2014); *Int'l Marble & Granite of Colo., Inc. v. Cong. Fin. Corp.*, 465 F. Supp. 2d 993, 1003–04 (C.D. Cal. 2006) (holding party in material breach of dispute resolution provision cannot enforce it).

Here, the Terms state that the Informal Dispute Resolution provision must be followed, on an individualized basis, so that L'Occitane can potentially resolve any issue informally, but also assess whether the complaint raised by each individual falls within the scope of a Dispute. More specifically, the Informal Dispute Resolution provision provides that:

> **the party** asserting the Dispute *shall* first try in good faith to settle such Dispute by providing written notice to the other party (by first class or registered mail) **describing the facts and circumstances (including any relevant documentation)** …

This Informal Dispute Resolution provision is, by itself, a condition precedent to invoking the Arbitration Agreement.

Remarkably, the defendants repeatedly chastise L'Occitane for "flouting" its Terms, which "bar any class, coordinated or collective proceedings." Motion at 10. Yet the form demand letter that the defendants exclusively rely on as "proof" of their compliance with the informal dispute resolution provision is as "collective" as it gets. *See* Compl., Ex. 2 ("[w]e write … to inform you of the potential legal claims that approximately 2,250 of our clients (collectively referred to as 'Claimants' may present against you … ."). This form demand letter does not even

identify (1) the party – singular, (2) describe the facts and circumstances of that party's claim (such as when and what they "communicated" to L'Occitane through the Website), or (3) provide any relevant documentation supporting their putative individualized claim.  In short, this collective demand letter violates every component of the Informal Dispute Resolution requirement.

In response, L'Occitane specifically informed Zimmerman Reed that "the 'information' provided in your demand letter makes it impossible" to determine whether any threatened claim "falls within the scope of a Dispute … *in the aggregate*, let alone on the required individualized basis."  Compl., Ex. 3 at fn. 5.  Needless to say, the defendants proceeded to file over 2,000 arbitration demands without in any way substantiating their claims.

Of course, that still remains true to this day: at no point have the defendants ever put in the work necessary to carry their burden to enforce *their* view of the Terms – effectively commencing this dispute as if it was a certified class action already. Relevant here, this means that they are in breach of the "agreement" *they* seek to enforce, and this is not permitted under hornbook contract law.

### F.  L'Occitane's Claims Preclude Arbitration And Cannot Be Resolved by an Arbitrator

Through its Complaint, L'Occitane seeks declaratory and injunctive relief that the defendants are attempting to enforce a state law that is both unconstitutional, and preempted by the Communications Decency Act, 47 U.S.C. § 230 ("CDA").  Compl. ¶¶ 77-106, 120-128.[17]

As to the CDA, it provides that "[n]o cause of action **may be brought** and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. 230(e)(3) (emphasis added).  "By its plain language, § 230 creates a **federal immunity to *any cause of action***" for website operators engaged in "any action voluntarily taken in good faith to restrict access to or availability of

---

[17]      These claims pertain to Counts I-III, and VI.

material that the provider or user considers to be … harassing, or otherwise objectionable." *Zeran v. Am. Online, Inc*., 129 F.3d 327, 330 (4th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998) (emphasis added) (holding that the CDA "precludes courts from entertaining claims that would place a computer service provider in a publisher's role."); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (ruling that "§ 230(c) provides broad immunity"); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6, 1171-72 (9th Cir. 2008) (holding that "the most common interactive computer services," which are granted immunity under Section 230, "are websites").

And as detailed in the Complaint, the defendants' claims against L'Occitane are clearly inconsistent with the CDA, given that L'Occitane uses the services at issue in good faith to detect and/or deter fraud, harassing conduct, and otherwise objectionable material and conduct on its website.  Compl. ¶¶ 120-128.  In other words, the very aspects of the Website that defendants contend violate CIPA are tools that L'Occitane uses to defend the Website against fraud, viruses and other objectionable conduct.  L'Occitane's good faith deployment of these tools mandates that the CDA not only preempts defendants' claims under CIPA, but expressly *prohibits* them from even being brought under the plain language of the CDA.[18] This alone should require denial of the Motion.

Separately, as to the Constitutional claims, the defendants provide absolutely no support, nor could they, that the AAA – which, relevant here, specializes in low-value consumer contract disputes – would entertain constitutional challenges to a state law.  And indeed, given the nearly identical constitutional infirmities that exist in CIPA that led the Ninth Circuit to strike down Oregon's indistinguishable "wiretapping" law, *see* Compl. ¶¶ 64-70, the *public* interest requires that L'Occitane's Complaint seeking to invalidate a law repugnant to the Constitution

---

[18]     Violation of federal law would clearly constitute a ground "at law or in equity for the revocation of any contract" under the FAA.  9 U.S.C. § 2.

be heard in federal court.  Simply put, CIPA should not be enforced against any entity in its current form.  That said, if the state of California wishes to defend its laws, there is no mechanism for the California Attorney General to intervene in thousands of consumer arbitrations, as there is in federal court pursuant to Rule 5.1.  *See* Fed. R. Civ. P. 5.1(c).

Granting the Motion would violate federal law by permitting the defendants to pursue claims they are expressly prohibited from bringing under the CDA, while also denying the California Attorney General – who has **the right** to intervene here – an appropriate forum.  This Court is the only forum that can properly grant L'Occitane the declaratory and injunctive relief it seeks through the Complaint consistent with federal law, and the Motion should be denied for these independent reasons.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, L'Occitane respectfully requests that the Court deny defendants' Motion in its entirety and with prejudice. In the alternative, and pursuant to Rule 56(d), L'Occitane requests that the Court defer or deny the Motion as being premature given the complete absence of any discovery to date.


Dated:  March 25, 2024                    **ARENTFOX SCHIFF LLP**


By:*/s/Allan E. Anderson*
      Allan E. Anderson
      Adam D. Bowser
      Andrea M. Gumushian
      Attorneys for Plaintiff
      L'OCCITANE, INC.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff L'OCCITANE, INC., certifies that this brief complies with the 25 page limit set by Paragraph 6(b) of the Court's Standing Order (ECF No. 13).

Dated:  March 25, 2024

                                                    */s/Allan E. Anderson*
                                                    Allan E. Anderson