ALLAN E. ANDERSON (SBN 133672)
allan.anderson@afslaw.com
ADAM D. BOWSER (*pro hac vice*)
adam.bowser@afslaw.com
ANDREA M. GUMUSHIAN (SBN 342528)
andrea.gumushian@afslaw.com
**ARENTFOX SCHIFF LLP**
555 West Fifth Street, 48th Floor
Los Angeles, California 90013
Telephone: 213.629.7400
Facsimile: 213.629.7401

Attorneys for Plaintiff
L'OCCITANE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L'OCCITANE, INC., <br><br> Plaintiff, <br><br> v. <br><br> Zimmerman Reed LLP and 3,144 Of Its Purported Clients, <br><br> Defendant(s). | Case No. 2:24-cv-01103-PA-RAO <br><br> **PLAINTIFF L'OCCITANE, INC.'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION** <br><br> [Filed concurrently with Declaration of Andrea M. Gumushian] <br><br> Judge: Hon. Percy Anderson <br> Dept.: 9A <br><br> Complaint Filed: February 8, 2024 |

Pursuant to the Court's April 2, 2024 Order (ECF No. 48), Plaintiff L'Occitane, Inc. respectfully submits this Supplemental Brief in Opposition to Defendants' Motion to Compel Arbitration.

## I. The FAA, Like L'Occitane's Terms Themselves, Only Applies To Contracts Evidencing A Purchase

As the Ninth Circuit has instructed, in determining whether to compel arbitration, the Court must assess (i) whether the parties' contract, if any, evidences a transaction involving commerce; (ii) whether the parties' contract, if any, contains a valid arbitration provision; and (iii) whether any arbitration agreement encompasses the dispute at issue. *See Boardman v. Pac. Seafood Group*, 822 F.3d 1011, 1017-18 (9th Cir. 2016) (finding agreement covered "*purchases* of fish" and "accordingly, it evidences a transaction involving commerce," but further holding arbitration agreement did not cover dispute at issue) (emphasis added).

### A. The Supreme Court Has Ruled Courts Lack Authority To Compel Arbitration Under The FAA If An Agreement Is Not Within Its Limited Scope

In a case directly on point as to the scope of the Court's authority under the FAA, or lack thereof, to compel arbitration, a unanimous Supreme Court ruled that:

> "[w]hile a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional. If two parties agree to arbitrate future disputes between them and one side later seeks to evade the deal, §§ 3 and 4 of the Act often require a court to stay litigation and compel arbitration "accord[ing to] the terms" of the parties' agreement. But **this authority doesn't extend to *all* private contracts**, no matter how emphatically they may express a preference for arbitration."

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537-38 (2019) (further holding that "[t]he parties' private agreement may be crystal clear and require arbitration of every question under the sun, but **that does not necessarily mean the Act authorizes a court to** stay litigation and **send the parties to an arbitral forum**.") (emphasis added).

Also independently fatal to the defendants' position here,[1] the Supreme Court expressly rejected the argument that the presence of a delegation clause would enable a court to compel arbitration so as to let the arbitrator take the first pass at the scope of the agreement.  *Id.*  Rather, it is strictly for the Court to determine whether the agreement in question evidences a transaction in commerce or not:

> all this overlooks the necessarily antecedent statutory inquiry we've just discussed. A delegation clause is merely a specialized type of arbitration agreement, and the Act "operates on this additional arbitration agreement just as it does on any other." … So a court may use §§ 3 and 4 to enforce a delegation clause **only if** the clause appears in a "written provision in ... **a contract evidencing a transaction involving commerce**" consistent with § 2.

*Id.* (emphasis added). Based on the foregoing, the Supreme Court upheld the district court's refusal to compel a party to arbitrate when the dispute was not within the scope of the FAA.  *Id.* at 537. Simply put, the Supreme Court has unequivocally ruled that a court has no authority to compel a party to arbitrate under the FAA if the agreement in question does not evidence a *transaction* involving interstate commerce.  This is true even where there is a delegation clause.

### B. Mere Use Of A Website Does Not Evidence A Transaction In Commerce

In a case directly on point to the precise issue here – that is, whether "the Court may, under the FAA, enforce an arbitration clause … for one who merely visits a website but makes no purchase," Order at 4 – Judge Zilly from the Western District of Washington held under indistinguishable facts that "**because plaintiff did**

---

[1] The defendants incorrectly claim in their Reply (ECF No. 46) that "L'Occitane fails to even address the delegation clause."  Reply at 12.  As L'Occitane detailed in its Opposition (ECF No. 43), however, the Ninth Circuit specifically addressed this issue last year in *Johnson v. Walmart Inc.*, 57 F.4th 677, 680 (9th Cir. 2023), holding that it is strictly for the Court to decide in the first instance whether the agreement at issue encompasses the dispute.  Opp. at 11, n.2. Given that L'Occitane's Terms only "apply when you purchase products," *and* claims related to the use of the Website are also expressly excluded from any liability or remedy, the "agreement" simply does not encompass these disputes under the plain language of the Terms.  Opp. at 19-25.

**not make any <u>purchase</u> through the website at issue**, the Terms and Conditions on the NFL ticket exchange website **cannot be viewed as a contract evidencing a transaction involving commerce**." *Long v. Live Nation Worldwide, Inc.*, Civ. No. 16-1961-TSZ, 2017 WL 5194978, *2 (W.D. Wash. Nov. 9, 2017) (emphasis added). It was that simple: no purchase means no transaction, and the FAA did not apply on this basis alone.

As a result, the court refused to compel the plaintiff to arbitrate his claims against the website operator, even though the terms containing the arbitration clause, unlike the Terms here, broadly applied to any "claims relating to your use of Live Nation's website." *Id.* Again, because the purported contract did not evidence any purchase as applied to the plaintiff – but merely his use of a website – the court refused to compel the plaintiff to arbitrate his claims on this threshold basis. *Id.*; *see also Office & Prof'l Emps. Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*, 724 F.2d 133, 139 (D.C.Cir.1983) (interstate agreement between Virginia, Maryland, and Washington, D.C. "is not a 'contract evidencing a transaction involving commerce' and the [FAA] does not apply.").

*Long* is therefore directly on point and entirely consistent with the plain language of the FAA, which is exactly how the Court should construe the statute here. *See New Prime*, 139 S. Ct. at 539 (interpreting FAA based on the "fundamental canon of statutory construction" that terms in statute should be interpreted using their *ordinary* meaning). And relevant here, the plain and ordinary meaning of "transaction" is "an **exchange** or transfer of **goods, services, or funds**." *Durkee v. Bank of Am., N.A.*, No. 20-CV-00347-DMS-LL, 2020 WL 4500607, at *2 (S.D. Cal. Aug. 5, 2020) (emphasis added), *aff'd,* 853 F. App'x 203 (9th Cir. 2021); *see also C. P. Robinson Const. Co. v. Nat'l Corp. for Hous. Partnerships*, 375 F. Supp. 446, 451 (M.D.N.C. 1974) ("The case law definition of transactions involving commerce to which Title 9 is applicable … includes **trade** generally between citizens of the several states, **including the purchase and sale of property** of all

kinds and descriptions. **Evidence of purchases** … is an undisputed part of the record of this case.") (emphasis added).

At bottom, the plain language of the FAA requires that the contract, if any, in question needs to be one "evidencing a transaction involving commerce." And just as it would be absurd to claim that someone "engages in a transaction" by looking at a billboard or perusing a catalogue, the same holds true on the Internet: "one who merely visits a website" is not engaged in any transaction, in commerce or otherwise. No goods or services are being exchanged for funds – no *purchase* is being made – under these circumstances, and there can thus be no "transaction" under the ordinary meaning of this term.[2] The FAA therefore provides no authority to the Court to grant the defendants' Motion in this case.

### C. A Purchase Is Expressly Required For L'Occitane's Terms And Its Arbitration Clause To Apply

In its Order, the Court suggests that it is possible that the term "transaction" could be interpreted differently "as a matter of <u>contract interpretation</u>," but "that does not mean that 'transaction' has that meaning as a matter of <u>statutory interpretation</u>." Order at 4 (emphasis in original). However, the hypothetical possibility of conflicting interpretations of "transaction" should not be possible in this case for at least three reasons.

First, the Terms and its arbitration clause specifically provide "[this Arbitration Agreement] shall be governed by, **and interpreted**, **construed**, **and**

---

[2] Zimmerman Reed will likely rely on its obscure definition of "transaction" as a "communicative action or activity involving two parties or things that reciprocally affect or influence each other." Simply put, this is not remotely the "ordinary" meaning of "transaction," nor does it make sense in the context of L'Occitane's Terms. More than that, Zimmerman Reed never explains how merely viewing a website, if at all, meets *this* definition. How does someone viewing a website "*reciprocally affect or influence*" L'Occitane? Of course it doesn't – and the defendants have failed to connect these dots. They also do not dispute that if this is *legitimately their* interpretation of "transaction," there was never a meeting of the minds, and no contract could be formed on this distinct ground. Opp. at 25-26.

**enforced in accordance** with, the Federal Arbitration Act." Order at 3 (emphasis added). The Terms therefore *expressly* provide that they should be interpreted and enforced *consistent* with the FAA and its scope. In short, if the arbitration agreement cannot be enforced as a matter of statutory interpretation, it can't be enforced through a potentially conflicting "contract interpretation" either. That's because the arbitration agreement is *expressly* coterminous with the FAA.

Second, contracts should also be interpreted the *same way* as statutes. That is, terms in a "contract are to be interpreted in their 'plain and ordinary sense.'" *Live Nation Ent., Inc. v. Factory Mut. Ins. Co.*, No. LACV2100862JAKKSX, 2022 WL 390712, at *5 (C.D. Cal. Feb. 3, 2022) (citing *Connick v. Tchrs. Ins. & Annuity Ass'n of Am.*, 784 F.2d 1018, 1020 (9th Cir. 1986)); *see also* Opp. at 22 n.11. Thus, the Court should independently interpret "transaction" in the arbitration clause as requiring "an exchange or transfer of goods, services, or funds" – which is the *only ordinary* meaning of the term that could possibly apply here.[3]

Third, the Terms as a whole expressly only "apply when you purchase products on our Websites and in Stores." Opp. at 19-28. What the Terms *govern* – use of the Website – is a distinct issue from the scope of the Terms' *application*.[4] Put differently, L'Occitane's Terms: "govern your use of our Websites **_and apply when_** you purchase products." This is expressly **_conjunctive_**: the object – "what" the Terms govern – is distinct from *their application* –"when" they apply.[5] Simply

---

[3] For the avoidance of doubt, the defendants' arbitration demands are in no way attempting to raise a "dispute" concerning the "breach, enforcement, interpretation, or validity" of L'Occitane's arbitration clause. *See, generally,* ECF No. 22-1. Rather, they are strictly pursuing unfounded CIPA claims under the theory that merely visiting the website is a "transaction" – which it is not. *Id.* ¶ 23.

[4] By analogy, Rule 1 provides in relevant part that "[t]hese rules govern the procedure [and apply] in all civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1. No one would argue that the *Federal* Rules would encompass state court cases merely because they "govern procedure." Of course, the Federal Rules *governing* procedure only *apply* in federal district court.

[5] L'Occitane was certainly not attempting to be disingenuous in its Complaint by focusing on the necessary *and* sufficient condition that the Terms only apply when a purchase is made. Order at 1, n.1. Just as someone making the sole point that the

put, if you do not purchase anything from L'Occitane, the Terms expressly do not apply. This is the *only* interpretation that gives "effect to every word or term employed." Opp. at 21 (citing *In re Crystal Prop.'s, Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001).[6] And it is also the only interpretation that is consistent with the FAA, which expressly governs the Terms: there needs to be a purchase.

## II. Newly Discovered Factual Issues Raise Additional Genuine Factual Disputes That Independently Require Denying The Motion To Compel

As the Court is aware, Zimmerman Reed is taking the seemingly irreconcilable position that it *does not* represent the individual defendants in this case – even though it has submitted multiple motions and filings ostensibly on their collective behalf. *See*, *e.g.*, ECF Nos. 17, 21, 29, 30, 32-33, 46. And by extension, it is refusing to accept service of the Complaint on their behalf. Given this, on April 5, 2024, L'Occitane began requesting waivers of service from the individual defendants for whom it has contact information to comply with Rule 4(d).

Troublingly, numerous individual defendants – individuals Zimmerman Reed purports to represent in its mass arbitration filings – began responding almost immediately that Zimmerman Reed does not represent them *at all*. These individuals often have no knowledge whatsoever of the underlying dispute, and consistently claim to have never spoken with anyone from Zimmerman Reed. For example, one defendant responded "there seems to be a mistake here. I'm not sure how [Zimmerman Reed] or you obtained any of my personal information but I never signed up for any kind of lawsuit or fight." Gumushian Decl. Ex. A. Another

---

Federal Rules only *apply* in federal district court, what the Terms *govern* is not relevant to the *scope of their application*. And *that* was the only point of the allegation it was making in its Complaint: if there's no purchase, the Terms do not apply and no dispute could possibly be encompassed by the Terms on this basis alone. *See Johnson*, 57 F.4th at 680.

[6] The defendants would have the Court rewrite L'Occitane's Terms to: "These Terms [apply to] your use of our Websites [*or*] when you purchase products." But that is obviously not what the Terms provide: they *govern* use *and apply when* – and only when – a product is purchased.

defendant responded "I am not a client of Zimmerman Reed. I never made a claim with them. All I did was click on an ad I saw on Instagram. … I actually unsubscribed from them shortly after I realized they were probably a scam and I didn't want to get any predatory emails from them." *Id.* Ex. B. Another individual responded that his father, whose information is listed on the arbitration demand, is deceased. *Id.* Ex. C.

Good cause exists for the Court to consider this new evidence. *See Anhing Corp. v. Thuan Phone Co. Ltd.*, 2015 WL 11018526, *4 (C.D. Cal. April 23, 2015) (finding good cause exists to consider evidence discovered after close of briefing). These responses occurred just within the last few days, and similar responses from individuals continue to arrive. Numerous individual defendants are claiming they **never** engaged Zimmerman Reed to file the arbitration demands on their behalf, and thus have no dispute with L'Occitane – let alone one that should be sent to arbitration. These party admissions raise important and disturbing questions. Among others, (1) how pervasive are these seemingly fake claims, and (2) what evidentiary bases does Zimmerman Reed have to move to compel arbitration on the individual defendants' behalf, particularly when so many are claiming they **never communicated anything** to Zimmerman Reed to support these claims, let alone authorized their filing? These developments further support why the Court should independently refuse to collectively compel arbitration when the Motion was not supported by *any admissible evidence*. Opp. at 13-16. At a minimum, further discovery is necessary to ascertain the extent to which these troubling individualized issues pervade Zimmerman Reed's mass arbitration ploy.[7] *See* Opp. at 13 n.3 (establishing that L'Occitane is entitled to discovery under 56(d) as needed to establish its defenses).

---

[7] If it turns out there is no actual claim or controversy between L'Occitane and any particular individual defendant, the Court should also not have jurisdiction to compel arbitration on Article III grounds.

| | |
|---|---|
| Dated: April 10, 2024 | **ARENTFOX SCHIFF LLP**<br><br>By:*/s/Allan E. Anderson*<br>     Allan E. Anderson<br>     Adam D. Bowser<br>     Andrea M. Gumushian<br>     Attorneys for Plaintiff<br>     L'OCCITANE, INC. |