CALEB MARKER (SBN 269721)
   caleb.marker@zimmreed.com
ZIMMERMAN REED LLP
6420 Wilshire Blvd, Suite 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for the Claimants*
*Appearing Specially for this Motion*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L'OCCITANE, INC., <br><br> Plaintiff, <br><br> v. <br><br> Zimmerman Reed LLP; and 3,144 Of Its Purported Clients, <br><br> Defendants. | CASE NO.: 2:24-cv-01103-PA-RAO <br><br> *Assigned to the Honorable Percy Anderson* <br><br> **CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL ARBITRATION** <br><br> Complaint Filed: February 8, 2024 <br> Courtroom: 9A <br> Trial Date: TBD |

Section 2 of the FAA states: "A written provision in any maritime transaction or <u>a contract evidencing a transaction</u> involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, shall be valid, irrevocable, and enforceable …." 9 U.S.C. § 2 (emphasis added). The Court requested supplemental briefing on two questions concerning the underlined language: (I) whether the terms that may apply to one who merely visits a website is a "contract evidencing a transaction," and (II) whether the Court may, under the FAA, enforce an arbitration clause contained within a website's terms for one who visits a website but makes no purchase. The answer to both inquiries is yes, and, therefore, the Court should grant Claimants' Motion to Compel Arbitration.

**I.    The Terms, Which Apply to One Who Merely Visits the Website, Is "A Contract Evidencing a Transaction."**

The principal question is whether the Terms, which apply to Claimants who merely visit or "use" L'Occitane's Website, is "a contract evidencing a transaction." Doc. No. 21-2 (Mem. in Supp.) at 6–7, 16, 19; Doc. No. 46 (Reply) at 6. It is not a coincidence that the arbitration provision in the Terms also uses the word "transaction." The word "transaction" means the same thing in the Terms as it does in § 2 of the FAA. As the Claimants argued in the opening brief, "transaction" means a "communicative action or activity involving two parties or things that reciprocally affect or influence each other," which includes website interactions. Doc. No. 21-2 (Mem. in Supp.) at 23.

L'Occitane will likely argue "transaction" means only "purchases" made on its Website. However, there is no support for such a narrow interpretation. The interpretative tools all support a broad reading of "transaction" to include an "action" taken on a website. As discussed below, the Terms are "a contract evidencing a transaction" (and therefore, subject to the FAA) because: (A) the Supreme Court interprets the FAA broadly to apply to any contract affecting interstate commerce, and the use of any website affects interstate commerce; (B) the ordinary meaning of "transaction" includes all actions taken by users on a website, not just purchases; and

(C) the FAA's legislative history supports the broad applicability of the FAA to contracts without purchases.

### A. The Supreme Court interprets the FAA broadly to apply to any contract affecting interstate commerce.

In *Allied-Bruce v. Dobson*, the Supreme Court considered the scope of the FAA and the contracts to which it applied. 513 U.S. 265, 279 (1995). There, the Court emphasized the need to read the FAA expansively because a "broad interpretation of [the] language [in § 2 of the FAA was] consistent with the Act's basic purpose, to put arbitration provisions on 'the same footing' as a contract's other terms." *Id.* at 275. The Court concluded that the "Act's history, to the extent informative, indicates that the Act's supporters saw the Act as part of an effort to make arbitration agreements universally enforceable." *Id.* at 279.

Consequently, the Court held that the FAA makes an arbitration provision in any contract enforceable, so long as it falls within the federal government's legislative domain, i.e., the contract involves commerce. *Id.* at 274 ("Further, this Court has previously described the Act's reach expansively as coinciding with that of the Commerce Clause."); *Immediato v. Postmates*, 54 F.4th 67, 73 (1st Cir. 2022) (holding § 2 "extends to any contract that falls within Congress's extensive power to regulate activities 'affecting' interstate commerce"); *see also AT&T v. Concepcion*, 563 U.S. 333, 339 (2011) ("We have described [§ 2 of the FAA] as reflecting both a liberal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract. In line with these principles, courts must place arbitration agreements on equal footing with other contracts, and enforce them according to their terms." (internal citations quotations omitted)). "For the FAA to apply the court must find that the contract containing the arbitration provision 'evidences a transaction involving commerce.' As other courts have explained, this is not a rigorous inquiry; the contract need only be 'related to' commerce to fall within the FAA." *In re Arb. Between Trans*

*Chem. Ltd.*, 978 F. Supp. 266, 300 (S.D. Tex. 1997) (cleaned up), *aff'd sub nom*, 161 F.3d 314 (5th Cir. 1998).

Here, the contract undoubtedly affected commerce and, as a result, the FAA applies and makes L'Occitane's arbitration provision enforceable. The Ninth Circuit has, in fact, confirmed that the internet is an "instrumentality and channel of interstate commerce." *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007); *United States v. Jackson*, 851 F. App'x 35, 36 (9th Cir. 2021). Moreover, the Terms "evidenc[e] a transaction involving commerce" because they have an interstate effect. L'Occitane is a New York company that "operates a website providing information and serving customers in the United States." Compl. ¶¶ 8–9. L'Occitane asserts that its "computers and servers are involved in and affect interstate and foreign commerce." *Id.* ¶ 130. It also alleges that "[t]hrough its operation of its Website, L'Occitane provides information services … including the publishing of electronic content and the ability of multiple website visitors to retrieve such information via the Internet from L'Occitane's servers." *Id.* ¶ 121–22. Interstate wires were used by Claimants in California to access and interact with the website. *Id.* The Complaint also describes commercial contracts that L'Occitane has with "various technology vendors" to "collect data concerning Website visitor interactions" and "analyze a user's interaction with the website." *Id.* ¶¶ 11–14, 122–24. That web traffic, moreover, originates in states throughout the country.

Collectively, these facts (all alleged by L'Occitane itself) establish the interstate effect of the Terms. Therefore, under *Allied-Bruce*, the FAA effectuates L'Occitane's arbitration provision, so long as the parties entered into a valid contract, which, as Claimants previously explained, is the case here.

**B.  The ordinary meaning of "transaction" includes all actions taken by users on a website, not just purchases.**

The ordinary meaning of "transaction" supports Claimants' view that § 2 governs the Terms here. When a statute does not define a word, courts typically give the word its "ordinary meaning." *FCC v. AT&T*, 562 U.S. 397, 403 (2011). Dictionaries may be

consulted to determine the word's ordinary meaning, including when interpreting § 2 of the FAA. *See Allied-Bruce*, 513 U.S. at 274–75 (examining the dictionary definition of "involving" in interpreting § 2).

Here, the Court has highlighted the word "transaction" in § 2 to inquire whether the FAA applies to the type of interaction at issue—use of a website. The word "transaction" has three relevant definitions: (1) "something transacted," "especially: an exchange or transfer of goods, services, or funds"; (2) "an act, process, or instance of transacting"; and (3) "a communicative action or activity involving two parties or things that reciprocally affect or influence each other." Merriam-Webster.com, "transaction," available at https://www.merriam-webster.com/dictionary/transaction. Dictionaries from the period in which the FAA was enacted similarly define "transaction" to include "the carrying on … of an action." Marker Supp. Decl., Ex. A. The ordinary meaning of "transaction" under § 2 therefore includes "an act," "a communicative action or activity involving two parties," and "the carrying on … of an action." Thus, for the same reasons the use and access of and visit to L'Occitane's Website is a "communicative action" and a "transaction" under the Terms (*see* Doc. No. 21-2 (Mem. in Supp.) at 6–7, Doc. No. 46 (Reply) at 2–9), it is also a "transaction" under § 2.

L'Occitane, however, asserts that its Terms apply only where a "purchase" has occurred, equating the term "transaction" with "purchase." Congress did not use that term in the FAA; it used the broader term "transaction." The Supreme Court explained why: "[Congress] wanted to 'get a Federal law' that would 'cover' areas where the Constitution authorized Congress to legislate, namely, 'interstate and foreign commerce and admiralty.'" *Allied-Bruce*, 513 U.S. at 279 (citing joint hearings). Importantly, the Supreme Court also noted that "every contract evidences some transaction." *Id*. at 274. In other words, Congress wanted the FAA to operate as broadly as possible to make enforceable an arbitration provision in any valid contract affecting interstate commerce. *Id.* Congress was aware of the word "purchase" but chose not to use that

4
SUPPLEMENTAL BRIEF ISO MOTION TO COMPEL ARBITRATION

narrower term. *See, e.g.*, 15 U.S.C. § 13 (using "purchaser" and "purchase" in Clayton Act passed in 1914).

L'Occitane's interpretation would also upend other precedent where courts applied the FAA to contracts even where no "purchase" ever occurred. For example, courts have held the FAA applies to: (1) an employment contract where the consideration is a promise of employment, not a purchase, *see Cir. City Stores*, 532 U.S. at 119; (2) a securities registration application where the dispute "did not arise from a 'commercial deal or merchant's sale,'" *see id.* at 113; (3) a stand-alone non-disclosure agreement where the consideration is the exchange of promises, not a purchase, *see Field Sys. v. Vestas-Am*, 2013 WL 1943307, at *5 (N.D. Ill. May 9, 2013); and (4) use of a website to obtain a free credit report, not a purchased credit report, *see Evans v. Experian*, 2023 WL 4714078, at *1 (C.D. Cal. July 21, 2023). If "transaction" equated to "purchase" the contracts in those cases (and many others containing arbitration provisions) would escape the reach of the FAA, which is contrary to Congress's goal to make arbitration provisions universally enforceable.

L'Occitane's interpretation, therefore, improperly narrows the FAA's enforcement power, contrary to Congressional intent and the purpose of the FAA, and would upend precedent that applied the FAA broadly to valid contracts affecting interstate commerce. Instead, applying the ordinary meaning of the term "transaction"—which includes far more than "purchases"—supports Claimants' view that the FAA governs the Terms here, making the arbitration provision enforceable.

### C. The FAA's legislative history supports the broad applicability of the FAA to contracts without purchases.

The FAA's legislative history further supports the broad applicability of the act to contracts without purchases. *Unicolors, Inc. v. H&M*, 595 U.S. 178, 187 (2022) ("[T]hose who consider legislative history will find that history persuasive here."). The FAA's legislative history shows that Congress viewed the term "transaction" to broadly connote "something we do," an action, or "act." Initially, § 2 referenced "a written

provision in any contract or maritime transaction or transaction involving commerce." *See* Marker Supp. Decl., Ex. B. at 2. The words "contract or" were later struck and the reference to "a contract evidencing a transaction involving commerce" was inserted instead. 9 U.S.C. § 2.

At the time, Arkansas Senator Caraway also advocated for language clarifying the meaning of "a written provision in any maritime transaction," based on his understanding of the word "transaction." *See* Marker Supp. Decl., Ex. C. Senator Caraway explained, "I take it that a transaction is something we do and I do not see how there could be such a thing as 'a written provision in an act' that we do." *Id*. at 5. He further elaborated, "a transaction is an act, it is something people do, and it is not a written contract. The contract may evidence what the transaction has been or what it is to be." *Id*. Senator Caraway, thus, also treated transaction as an "act," not a contract or a purchase of a good. Here, the "act" that the Terms require to make the arbitration enforceable is broad and includes the mere "use" or "visits" that interact with the website, and do not require actual purchases. Echoing the Senator's statement, the Supreme Court has noted that "every contract evidences some transaction." *Allied-Bruce*, 513 U.S. at 274.

## II. The Court May, Under the FAA, Enforce an Arbitration Clause Contained Within the Website's Terms for One Who Merely Visits a Website But Makes No Purchase.

Section 2 has two requirements for enforcing an arbitration provision. There must first be a written arbitration provision in "a contract evidencing a transaction" involving commerce. 9 U.S.C. § 2. As noted above, L'Occitane's Terms are a "contract evidencing a transaction involving commerce" and, therefore, are subject to the FAA. Thus, the only outstanding issue concerns the second requirement, which is whether the "controversy thereafter aris[es] out of such contract or transaction." *Id*. If the controversy does so arise, then the arbitration provision "shall be valid, irrevocable, and enforceable." *Id.*

6
SUPPLEMENTAL BRIEF ISO MOTION TO COMPEL ARBITRATION

In *Revitch v. DirectTV, LLC*, Judge O'Scannlain of the Ninth Circuit considered the scope of the term "arising out of" in the FAA. 977 F.3d 713, 723–24 (9th Cir. 2020) (concurrence). There, he concluded that "[f]unctionally, the 'arising out of' language in § 2 appears to serve as a boundary to the types of controversies that are covered by the FAA: Federal courts are required to compel arbitration for those controversies that actually stem from the contract" but not when "the dispute is wholly unrelated to the contract." *Id.* Here, the controversy is not "wholly unrelated" to the Terms, but rather, stems from them.

As evidenced by the extensive briefing in this Motion, there is a controversy arising out of whether the arbitration provision in the Terms applies at all. The arbitration provision applies to a "Dispute," defined as "any controversy, claim, action or dispute arising out of or related to any transaction conducted on the Websites, or the breach, enforcement, interpretation, or validity of this Agreement or any part of it." Doc. No. 21-2 (Mem. in Supp.) at 6. The controversies certainly "arise out of" this question and the enforceability of the arbitration provision is expressly delegated to the arbitrator.

In addition, both Claimants' CIPA claims made in arbitration and L'Occitane's claims in its Complaint filed in this Court relate to or stem from the Terms. Specifically, Claimants and L'Occitane have conflicting allegations concerning whether L'Occitane's Terms adequately disclosed its use of several third-party monitoring and recording technologies on its Website, an issue that centers on the effect and sufficiency of the Terms. Claimants contend that the Terms failed to adequately disclose the use of those technologies in violation of CIPA; while L'Occitane asserts that the Terms adequately informed Website visitors of its practices and asks the Court to declare it complied with state privacy laws. Compl. ¶ 16–17. Which view prevails depends on the Terms, meaning the controversies at issue arise out of them. As such, the Terms' arbitration provision is valid, irrevocable, and enforceable under the FAA.

|   |   |   |
|---|---|---|
| | | Respectfully submitted, |
| | | ZIMMERMAN REED LLP |
| Date: April 10, 2024 | By: | /s/ Caleb Marker |
| | | Caleb Marker |
| | | 6420 Wilshire Blvd, Suite 1080 |
| | | Los Angeles, CA 90048 |
| | | Telephone (877) 500-8780 |
| | | Facsimile (877) 500-8781 |
| | | Email: caleb.marker@zimmreed.com |
| | | *Attorneys for the Claimants* |
| | | *Appearing Specially for this Motion* |